UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| ANTIOCH LITIGATION TRUST, | : | Case No. 3:09-cv-218 |
| W. TIMOTHY MILLER, TRUSTEE, | : | |
| | : | |
| Plaintiff, | : | |
| | : | Judge Timothy S. Black |
| vs. | : | |
| | : | |
| McDERMOTT WILL & EMERY LLP, | : | |
| | : | |
| Defendant. | : | |

## ORDER THAT DEFENDANT'S MOTION TO DISMISS (Doc. 16) BE DENIED

This civil action is currently before the Court on Defendant's motion to dismiss

(Doc. 16) and the parties' responsive memoranda (Docs. 18, 19).

Defendant McDermott Will & Emery LLP ("MWE") asserts three grounds for

dismissal pursuant to Federal Rules of Civil Procedure 8(a) and 12(b)(6): (1) the Trust's

claims are time-barred to the extent they arise out of MWE's representation of Antioch

with respect to the Antioch ESOP and related ERISA and tax matters; (2) the transfer of

the Debtor's professional negligence claims to the Trust as part of the confirmed plan of

reorganization is invalid under Ohio law; and (3) the complaint fails to allege plausible

malpractice claims with sufficient particularity, or to state a claim upon which relief can

be granted.

## I.    FACTS ALLEGED BY THE TRUST

For purposes of this motion to dismiss, the Court must: (1) view the complaint in the light most favorable to the Trust and (2) take all well-pleaded factual allegations as true. *Tackett v. M&G Polymers*, 561 F.3d 478, 488 (6th Cir. 2009); *Gunasekera v. Irwin*, 551 F.3d 461, 466 (6th Cir. 2009). And the Plaintiff <u>alleges</u> as follows:

MWE served as company legal counsel for The Antioch Company from May 2003 until June 5, 2008. (Doc. 14 at ¶¶ 4, 17-18). One of the purposes for which Antioch retained MWE was to provide legal expertise and advice in connection with ERISA and tax issues related to the Antioch employee stock ownership plan ("ESOP"). Marsha Matthews, a partner at MWE, helped plan and consummate a transaction that resulted in the Antioch ESOP owning 100% of Antioch's shares ("Tender Offer"). (*Id.* at ¶¶ 16-17). MWE worked with Antioch and its financial advisors to structure the Tender Offer by which the company offered to purchase all of the Antioch shares held by shareholders (other than the ESOP) for cash or a combination of cash, promissory notes, and warrants. (*Id.* at ¶¶ 21, 25). The Tender Offer allowed CEO Lee Morgan and his daughter Asha Morgan Moran (both directors of Antioch) to liquidate their substantial personal holdings of Antioch stock and diversify their assets while reaping tax savings and still maintaining control of the company. (*Id.*) MWE's advice was directed to ensuring the best way to structure the transaction in order for the Morgans to maintain control and to minimize any effective powers of the ESOP Trustee. (*Id.* at ¶ 19).

-2-

The Antioch board of directors was led by Lee and Asha Morgan, who, individually, and through Morgan family trusts, owned 46.5% of all Antioch shares, and, therefore, stood to gain the most from the proposed transaction. Four of the remaining seven board members also owned substantial blocks of Antioch stock and consequently benefitted from the transaction. The entire board was subject to a conflict of interest. (*Id.* at ¶ 23).

Antioch retained financial advisor Houlihan Lokey to provide an opinion that the transaction was fair to the selling shareholders. Antioch never sought nor obtained an independent opinion as to whether the transaction was fair to the company as purchaser, nor did Antioch obtain an independent opinion regarding whether the underlying business decision to effect the transaction was prudent, and MWE never advised anyone to do so. (*Id.* at ¶ 28).

Plaintiff alleges that MWE knew or reasonably should have known that the Tender Offer, as a "prohibited transaction" under ERISA Sections 406 and 408, would result in violations of ERISA and tax law by both the individual directors and Antioch that were likely to result in substantial injury to the corporation and its constituents, including disqualification of the ESOP, loss of 100% S-corporation status, and loss of tax-exempt status, resulting in significant tax liability. (*Id.* at ¶ 32). Plaintiff further alleges that MWE knew that the Morgans and a majority of the Board were subject to conflicts of interests with regard to the Tender Offer, but failed to advise the Board that the transaction would be voidable unless it could be shown to be fair to the corporation. (*Id.* at ¶ 33).

The Tender Offer, among other things, burdened Antioch with a massive increase in debt, from less than $11 million as of December 31, 2002 to more than $200 million as of December 31, 2003. (*Id.* at ¶ 44). Subsequently, a predictable surge in employee resignations aggravated the company's repurchase obligations, which were dictated by the ESOP and ERISA law, and drove the company deeper into debt. (*Id.* at ¶ 46).

Antioch attempted to satisfy its repurchase obligations by providing departing employees promissory notes ("ESOP Notes") guaranteed by insurance bonds issued by Condor Guaranty, Inc., an unrated offshore company. These bonds failed to provide adequate security for the company's repurchase obligations, as required by ERISA. MWE provided legal advice to Antioch regarding these efforts. (*Id.* at ¶ 53).

By early 2007, Antioch was in severe financial distress. As Antioch's financial problems mounted, rooted in the burdensome debt created by the Tender Offer, MWE failed to reevaluate the prudence of the Tender Offer, or advise the Antioch Board of potential claims against its financial advisors and conflicted directors prior to December 2007, when negligence claims and fiduciary claims against these entities could be found to have run. (*Id.* at ¶¶ 47-51). MWE's inaction may have precluded the company from recovering damages from these entities.

Antioch hired Houlihan Lokey to help it find a purchaser for the company, and it looked to MWE to provide legal advice and representation in connection with its efforts to either sell substantially all of the company's assets or refinance the company's debt.

-4-

(*Id.* ¶ at 54). The alternatives available to Antioch were complicated by the 100% ESOP S-corp structure established by the 2003 transaction. as well as by the ESOP Notes, Subordinated Notes, and Warrants, that partially funded that transaction. MWE continued to advise Antioch on complications related to the Tender Offer right up until Antioch terminated MWE on June 5, 2008. (*Id.* at ¶ 55).

The Morgans, however, did not favor a sale to an independent outside buyer because they did not want to lose control of the company. The Morgans separately hired their own financial advisor, Candlewood Partners, to explore refinancing options that might allow the Morgans to maintain their control of Antioch. (*Id.* at ¶ 56). MWE advised the Morgans with respect to their retention of Candlewood. (*Id.* at ¶ 57). The Antioch Board, lacking objective guidance from MWE, remained ambivalent and undecided about a clear direction for Antioch's future. continuing to allow the Morgans to pursue recapitalization alternatives while re-engaging Houlihan to explore a sale of Antioch. (*Id.* at ¶ 58).

Jim Shein of MWE participated in a meeting in Chicago in February 2008 with the Morgans, Antioch Board members, and financial advisors. The participants at the meeting agreed to permit the Morgans to work toward a consensual transaction that would leave the Morgans in control, over any transaction where independent buyers or investors would acquire a controlling interest in the company. The Morgans pursued deal structures that would have given themselves, as Subordinated Noteholders, preferential

treatment over other unsecured creditors such as the holders of the ESOP Notes. (*Id.* at ¶ 59).

The preference given by Antioch to a deal designed by and for the Morgans had the effect of discouraging potential purchasers who were interested in acquiring control of Antioch. Potential purchasers knew that two directors, including the CEO and COO, who effectively controlled the ESOP and also were the largest unsecured creditors of Antioch, disfavored the sale to such an extent that they were pursuing, with the Board's blessing, alternative transactions so as to maintain their own control of the business. (*Id.* at ¶ 60). The Antioch Board, advised by MWE, continued to allow the Morgans' efforts to interfere with the Board's/Houlihan's efforts. (*Id.* at ¶ 61).

In early June 2008, the company was in the late stages of an auction process run by Houlihan, working to close on a sale of the company's assets to J.H. Whitney pursuant to a signed Letter of Intent, to be achieved through a bankruptcy sale. MWE was actively involved in the process, exchanging drafts of an Asset Purchase Agreement with counsel for J.H. Whitney, preparing bankruptcy petitions and first day motions, and otherwise advising the company in connection with the sale and ongoing matters. (*Id.* at ¶ 63).

On June 4, 2008, the ESOP Trustee exercised its right to replace Antioch's Board of Directors in order to bring the Whitney sales process to a halt and allow more time for the Morgans to accomplish their own deal. (*Id.* at ¶ 65). The Board was dismissed and replaced with Lee Morgan, Asha Morgan Moran, and an acquaintance of the Trustee,

-6-

Robert Morris. (*Id.*) At a meeting the next day, on June 5, 2008, the newly constituted Board fired MWE. (*Id.* at ¶ 66).

No sale or refinancing was achieved. Antioch filed for bankruptcy protection on November 13, 2008. (*Id.* at ¶¶ 1, 68).

## II. STANDARD OF REVIEW

A motion to dismiss pursuant to Rule 12(b)(6) operates to test the sufficiency of the complaint. Rule 12(b)(6) permits dismissal of a complaint for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P 12(b)(6). The complaint must contain a "short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a). The plaintiff's ground for relief must entail more than "labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007).

The first step in testing the sufficiency of the complaint is to identify any conclusory allegations. *Ashcroft v. Iqbal*, --- U.S. ---, 129 S.Ct. 1937, 1950 (2009). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* at 1949 (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). That is, "a plaintiff's obligation to provide the grounds of [his] entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555. Although the court must accept well-pleaded factual allegations of the complaint as true for purposes of a

motion to dismiss, the court is "not bound to accept as true a legal conclusion couched as a factual allegation." *Id.*

After assuming the veracity of all well-pleaded factual allegations, the second step is for the court to determine whether the complaint pleads "a claim to relief that is plausible on its face." *Iqbal*, 129 S.Ct. at 1949, 1950 (citing *Twombly*, 550 U.S. at 556, 570). A claim is facially plausible when the plaintiff "pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* at 1949 (citing *Twombly*, 550 U.S. at 556).

## III.  ANALYSIS

### A.  Whether The Trust Has Stated A Plausible Claim For Relief Under The Twombly/Iqbal Standard

Traditionally, courts have held that a motion to dismiss under Fed. R. Civ. P. 12(b)(6) for failure to state a claim is viewed with disfavor and is rarely granted. *Nuchols v. Berrong*, 141 Fed. Appx. 451, 453 (6th Cir. 2005). *See also Lormand v. US Unwired, Inc.*, 565 F.3d 228, 232 (5th Cir. 2009).

Plaintiff asserts six claims of malpractice: (1) MWE failed to advise Antioch to obtain a fairness opinion for the Tender Offer and to avoid corporate waste (Doc. 14 at ¶¶ 33-35, 67); (2) MWE failed to advise Antioch about the legality and consequences of the Tender Offer under ERISA, tax laws, and Ohio corporate law (*Id.* at ¶¶ 32-33, 37-38, 71); (3) MWE failed to provide legal advice to Antioch's individual directors (*Id.* at ¶¶ 35, 38,

67); (4) MWE aided the majority shareholders (the Morgans) in breaches of their fiduciary duties (*Id.* at ¶¶ 34, 71); (5) MWE failed to advise Antioch about potential causes of action that Antioch had against its Board of Directors and its independent financial advisors (*Id.* at ¶¶ 49-51, 71); and (6) MWE failed to stop one of Anitoch's shareholders from attempting to find an entity to buy Antioch (*Id.* at ¶¶ 54, 56, 67-68).

A malpractice claim requires "(1) an attorney-client relationship, (2) professional duty arising from that relationship, (3) breach of that duty, (4) proximate cause, (5) and damages." *Shoemaker v. Gindlesberger*, 118 Ohio St.3d 226, 228 (2008) (citing *Vahila v. Hall*, 77 Ohio St.3d 421, 427 (1997)). MWE alleges that the elements of a malpractice claim have not been stated, because MWE had no duty to protect Antioch, and, if it did, it did not breach such a duty.

To survive a motion to dismiss under Fed. R. Civ. P. 12(b)(6), the plaintiff does not have to "show" anything; he need only allege. *Higgs v. Carver*, 286 F.3d 437, 439 (7th Cir. 2002). At this stage of litigation, a court is concerned not with what plaintiff did or did not show, but rather with what plaintiff did or did not allege.

As an initial matter, Defendant claims that Plantiff's allegations that are based "upon information and belief" (Doc. 16 at ¶¶ 27-28, 35, 37-38, 51, 67), and the allegations that use the term "appear" (*Id.* at ¶¶ 27, 36), should be dismissed, because they are speculative. However, Defendant fails to cite any legal authority supporting its contention. Moreover, qualifying words such as "upon information and belief" and "appear" are the appropriate

manner to plead when a plaintiff is drawing reasonable inferences from facts. *See, e.g.,*
*Dudzienski v. Gordon Food Serv.*, No. 07cv4033, 2008 U.S. Dist. LEXIS 22467, at *6
(N.D. Ill. Mar. 19, 2008) (denying defendant's argument that *Twombly* prohibits allegations
in the complaint that are made upon "information and belief" as speculative). *See also*
*Brown v. Budz*, 398 F.3d 904, 914 (7th Cir. 2005).

### 1. Fairness opinion[1]

Plaintiff alleges that MWE committed malpractice by failing to advise Antioch that
(a) the Tender Offer transaction must be "fair to the corporation" (Doc. 14 at ¶¶ 33, 35) and
that (b) Antioch had an obligation to avoid wasting "corporate assets" (*Id.* at ¶¶ 34, 67).

Defendant claims that these allegations fail because: (a) Antioch had no legal duty to
enter into a fair transaction, to obtain an opinion that the Tender Offer was fair to Antioch,
or to avoid corporate waste; therefore, MWE had no duty to advise Anitoch on those issues;
and (b) Plaintiff does not allege any facts establishing that the 2003 transaction was unfair.
Moreover, Defendant claims that the complaint establishes that three financial advisors
performed valuations of Antioch that establish that the $850 per share price was fair. (*Id.* at
¶¶ 20, 23-24, 27-28).

---

[1] Fairness opinions are "short letters that state an opinion about whether the consideration in a
proposed transaction is fair" to the shareholders from a financial point of view. An investment
banker usually addresses this letter to a special committee of the board of directors, which then
publishes it in a proxy statement to all shareholders in accordance with securities law.
Investment bankers deem a "fair" price to be one which falls "within a range of prices at which
informed parties might strike a deal, but not necessarily the highest obtainable price." *See*
"Fairness Opinions and Negligent Misrepresentation: Defining Investment Bankers' Duty to
Third-Party Shareholders," 60 Fordham L. Rev. 133, 137 (1991).

a. *Whether Antioch had a legal duty to enter into a fair transaction or obtain a fairness opinion, and whether MWE had a duty to advise Antioch to do so*

Plaintiff claims that the Tender Offer was a self-dealing transaction designed by MWE and Deloitte primarily to benefit the Morgan directors/shareholders. The transaction consisted of the corporation offering to purchase all of its outstanding shares held by all shareholders except the ESOP. (Doc. 14 at ¶¶ 20-21). The Morgan family controlled 80% of the shares eligible to be purchased and expected to receive several hundred million dollars in direct consideration and savings from the transaction. Four of the remaining seven Board members also owned substantial blocks of Antioch stock. (*Id.* at ¶ 23). These were the same directors who were controlling the price and other terms by which their shares would be purchased by the company. (*Id.*)

Under Ohio corporation law, directors and officers owe a fiduciary duty to the corporation. Ohio Rev. Code § 1701.59. Specifically, a director must perform her duties "in good faith, in a manner the director reasonably believes to be in or not opposed to the best interests of the corporation, and with the care that an ordinarily prudent person in a like position would use under similar circumstances." *Id.*; Ohio Rev. Code § 1701.59(B). Consequently, a director has a duty of good faith, a duty of loyalty, a duty of disclosure, and a duty to refrain from self-dealing. *Id. See also Wing Leasing, Inc. v. M & B Aviation, Inc.*, 44 Ohio App. 3d 178, 182 (Ohio Ct. App. 1988).

-11-

In Ohio, self-dealing includes a director's participation in a transaction of the corporation in which the director has an interest. *United States v. Skeddle*, 940 F. Supp. 1146, 1150 (N.D. Ohio 1996) (self-dealing is considered a breach of the duty of loyalty). Where a director engages in a transaction with the corporation, the transaction is voidable unless approved by a disinterested majority of the board of directors after full disclosure. Ohio Rev. Code § 1701.60. Here, Plaintiff alleges that there was no disinterested majority of the Board. In that situation, the only way to ensure that the transaction would not be voidable is for the corporation to be able to show that the transaction was actually fair to the corporation at the time it was authorized. *Id.* If the Tender Offer was voided as not fair to the company, it would have serious consequences for the corporation. The ESOP would not be a qualified plan and therefore not a tax-exempt entity. (Doc. 14 at ¶ 32). As a consequence, the company would no longer be 100% owned by a tax-exempt entity and would owe substantial taxes. *Id.*

Plaintiff argues that when an attorney representing a company is aware that the directors have a conflict of interest, or are engaged in self-dealing, the attorney must advise the board of directors, acting for the company, that the transaction would be voidable unless objectively shown to be fair to the company at the time it was authorized. Ohio R. Prof. Cond. 1.13; EC 5-19. Rule 1.13 of the Ohio Rules of Professional Conduct provides, in relevant part, that if a lawyer knows or reasonably should know that a director's "action, intended action, or refusal to act (1) violates a legal obligation, or (2) is a violation of law

that reasonably might be imputed to the organization and that is likely to result in substantial injury to the organization, then the lawyer shall proceed as necessary in the best interest of the organization." Ohio R. Prof. Cond. 1.13(b). Plaintiff claims that although aware of the directors' conflicts with regard to the Tender Offer, and the substantial harm to the corporation if the transaction were disqualified, MWE failed to advise the Board that the transaction would be voidable unless it could be shown to be fair to the corporation. (Doc. 14 at ¶ 33).

Defendant claims that Plaintiff confuses the duties that individual directors owe to Antioch with the duties owed by Antioch itself. Defendant asserts that if the Tender Offer was unfair to Antioch, then Antioch as a corporation may have a claim against the individual directors, as those individuals have fiduciary duties to avoid self-dealing and wasting corporate assets. However, Defendant alleges that Plaintiff's claims against MWE fail because MWE had no duty to advise Antioch (and thus its Board) on the fairness of the Tender Offer because, under Ohio corporate law, Antioch itself had no legal duty to enter into a fair transaction or to obtain a fairness opinion, because the prudence of entering into a business transaction, including the price to be paid, is a business matter for decision by the corporation through its directors.[2] (Doc. 16 at 18-19). MWE admits that each director

---

[2] In support of its argument, Defendant cites *Krieger v. Gast*, 179 F.Supp.2d 762, 784 (W.D. Mich. 2001), for the proposition that "courts do not require fairness opinions as a matter of law." However, this statement was taken out of context. The court's language actually states that "*Delaware* courts do not require fairness opinions as a matter of law." *Id.* (Emphasis added). "It is customary for corporations to seek a fairness opinion from an investment banker or other financial expert prior to issuing a new series of securities. The purpose of obtaining an objective, independent evaluation of the proposed issue is to ensure that the issuance of the new stock or other security will be fair to existing shareholders." *NCR Corp. v. Am. Tel. & Tel. Co.*, 761 F.Supp. 475, 492 (S.D. Ohio 1991).

had a duty to ensure that self-dealing transactions are fair to the corporation but claims that the corporation itself did not. *Id.* The corporation owes itself no legal duty to make prudent decisions.

Defendant appears to misapprehend Plaintiff's allegations. Plaintiff claims that Defendant had a duty to the company as Defendant's client to insure that the Board was not self-dealing.

"An organizational client is a legal entity, but it cannot act except through its officers, directors, employees, shareholders, and other constituents." Ohio R. Prof. Cond. 1.13, Official Comment 1. Therefore, a corporation, acting through its board of directors, has an obligation to determine that a transaction between the corporation and its directors or officers is fair to the corporation and not prejudicially beneficial to the conflicted directors or officers. Thus, MWE had a duty to its client, the company, to ensure that the Board was not self-dealing.

> *b. Whether the valuation opinions rendered were sufficient to establish a fairness opinion*

The Trust alleges that the Antioch Board, advised by MWE, failed to obtain any independent opinion as to the fairness of the Tender Offer *to the company*. (Doc. 14 at ¶¶ 28, 33-35). Although there were three valuation opinions "as to the Tender Offer" (Doc. 16 at 19-21), none of these opinions address the fairness of the transaction to the corporation.

-14-

Conversely, Defendant alleges that the three valuation opinions were sufficient to establish a fairness opinion. MWE claims that Deloitte & Touche prepared a valuation. However, the complaint alleges that "Deloitte & Touche recommended $894.00 per share as the purchase price for the Tender Offer." (Doc. 14 at ¶ 23). There is nothing in writing, and no allegation in the complaint, that Deloitte rendered a formal, professional opinion that it was fair to Antioch to pay $175 million to purchase its own shares from its officers and directors, or that Deloitte presented an analysis that the Board could reasonably rely on concluding that any benefits of the transaction outweighed its risks and costs.

MWE also claims that Houlihan Lokey prepared a fairness opinion. However, as alleged in the complaint, Houlihan's opinion was for the benefit of the selling shareholders, not the company. Houlihan's opinion letter states:

> This Opinion does not address (a) the Company's underlying business decision to effect the Transaction, (b) the fairness of the Transaction to the ESOP, or (c) the relative fairness of the Transaction to the shareholders electing to receive cash versus the Exchange Consideration. . . .We have not been engaged to give advice as to whether the Company should engage in the Transaction, nor have we been requested to seek or identify alternatives or to advise the Company with respect to its duties generally.

(Doc. 16, Ex. B at 1).

MWE represents that Houlihan stated that the $850 per share was "fair . . . from a financial point of view." (Doc. 16 at 21). However, Houlihan was only opining as to

-15-

whether the transaction and share price were fair *to the selling shareholders*:

> Based upon the foregoing, and in reliance thereon, it is our opinion as of the date of this letter that (i) the cash consideration of $850 per share to be received by the shareholders (other than the ESOP) in exchange for tendering their shares of the common stock of the Company in the Transaction is fair to any such shareholder (other than the ESOP) from a financial point of view; (ii) the consideration in the form of the Exchange Consideration to be received by the shareholders (other than the ESOP) in exchange for tendering their shares of the common stock of the Company in the Transaction is fair to any such shareholder (other than the ESOP) from a financial point of view; and (iii) the reasonable range of the fair market value of the exchange consideration is $836.00 to $869.00.

(Doc. 16, Ex. B at 3). That is, it was fair to the Morgans and the other insiders.

MWE also cites an opinion given by Duff & Phelps to the ESOP Trustee, Great Banc. The Duff & Phelps' opinion expressly states that it is for the benefit of the ESOP Trustee only. (Doc. 16, Ex. C at 5). The opinion letter is dated December 16, 2003, after the closing of the Tender Offer, and after the Board of Antioch voted to authorize the transaction, so the Board could not have relied upon it in making its decision. (Doc. 16, Ex. 3). Furthermore, the Duff & Phelps' opinion was that the terms and conditions of the proposed transaction (to which the ESOP was not a party) were fair and reasonable *to the ESOP* from a financial point of view. (*Id.* at 1). Again, this is not an opinion as to whether or not the terms and conditions of the transaction were fair to the company.

The ESOP is not the company. The selling shareholders are not the company. There

was no opinion available to the Board prior to the transaction independently determining that the transaction was fair to the company. MWE argues, without any authority, that "if the Tender Offer is fair to the entity that is to become the 100% owner of Antioch as a result of the Tender Offer, then the Tender Offer was necessarily fair to Antioch." (Doc. 16 at 21). This argument ignores that the corporation is a legal entity distinct from its shareholders and the ESOP (which was not even a party to the transaction).[3]

Accordingly, Plaintiff has alleged sufficient facts in order to state a claim.

### 2. The standard of care in providing ERISA, tax, and corporate law advice in connection with the 2003 Tender Offer and subsequent related complications

Plaintiff alleges that MWE "failed to provide full and accurate advice to Antioch as to the legality of the transaction and its consequences to the company under ERISA, tax laws, and Ohio corporate law." (Doc. 14 at ¶¶ 17, 53, 27, 32, 37). Specifically, MWE failed to advise Antioch of the potentially severe consequences to the company if the transaction violated ERISA, including disqualification of the ESOP, loss of S-corporation status, and loss of tax-exempt status. (*Id.* at ¶ 38). Moreover, the Trust alleges that MWE knew that the directors' actions in causing the corporation to purchase their shares would breach the directors' fiduciary duties to the corporation and would violate ERISA and tax law resulting in substantial injury to the corporation through loss of tax-exempt status and

---

[3] The transaction burdened the company with massive debt, but the ESOP was not a party to those loans and had no obligation to repay the debt.

ERISA and tax penalties. (*Id.* at ¶¶ 29-34). Still, MWE failed to advise against self-dealing, that the directors had heightened duties, and that the company would incur massive debt.

### a. Whether the risk of the Tender Offer was disclosed

Antioch alleges that it suffered two adverse financial consequences as a result of the 2003 Tender Offer: (1) incurred significant debt that could not be repaid; and (2) had insufficient cash to repurchase the shares of departing ESOP participants. (Doc. 14 at ¶¶ 46-48, 52). In response, Defendant argues that those consequences were fully disclosed in the Tender Offer. (Doc. 16, Ex. A at 67-68, 70) ((1) addressing the "substantial" levels of debt associated with the transaction, and (2) discussing the risk that Antioch may become "insolvent" if a large number of ESOP participants departed Anitoch at the same time). Accordingly, Defendant claims that Antioch knew of the possible risks and whether it should have proceeded with the Tender Offer was a business decision.[4] (*Id.* at 24).

Plaintiff claims that the company hired MWE to provide expert advice with respect to ERISA, tax, and corporate law, and to ensure that the Tender Offer complied with all laws. Accordingly, Plaintiff maintains that if the transaction that the directors chose was not legal, or could have resulted in severe consequences for the company, then it was the

---

[4] Defendant also claims that the more likely explanation for Antioch's financial troubles "involve lawful, non-actionable behavior" – namely, Antioch's declining sales in 2004, 2005, and 2006. (Doc. 14 at ¶¶ 11, 46-48). *See Kregler v. City of New York*, No. 08-689, 2009 U.S. Dist. LEXIS 72571, at *31-32, 36 (S.D.N.Y. Aug. 1, 2009). However, it is not permissible at this stage of the litigation to make such a factual determination.

obligation of company counsel to take appropriate action. The Court agrees. The fact that

risks may have been disclosed in the Tender Offer does not absolve MWE from discussing

those risks with its client.

### b. Whether the complained-of consequences occurred

Additionally, Defendant argues that Plaintiff's allegations that MWE's advice (or

lack thereof) may cause adverse consequences to Antioch, including disqualification of the

ESOP, loss of the S-corporation status, and loss of the tax-exempt status (Doc. 14, at ¶¶ 32-

33, 38), never actually occurred, and, therefore, Antioch did not suffer any injury.[5] Thus

Defendant maintains that the fact that the illegality of the 2003 transaction *could* have

resulted in future harm is insufficient. *Key v. DSW, Inc.*, 454 F.Supp. 2d 684, 685-86, 689-

91 (S.D. Ohio 2006) (granting defendants' motion to dismiss where plaintiff's sole

allegation of injury was that she had "a substantial increased risk" of future harm).[6]

Plaintiff argues that the fact that the company was ordered into bankruptcy before

---

[5] *See* Doc. 18 at 4 (stating that the unlawful transaction was "likely to result in substantial injury to the corporation and its constituents, including disqualification of the ESOP, loss of 100% S-corp status, and loss of tax-exempt status, resulting in significant tax liability"); *id.* at 12 (arguing that the Company would incur harm "if the transaction was disqualified"); *id.* at 15 ("MWE failed to advise Antioch of the potentially severe consequences to the company if the transaction violated ERISA"); *id.* at 17 ("If the transaction was invalid, it would invalidate Antioch's entire capital structure and tax-exempt status.").

[6] *Key* was a class action lawsuit against a retail store that allegedly improperly retained and secured personal financial information. *Id.* at 685-86. The court held that "[i]n *the identity theft context*, courts have embraced the general rule that an alleged increase in risk of future injury is not an 'actual or imminent' injury." *Id.* (emphasis added).

the violations of ERISA and tax law were exposed does not absolve MWE of liability for its role in designing the transaction and facilitating the directors' breaches of fiduciary duties. Unlike the "identity theft" context in *Key*, the issues before this Court involve attorney malpractice, and one can imagine numerous instances where an attorney may have committed malpractice even though the client did not suffer any injury. Moreover, Ohio R. Prof. Cond. 1.13(b) states that a lawyer for a corporation who knows or reasonably should know that a director's action will violate a legal obligation to the corporation, and that is likely to result in substantial injury to the corporation, must take action to protect the best interests of the corporation." Therefore, actual injury is not required.

### 3. Whether the Tender Offer violated ERISA and burdened the company with debt which ultimately forced it into bankruptcy

Plaintiff alleges that the Tender Offer violated ERISA, as a prohibited transaction for more than adequate consideration. (Doc. 14 at ¶¶ 31-32). Adequate consideration must be determined through a good faith process, which Plaintiff claims was lacking here. (*Id.* at ¶ 27).

Defendant argues that three separate financial advisors concluded that the $850 price per share was fair and that the complaint does not allege facts known at the time of the 2003 Tender Offer that suggested that those fairness opinions were faulty or that MWE should have known about those unidentified faults. (Doc. 16 at 36). However, for the reasons explained in Section III.A.1, Defendant's argument fails.

-20-

Additionally, MWE alleges that the Tender Offer could not have violated ERISA because the ESOP was not a party to the transaction. (Doc. 16 at 23). However, the result of the transaction was that the ESOP owned 100% of the shares of the company, and, therefore, Plaintiff argues that the ESOP was a party to the transaction. (Doc. 14 at ¶ 42). Additionally, an action by participants in the Antioch ESOP against the Morgans and GreatBanc filed in the Northern District of Illinois survived a motion to dismiss that raised this same argument. *Bonnie Fish v. Greatbanc & Trust*, Case No. 1:09-cv-1668 (N.D. Ill.).[7] Thus, here, this is a disputed issue of fact that the Court is unable to resolve at this stage in the litigation.

Additionally, MWE argues that ERISA does not impose any fiduciary duties on Antioch, as it was not a named fiduciary.[8] This argument fails for at least two reasons. First, fiduciary status under ERISA is not limited to named fiduciaries. "Anyone who exercises authority over an employee benefit plan can properly be held an ERISA

---

[7] The Court does take note that the district court denied defendants' motions to dismiss "without prejudice to a possible future renewal," but provided no explanation for the denial and did not address any of the arguments raised in the motions to dismiss.

[8] Additionally, MWE claims that Plaintiff in fact alleged in the complaint that the Trustee of the ESOP (GreatBanc) had sole authority to decide whether the ESOP would tender its shares. (Doc. 14 at ¶¶ 24, 26, 39). Based on this fact, MWE concludes that the only ERISA fiduciary as to the Tender Offer was the ESOP Trustee because Antioch had no decision-making power over the Trustee's decision. *Hunter v. Caliber Sys., Inc.*, 220 F.3d 702, 722-23 (6th Cir. 2000) (affirming summary judgment to alleged ERISA fiduciaries; employer was not a fiduciary as to whether the Plan's assets were diversified because the trustee of the Plan "had the sole responsibility for diversifying Plan investments under ERISA"). Here, the Court does not interpret any of the pinpointed paragraphs to allege that GreatBanc had sole authoirty to decide whether the ESOP would tender its shares.

fiduciary." *Brock v. Hendershott*, 840 F.2d 339, 342 (6th Cir. 1988). Whether an employer

such as Antioch, who is also an ERISA plan administrator, is a fiduciary of the plan

generally requires a detailed factual analysis that is not appropriate upon a motion to

dismiss. *Hunter v. Caliber Sys., Inc.*, 220 F.3d 702, 718 (6th Cir. 2000). Second, if MWE

provided bad legal advice that caused individual directors and officers to breach their

fiduciary duties under ERISA, MWE's client, the corporation, would be harmed by

invalidation of the transaction. If the transaction was invalid, it would invalidate Antioch's

entire capital structure and tax-exempt status.

Accordingly, Plaintiff's claim survives. Disputed issues of fact make it impossible

for this Court to address many of the issues Defendant raises.

### 4. Whether MWE had a duty to represent Antioch, which could only be discharged by rendering competent advice to its directors

Plaintiff alleges that MWE breached its duty of care to the corporation by failing to

counsel the directors of their duties to safeguard corporate assets against self-dealing, and,

instead, by facilitating and encouraging conflicted transactions. (Doc. 14 at ¶¶ 35, 38, 67).

Defendant argues that Plaintiff never alleged that MWE represented the non-client

directors and officers personally and therefore MWE owed them no duty. *Nilavar v. Mercy*

*Health Sys.*, 143 F. Supp. 2d 909, 913 (S.D. Ohio 2001) ("an attorney's representation of a

corporation does not make that attorney counsel to the corporate officers and directors as

individuals."). Additionally Defendant argues that even assuming MWE had an attorney-

client relationship with the directors, any claims for failing to advise those persons would belong only to those persons, and, therefore, Plaintiff has no right to bring such claims.

Defendant appears to misapprehend Plaintiff's allegations. The Trust does not allege that MWE had a duty to advise the Morgans as individuals, but, instead, that MWE owed a duty of care to the corporation that required MWE to provide competent counsel to the representatives of that legal entity. Corporate counsel has a duty to act as gatekeeper, to take appropriate action to advise the directors, and to help them avoid wrongdoing that could seriously harm its corporate client. *See* Ohio R. Prof. Conduct 1.13(b). Accordingly, the Court finds that Plaintiff has properly stated a claim.

### 5. Aiding and abetting breaches of fiduciary duty by the Morgans

The Trust alleges that MWE aided and abetted the Morgans' breaches of fiduciary duty when they pursued the Tender Offer to maximize their own interests at the expense of the corporation. (Doc. 14 at ¶¶ 16, 19, 30-31, 42-43). MWE "counseled the Morgans on the best way to structure the transaction in order for the Morgans to maintain control and to minimize the effective powers of the ESOP trustee." (*Id.* at ¶ 19). MWE enabled and facilitated the conflicted transaction. (*Id.* at ¶ 21). MWE "participated in structuring the transaction, advising as to various alternatives and drafting the necessary documents" (*Id.* at ¶ 35), and MWE failed to advise the board of its duty to independently verify the fairness and prudence of the transaction, and failed to keep the board focused on the best interests of the corporation. Plaintiff also alleges that MWE enabled and facilitated

-23-

the Morgans' interference with Antioch's efforts to find an independent purchaser, by advising the Morgans on their retention of separate financial advisors (*Id.* at ¶ 57) and by participating in a decision to give preference to a self-dealing refinancing by the Morgans, discouraging other suitors (*Id.* at ¶¶ 59-60).

### a. Fiduciary Duty of the Morgan Family

"Because the inquiry as to whether a fiduciary relationship exists is necessarily fact-specific, a claim alleging the existence of a fiduciary duty is usually not subject to dismissal under Rule 12(b)(6)." *JPMorgan Chase Bank v. IDW Group*, No. 08-civ-9116, 2009 U.S. Dist. LEXIS 9207, at *9 (S.D.N.Y. Feb. 9, 2009). In addition to imposing duties of loyalty and care, ERISA explicitly prohibits a fiduciary from engaging in self-dealing transactions: "A fiduciary with respect to a plan shall not . . . (2) in his individual or in any other capacity act in any transaction involving the plan on behalf of a party (or represent a party) whose interests are adverse to the interests of the plan or the interests of its participants or beneficiaries." 29 U.S.C. § 1106(b).

Here, the Morgans acted in their own self-interest, and not in the interests of Antioch, when they allegedly breached their fiduciary duties. MWE assisted the Morgans "to maximize their own interests, which were in conflict with those of the corporation." (Doc. 14 at ¶ 19). Moreover, the complaint alleges that the transaction was to the detriment of the company. *Id.* "As a result of the transaction, Antioch's interest bearing debt rose from $10.8 million as of December 31, 2002 to $201 million as of December 31, 2003. (*Id.* at ¶ 44).

Accordingly, Plaintiff has alleged sufficient facts to state a claim for aiding and abetting.

### b. In Pari Delicto Doctrine

MWE argues that Plaintiff's claims are barred by the doctrine of *in pari delicto*. The doctrine of *in pari delicto* "refers to the plaintiff's participation in the same wrongdoing as the defendant." *Bubis v. Blanton*, 885 F.2d 317, 321 (6th Cir. 1989) (citing *Memorex Corp. v. Int'l Bus. Mach. Corp.*, 555 F.2d 1379, 1382 (9th Cir. 1977)). The doctrine is only applicable when the plaintiff bears equal fault to, or more fault than, the defendant for the alleged wrong. *In re KDI Holdings, Inc.*, 277 B.R. 493, 518 (Bankr. S.D.N.Y. 1999).

On a motion to dismiss, a court can dismiss on *in pari delicto* grounds "only if the complaint 'establishes conclusively' that the defense applies." *In re Nat'l Century Fin. Enter., Inc.*, 617 F. Supp. 2d 700, 712 (S.D. Ohio 2009) (*citing Nisselson v. Lernout*, 469 F.3d 143, 154 (1st Cir. 2006)). The facts, as pleaded, must be "clear enough to permit preemptory resolution of the dispositive issue." *Nisselson*, 469 F.3d at 154. Because the doctrine involves a factual inquiry, the defense is generally not appropriate on a motion to dismiss. *World Capita Comm., Inc. v. Island Capital Mgmt.*, 389 B.R. 801, 810 (Bankr. M.D. Fla. 2008) (stating that a "motion to dismiss should be denied to allow for the development of the factual predicates of the defense and the balancing of relative fault") (citing *Kalisch v. Maple Trade Fin. Corp.*, No. 06-B-10706, 2007 WL 1580049, at *1 (Bankr. S.D.N.Y. 2007)).

-25-

In support of its *in pari delicto* defense, MWE alleges that the wrongful conduct of the Morgans can be imputed to Antioch because they dominated and controlled the company. *Terlecky v. Hurd (In re Dublin Sec., Inc.)*, 133 F.3d 377, 380-81 (6th Cir. 1997) (affirming Rule 12(b)(6) dismissal because the allegation "that the officers and directors ... dominated and controlled the corporation" was sufficient to apply the *in parti delicto* doctrine to the trustee's malpractice claim). However, there are no allegations of domination in the complaint here.[9] Even to the extent that the Morgans' conduct could be imputed to Antioch, nowhere in the complaint is it even mentioned that the Morgans are at least as culpable as MWE, let alone "conclusively established," as required. If the court cannot clearly determine the relative fault of the parties based on the allegations of the Complaint, dismissal is not appropriate. *Jones v. Hyatt Legal Servs.*, 132 B.R. 853, 861 (Bankr. S.D. Ohio 1991) (denying a motion to dismiss because it was unclear from the complaint whether *in pari delicto* should bar the claim).

Here, the Court finds that the complaint does not conclusively establish that the *in pari delicto* defense applies. Therefore, Plaintiff's claim survives.

### 6. Claims against Antioch's directors and financial advisors

Plaintiff alleges that MWE committed malpractice by failing to advise Antioch about claims for "breach of fiduciary duty" that it had against the Morgans (and other

---

[9] MWE cites several references that the Morgans "controlled" the company. However, the Trust does not allege that the Morgans controlled the company through domination. The Morgans constituted two of five directors, and there is no reason to believe that the other five directors could not have put a stop to the Morgans' self-dealing if properly counseled by MWE.

directors) and about claims for "professional negligence" that it had against its financial

advisors (Deloitte & Touche and Houlihan Lokey). (Doc. 14 at ¶¶ 49-51, 72). The Trust

has alleged that the Tender Offer was detrimental to the corporation and burdened it with

massive debt from which it never recovered, ultimately forcing the company into

bankruptcy. (*Id.* at ¶¶ 32, 43-44). Plaintiff alleges that competent counsel would have at

least questioned whether the company received proper independent financial advice and

whether the directors avoided a close analysis of the benefits and detriments of the

transaction to the company due to their own desire to gain from the transaction.

### a. *Statute of Limitations*

Actions against directors for breach of fiduciary duty and against financial

professionals for negligence are governed by the four-year general tort statute of limitations

pursuant to Ohio Rev. Code § 2305.09(D). *Investors REIT One v. Jacobs*, 46 Ohio St.3d

176 (Ohio 1989); *In re Keithley Instruments, Inc. Derivative Litig.*, 599 F. Supp. 2d 875

(N.D. Ohio 2008).

The Trust alleges that the limitations period could be found by courts to run as early

as December 16, 2007, because that is four years from the date of the Tender Offer.

However, it is conceivable that the company did not have sufficient knowledge of its claim

to trigger the statute until some later date. Based on this concession. MWE claims that

dismissal is appropriate because the third-party claims are not alleged to be time-barred.

*See, e.g., Envtl. Network Corp. v. Goodman Weiss Miller*, 119 Ohio St. 3d 209, 213 (2008)

(requiring proof that the malpractice was the "but for" cause of plaintiff's injuries).[10]

Plaintiff claims that whether or not the limitations period has run on these claims is not for the Trust to decide, but will be decided after discovery. The Court agrees. Although the statute of limitations may have expired, it is premature for the Court to make this determination. Plaintiff may preserve its claim until proper discovery has been completed.

### b. Business Judgment Rule

Additionally, Defendant argues that Antioch cannot assert professional negligence claims because the directors and advisors were protected by the business judgment rule. However, the business judgment rule does not protect directors who engage in self-dealing. *In re Nat'l Century Fin. Enter., Inc.*, 504 F. Supp. 2d 287, 312 (S.D. Ohio 2007) (citing *Gries Sports Enter., Inc. v. Cleveland Browns Football Co., Inc.*, 26 Ohio St.3d 15, 20 (Ohio 1986)). Since the business judgment rule was intended for directors who act reasonably, and not for the purpose of protection against self-dealing, the rule does not apply to the conflicted directors with respect to the transaction. *See Granada Inv., Inc. v. DWG Corp.*, 823 F.Supp. 448, 454 (N.D. Ohio 1993). Consequently, the business judgment rule provides no defense to the Antioch directors or to MWE.

Additionally, Defendant claims that based on the opinions of three separate financial advisors that the $850 per-share price was fair, MWE had no basis for advising Antioch to

---

[10] The issue in *Envtl. Network* was that the plaintiff had only presented "some evidence" of the merits of the underlying claim. *Id.* In the instant case, Defendant takes issue with whether the statute of limitations had expired, not with whether Plaintiff has presented enough evidence to support the merits of the underlying claim. This is a significant distinction.

assert causes of action against its Board for self-dealing. However, as discussed in Section III.A.1, *supra*, these valuations did not state that the $850 per-share was fair to the *corporation* (MWE's client).

Moreover, although securing an independent assessment from a financial advisor or legal counsel is evidence of a thorough investigation, *Martin v. Feilen*, 965 F.2d 660, 670-71 (8th Cir. 1992), it is not a complete defense to a charge of imprudence. *See Donnovan v. Mazzola*, 716 F.2d 1226, 1234 (9th Cir. 1983). Independent expert advice is not a "whitewash." *Donovan v. Bierwirth*, 680 F.2d 263, 272 (2d Cir. 1982); *Donovan v. Walton*, 609 F. Supp. 12, 16 (D.C. Cal. 1984). The fiduciary must: (1) investigate the expert's qualifications, *Mazzola*, 716 F.2d at 1234, (2) provide the expert with complete and accurate information, *Cunningham*, 716 F.2d at 1467, and (3) make certain that reliance on the expert's advice is reasonably justified under the circumstances. *Id.* at 1474; *see also* Jordan, Pflepsen, Jr., & Goldberg, *ERISA Litigation Handbook*, § 3.03[A] (1994).

Conflicted fiduciaries do not fulfill ERISA's investigative requirements by merely hiring an expert. There is no indication that the directors meaningfully reviewed, discussed, or questioned the valuation.

### 7. Malpractice arising out of MWE's advice relating to Antioch's attempted sale and refinancing

MWE continued to represent Antioch in connection with the company's efforts to sell, refinance, or recapitalize itself, which spanned the period from early 2007 through June 5, 2008, the day that Antioch terminated MWE. (Doc. 14 at ¶¶ 54-68). While

Antioch had engaged Houlihan again to find a purchaser for the company, MWE helped the Morgan family hire a separate financial advisor, Candlewood Partners, to assist in efforts by the Morgans to secure refinancing or recapitalization that would leave the Morgan family in control of the company. (*Id.* at ¶¶ 56-57). Plaintiff claims that despite conflicts between these two efforts, MWE failed to counsel the Board to stop this incompatible dual track approach, which was caused by the Morgans, acting in their own self-interest, rather than in the interest of the company. (*Id.* at ¶ 61).

As alleged in the complaint, "the preference given by Antioch to a consensual deal with the Morgans had the effect of discouraging potential purchasers who were interested in acquiring control of Antioch. Potential purchasers knew that two directors, including the CEO and COO, who also controlled a large block of stock and were the largest unsecured creditors of Antioch, disfavored a sale to such an extent that they were pursuing with the Board's blessing, alternative transactions to maintain their own control of the business." (Doc. 14 at ¶ 60). Plaintiff claims that these factual allegations support more than a plausible conclusion that Antioch foreclosed opportunities to sell the company to independent purchasers by pandering to the Morgans' interests. Plaintiff claims that it is plausible that a purchaser would pay more to purchase a company outright, including the right to control the company through its own directors and officers, than one would pay to provide financing or capital to others who would control the decision-making.

-30-

Defendant maintains that Plaintiff does not allege any causal link between the alleged "incompatible" efforts of the Morgans' financial advisor and Antioch's financial advisor and the failure to sell or refinance the company. Defendant claims that having two advisors search for purchasers of the company actually increased the likelihood of both consummating a sale and a higher transaction price for the sale. Defendant also claims that Plaintiff does not have any factual support for the allegation that the company's "preference" for a "consensual deal with the Morgans had the effect of discouraging potential purchasers."

As this Court explained initially, the Federal Rules require only that the complaint state a claim, and the conclusory nature of particular allegations alone cannot justify dismissing a complaint. *Back v. Hall*, No. 07-5934, 2008 U.S. App. LEXIS 17057, at *14 (6th Cir. Aug. 11, 2008). *See Erickson v. Pardus*, 551 U.S. 89 (2007). Here, Defendant has offered potentially plausible defenses to Plaintiff's claim, but these arguments are insufficient to dismiss the claim.

Additionally, Defendant claims that the number of financial advisors that Antioch should have retained is a business question, and Plaintiff concedes that MWE had no duty to provide "business advice" to Antioch. The Trust, however, does not allege that MWE should have provided business advice. Rather, the Trust alleges that, as company counsel, MWE should have advised the directors against self-dealing.

## B.    Whether Plaintiff's Legal Malpractice Claims Are Time-Barred

The first amended complaint alleges that MWE committed malpractice in the course of representing Antioch in what Defendant claims are two separate events: (1) the November 14, 2004 Tender Offer and (2) the 2007 through early-2008 attempts to refinance or sell Antioch. (Doc. 14 at ¶¶ 20, 29, 54, 59). Accordingly, Defendant claims that all allegations relating to the 2003 Tender Offer are barred by the one-year statute of limitations. Ohio Rev. Code § 2305.11(A).[11]

A cause of action for legal malpractice accrues, and the one-year statute of limitations begins to run, on the later of two dates: (1) "when there is a cognizable event whereby the client discovers or should have discovered that his injury was related to his attorney's act or non-act and the client is put on notice of a need to pursue his possible remedies against the attorney"; or (2) when the attorney-client relationship for that particular transaction or undertaking terminates." *Zimmie v. Calfee, Halter & Griswold*, 42 Ohio St. 3d 54, 57-58 (1989).

Defendant claims that the 2003 Tender Offer transaction closed in December 2003, and, therefore, all allegations relating in any way to the 2003 Tender Offer are barred by the one-year statute of limitations. (Doc. 14 at ¶ 41; Doc. 16, Ex. A at 11). Conversely, Plaintiff argues that the termination of the "particular transaction" prong of *Zimmie* was triggered in June 2008, when Antioch terminated the attorney-client relationship with MWE. (Doc. 18 at 25-30).

---

[11]    "An action . . . for malpractice . . . shall be commenced within one year after the cause of action accrued." *Id.*

1.    **Cognizable event**

A "cognizable event" is one "alert[ing] a reasonable person that his attorney has committed an improper act in the course of legal representation." *Warman v. L. Patrick Mulligan & Assocs., Co.*, No. 22503, 2009 Ohio App. LEXIS 1670, at *5-6 (Montgomery Cty. Apr. 17, 2009). "Knowledge of the potential problem" triggers the limitations period. *Halliwell v. Bruner*, Nos. 76933 and 77487, 2000 Ohio App. LEXIS 5896, at *19 (Cuyahoga Cty. Dec. 14, 2000).

Defendant claims that if it caused any of Antioch's injuries, then Antioch knew that there was a problem with the Tender Offer no later than December 2006.[12] *Zimmie*, 43 Ohio St. 3d at 58 (an injured client need not "be aware of the full extent of the injury before there is a cognizable event"); *Mohler v. Unger*, No. C3-90-284, 1994 U.S. Dist. LEXIS 21698, at *2, 23 (S.D. Ohio Aug. 26, 1994) ("While the Plaintiffs may have been in doubt about whether Defendant's professional services, or lack thereof, had played a part in the loss of stock value, they were then aware that all was not well"). Defendant further claims that it is irrelevant whether Antioch knew about the "legal significance" of those facts. *Collett v. Steigerwald*, No. 22028, 2007 Ohio App. LEXIS 5523, at *6, 8, 14, 16

---

[12] According to Plaintiff, Antioch's requirement to pay cash to repurchase the shares of its departing employees increased from $14 million in 2003 (before the Tender Offer) to "almost $75 million" in 2004 (after the Tender Offer). (Doc. 14 at ¶¶ 11, 46-47). Antioch suffered additional financial harm in 2005 and 2006. (*Id.* at ¶¶ 11, 46-48, 52). Plaintiff alleges that by December 2006, "Antioch's cash reserves and borrowing capacity were destroyed and the company ceased making any further repurchase payments to any former employees." (*Id.* at ¶¶ 48, 52) (in 2005 and 2006, Antioch's "debt continued to remain at extraordinarily high and unmanageable levels.").

(Montgomery Cty. Nov. 21, 2007) (affirming dismissal of malpractice action; explaining that knowledge of a "breach of the attorney's duty of care" is not required). Accordingly, Defendant argues that Plaintiff's malpractice claims accrued at least by December 2006 under the "cognizable event" prong of the *Zimmie* test. *Mohler*, 1994 U.S. Dist. LEXIS 21698, at 2, 21, 23 (the "cognizable event" occurred when the ESOP and plaintiffs learned that stock prices had significantly dropped after the leverage buyout of the company).

Plaintiff claims, and the Court agrees, that it is not necessary to determine when a "cognizable event" occurred, because termination of the attorney-client relationship (June 5, 2008, as discussed in Section III.A.2, is the later date of the two tests.

### 2.  Termination of the attorney-client relationship

The Sixth Circuit and this Court have held that the "key date" in determining the date of termination of a "particular transaction" (*Zimmie*, 43 Ohio St. 3d at 57-58) is "when the [legal] representation on the matter in question ceases, rather than all representation." *Mohler*, 1994 U.S. Dist. LEXIS 21698, at 22. *See also FDIC v. Alexander*, 78 F.3d 1103, 1106, 1110 (6th Cir. 1996) (in legal malpractice action under Ohio law, holding that law firm's "general representation" of the corporation for other matters did not "toll the statute of limitations" for the earlier transaction at issue). "The question of when an attorney-client relationship for a particular undertaking or transaction had terminated is necessarily one of fact." *Alexander*, 78 F.3d 1103 at 1110.

The Trust alleges that MWE opened two matters for its representation of Antioch, one called "General," and another called "ESOP Transaction." (Doc. 14 at ¶ 18). In February 2008, MWE billed Antioch an additional $100,000 for a retainer under the ESOP Transaction matter and billed Antioch for services provided up through June 5, 2008 (the instant lawsuit was filed on June 4, 2009). (*Id.*; *see also Id.* at ¶ 55) ("McDermott's attorneys continued to advise Antioch on matters related to the 2003 Transaction right up until Antioch terminated MWE on June 5, 2008."). Additionally, Plaintiff alleges that neither party communicated that the representation related to the ESOP Transaction had ended, and there was no suggestion that MWE closed the ESOP Transaction matter number, that the attorneys working on that transaction stopped working for Antioch, or that ESOP files were returned to Antioch or given to another lawyer before June 5, 2008. (Doc. 18 at 30).

Conversely, Defendant claims that its continued representation of Antioch after the 2003 Tender Offer transaction closed does not extend the limitations period for its malpractice claims relating to that "particular transaction," because Plaintiff's malpractice claims relating to the 2003 Tender Offer are based solely on advice provided before the transaction closed. (*E.g.*, Doc. 14 at ¶¶ 33-35) (alleging that MWE failed to advise Antioch to obtain a fairness opinion before the transaction was approved).

Additionally, Defendant claims that the cases cited by Plaintiff (Doc. 18 at 26-28 *Murphy* and *Johnson*) do not support its contention that MWE's general representation of

-35-

Antioch tolled the limitations period as to MWE's specific work on the Tender Offer. The courts in *Murphy* and *Johnson*[13] concluded that factual issues existed regarding when the termination prong was triggered because the evidence showed that the challenged legal advice that was given after the original transaction had ended related directly to that transaction. Defendant maintains that, unlike the claims in *Murphy* and *Johnson*, Plaintiff's allegations of continued representation (Doc. 14 at ¶¶ 18, 48, 55, 62) do not relate to MWE's pre-closing work on the 2003 transaction.[14]

Defendant claims that under the second prong of the *Zimmie* test, the limitations period was triggered in December 2003 -- when the Tender Offer closed. (Doc. 14 at ¶¶ 27, 41). This Court has held that an attorney's representation terminates as to a particular transaction when the business transaction closes. *Mohler*, 1994 U.S. Dist. LEXIS 21698, at 2, 22. Defendant alleges that because the Tender Offer closed in December 2003, claims related to MWE's work on that transaction are untimely under the "particular transaction" prong of *Zimmie*. Plaintiff pleads around the "particular transaction" prong by alleging that MWE continued to advise Antioch on matters concerning the 2003 Tender Offer through

---

[13]  *Murphy v. Hyatt Legal Servs.*, No. 16194, 1993 Ohio App. LEXIS 5829, at *7-8 (Summit Cty. Dec. 1, 1993) (deposition testimony indicated that attorney-defendant told the client after the original deed was filed that he would correct his mistakes on that deed); *Johnson v. Lapin*, No. 3:93-CV-7521, 1995 WL 681102, at *1-3 (N.D. Ohio Oct. 24, 1995) (malpractice claim was based on alleged incorrect legal advice provided after the original land transaction had closed and the post-closing advice related to what was wrong with the original transaction).

[14]  To toll the termination prong of *Zimmie* as to the 2003 transaction, MWE's continued legal advice must be alleged to have been incorrect, and the alleged malpractice must relate to that transaction.

June 2008. (Doc. 14 at ¶¶ 18, 48, 55, 62). In response, Defendant alleges that this Court

has expressly rejected an attempt to extend Ohio's statute of limitations in a legal

malpractice action based on continued representation. That is, in *Mohler*, 1994 U.S. Dist.

LEXIS 21698, at 2-3, 22-23, this Court ruled that the law firm's representation of the ESOP

ended on the date of the leveraged buyout (in September 1987), even though plaintiffs

alleged that the firm "continued to represent the ESOP until the financial demise of [the

company] in October 1990." *See also Alexander*, 78 F.3d at 1106, 1110 (affirming

dismissal of legal malpractice claim under Ohio law; holding that representation for the

"particular transaction" at issue ended in December 1986, despite the fact that the law firm

continued to represent the company on other issues).

However, the Court finds that *Mohler* and *Alexander* are distinguishable from the

facts of the instant case. The legal malpractice claim was before the *Mohler* Court on a

motion for judgment as a matter of law (*Mohler*, 1994 U.S. Dist. LEXIS 21698 at 2) and

before the *Alexander* Court on an appeal from a grant of summary judgment (*Alexander*, 78

F.3d 1103 at 1106). Accordingly, the courts had complete factual records for their

consideration. This is a significant distinction from the instant case, where there are still

disputed issues of material fact regarding whether Defendant continued to provide legal

services related to the ESOP Transaction. Additionally, in both *Mohler* and *Alexander*,

Plaintiff sought to use "general representation" by the law firm to keep alive a malpractice

claim related to a particular transaction or undertaking. Neither court analyzed the question

of how the particular transaction or undertaking was concluded; they merely reaffirmed the

-37-

basic principle that a general representation on its own does not necessarily toll the statute as a matter of law.

In *Slavens v. Spetnagel*, No. 95CA769, 1996 WL 422499 (Ohio Ct. App. July 26, 1996), the court reviewed the policy behind the particular transaction or undertaking rule and explained that "the 'particular transaction' language was added to the termination rule to avoid the possibility of continuous 'general' representations tolling the statute of limitations." *Id.* at 5. However, the court cautioned as follows:

> We think it unwise to attempt to dissect every legal transaction down to its elemental building blocks and then call each of these building blocks a separate transaction. If we were to narrowly define the "particular transaction," we believe that the attorney-client relationship would be significantly weakened. Any possible malpractice would force the client to consider bringing suit and likely end the attorney-client relationship or risk the waiver of a malpractice action. The client, as well as the attorney, might never know when one particular transaction has concluded and another has begun, thus ending the tolling provided by the termination rule, until a malpractice action was tried. *The termination rule was adopted to avoid the necessity of the client making this unpleasant choice.*

*Id.* (citation omitted) (emphasis added).

The court held that "'particular transaction' . . . encompasses all dealings related to the proceeding in which the alleged malpractice occurred that are not of a general nature." *Id.* The court determined that a question of fact remained as to whether the estate matter work was a general representation or whether it was "related to the proceeding in which the alleged malpractice occurred." *Id.* at 6.

MWE, like the lawyer in *Murphy*, suggests that its representation of Antioch

-38-

regarding the ESOP necessarily ended – as a matter of law – when the ESOP Tender Offer

was concluded in December 2003, because that signaled the end of a "particular

transaction." (Doc. 16 at 11). But MWE, like the lawyers in *Slavens* and *Murphy*,

continued to represent Antioch in matters related to the ESOP and the Tender Offer,

including providing advice related to the 800 Antioch employees who resigned or were

terminated between 2004 and 2007 because of the Tender Offer, as well as issues related to

the ESOP S-Corporation structure and ESOP Notes that were established by the 2003

transaction. (Doc. 14 at ¶¶ 48, 55).

The Court must analyze the facts to determine when MWE's representation ended,

and, at this stage in the litigation, construe the conflicting facts in the light most favorable

to the Trust and take all well-pleaded factual allegations as true. *Gunasekera v. Irwin*, 551

F.3d 461, 466 (6th Cir. 2009). Accepting Plaintiff's facts as true, there are genuine issues

of fact as to when the relationship between Plaintiff and Defendant terminated, and

reasonable minds could differ as to whether Defendant continued to represent Plaintiff with

respect to the ESOP.

Accordingly, at this stage in the litigation, the Court finds that Plaintiff has properly

alleged that it initiated this action within the one year statute of limitations.

### C. Whether The Attempted Assignment Of Antioch's Malpractice Claim To The Litigation Trust Was Invalid

As part of Antioch's plan of reorganization, in accordance with 11 U.S.C.

§ 1123(b)(3), Antioch's bankruptcy estate succeeded to and retained certain identified

Litigation Claims and Business Litigation Claims. (Doc. 10. Ex. D). The Bankruptcy

Order provided that "the Debtors, their Estates, or the Reorganized Debtors [*i.e.* Antioch]

shall cause the Litigation Claims to be contributed, transferred, and assigned to the

Litigation Trust" (Plaintiff here). (*Id.*, ¶ M at 11). *Accord*: (*Id.*, ¶ 30 at 37; Plan of

Reorganization, ¶ 5.13(a) at 29-30; ¶ 10.5 at 37-38). The Litigation Trust Agreement

recognized that Antioch as debtor owned the Litigation Claims but purported to assign

them to the Litigation Trustee: "Debtors hereby absolutely assign to the Trustee, and to his

successors in trust and successors and assigns, all right, title and interest of the Debtors in

and to the Trust Assets," including the Litigation Claims.[15]  (*Id.*, Ex. 2 at 2; ¶ 1.3, at 3) ("the

Debtors and their Chapter 11 estates shall transfer, assign and convey to the Trustee the

Trust Assets"). Ohio law governs the Litigation Trust Agreement. (*Id.* ¶ 8.1 at 16).

Plaintiff argues that pursuant to The Second Amended Joint Prepackaged Plan of

Reorganization of The Antioch Company and its Affiliate Debtors, confirmed on January

27, 2009 by the United States Bankruptcy Court for the Southern District of Ohio, the

Litigation Trust Agreement grants the Trustee the powers "to act as a representative of the

Estates in accordance with Section 1123(b)(3) of the Bankruptcy Code with authority to

investigate, institute, prosecute, litigate, maintain, settle, compromise or otherwise resolve

Litigation Claims or any other actions or proceedings that the Trustee determines to be

---

[15] "Litigation Claims" are defined as "all claims, rights of action, suits or proceedings by any
Debtor or Estate, whether in law or in equity, whether known or unknown, that any Debtor or
Estate may hold against any person." (*Id.* § 1.75 at 14).

prudent."[16]  (Doc. 10, Ex. D, Ex. 2, § 2.1(a) at 20).  As a result, Plaintiff claims that the

Trustee stands in the shoes of Antioch, and he can bring any claim that Antioch could have

brought, including legal malpractice claims.  *Metro. Creditors' Trust v.*

*Pricewaterhousecoopers*, 463 F. Supp. 2d 1193, 1199-1200 (E.D. Wash 2006) (holding that

the "reference to Section 1123 in the trust agreement at issue manifests a clear intent to

appoint the [t]rusts as representatives, rather assignees, of the debtors' claims").  Moreover,

the transfer of Antioch's claims to the Trust is consistent with the goal of a Chapter 11

plan, to maximize distributions to creditors.  *Id.* at 1200; *Fields Station  v. Capitol Food*

*Corp. of Fields Corner*, 490 F.3d 21, 25 (1st Cir. 2007) (holding that a primary purpose of a

chapter 11 petition is to maximize distributions to creditors).  The Trustee has a duty to

investigate and prosecute claims in order to increase potential distributions to certain

creditors.  (Doc. 10, Ex. D, Ex. 2 § 2.1(a) at 20).  Accordingly, Plaintiff argues that the

Trust's possession of Antioch's malpractice claims is governed by and consistent with

bankruptcy law.

---

[16] "The controlling principle of the Bankruptcy Code is the quick and efficient resolution of
the bankrupt estate." *In re Enron Corp.*, No. 01-16034, 2006 WL 538552, at *4 (Bankr.
S.D.N.Y. Jan. 6, 2006).  Section 105(a) of Chapter 11 grants bankruptcy courts broad equitable
powers to effectuate the purposes of the Bankruptcy Code, so long as the court's actions are not
inconsistent with the Code. *See ATD Corp. v. Advantage Packaging, Inc. (In re ATD Corp.)*, 352
F.3d 1062, 1066 (6th Cir. 2003); *In re Richard Potasky Jeweler, Inc.*, 222 B.R. 816, 829 (S.D.
Ohio 1998).  The Code specifically contemplates the need for post-confirmation entities to
implement a plan. 11 U.S.C. § 1123(a)(5)(B) (authorizing the "transfer of all or any part of the
property of the estate to one or more entities, whether organized before or after the confirmation
of such plan").

Defendant claims that the Court should reject Plaintiff's arguments because: (1) the clear language of the Plan documents state that there was an assignment, and (2) Ohio law prohibits such an assignment. Defendant maintains that Ohio law bars the transfer of Antioch's legal malpractice claims to the Trust because, upon the filing of Antioch's petition for bankruptcy under 11 U.S.C. § 541, any of Antioch's purported professional negligence claims became property of the bankruptcy estate. *Cottrell v. Schilling*, 876 F.2d 540, 542-43 (6th Cir. 1989). "Under 11 U.S.C. § 541, the trustee . . . takes the property subject to the same restrictions that existed at the time the debtor filed the petition." *Demczyk v. Mut. Life Ins. Co.*, 126 F.3d 823, 831 (6th Cir. 1997). "To the extent an interest is limited in the hands of the debtor, it is equally limited as property of the estate." *Guar. Residential Lending, Inc. v. Homestead Mortgage Co.*, 291 Fed. Appx. 734, 741 (6th Cir. 2008).

Specifically, Defendant claims that the formation of the Litigation Trust pursuant to the debtor's right to retain claims under 11 U.S.C. § 1123(b)(3) does not negate the plain language of the Plan documents that an assignment of a legal malpractice claim was made, nor does Section 1123(b)(3) transform the Litigation Trustee into a "bankruptcy trustee" with all authority under bankruptcy laws. Rather, the Litigation Trustee, a creature created by contract, has only those rights and duties purportedly given to it by the Litigation Trust Agreement, and it received only some of Antioch's claims.[17]

---

[17] The Litigation Claims and Business Litigation Claims that Antioch retained are listed on Plan Schedule 10.5 of the Plan of Reorganization.

-42-

Defendant claims that state law governs as to the restrictions that existed at the time the debtor filed the petition. *Guar. Residential Lending*, 291 Fed. Appx. at 738.[18] The Court does not dispute that the assignment of legal malpractice claims is generally prohibited. *Sparagowski v. Williams*, No. L-80-064, 1980 Ohio App. LEXIS 12363, at *7 (Lucas Cty. July 25, 1980) ("A cause of action running in favor of a person or corporation for legal malpractice is not transferable or assignable. This harmonizes with the general rules in Ohio that contracts to render professional or personal services, or those that involve a relationship of personal confidence and which involve rendition of skill or competence, are not transferable or assignable.").[19] The rule against assignability of legal malpractice claims stems from "the unique quality of legal services, the personal nature of the

---

[18] Defendant claims that this same principle has been applied to prohibit the assignment of legal malpractice claims under other states' laws by a bankruptcy estate. *See, e.g., Baum v. Duckor, Spradling & Metzger*, 84 Cal. Rptr. 2d 703, 712 (Cal. Ct. App. 1999) ("We thus hold [under California law] that a legal malpractice claim belonging to the bankruptcy estate of a corporation may not be assigned by the trustee of that estate to a creditor of the corporation or any other person."). However, *Baum* did not involve a Chapter 11 petition. *See Office of Statewide Health Planning & Dev. v. Musik, Peeler & Garrett*, 76 Cal. App. 4th 830, 835 (Cal. Ct. App. 1999) (holding that the no-assignment rule set forth in *Baum* did not apply because "a Chapter 11 bankruptcy plan may allow for the retention of a claim in the bankruptcy estate to be enforced by a representative other than the estate").

[19] Defendant argues that because the Supreme Court of Ohio has not addressed this issue, the Court is bound by *Sparagowski*. *Johnson v. Karnes*, 198 F.3d 589, 593 n.3 (6th Cir. 1999) (concluding that it was "bound" by "an unpublished decision" of an Ohio appellate court because the criminal defendant did not show that the Ohio Supreme Court "would decide the issue differently"). *Accord: Stanek v. Greco*, 323 F.3d 476, 478 (6th Cir. 2003) ("Where a state's highest court has not spoken on a precise issue, a federal court may not disregard a decision of the state appellate court on point unless it is convinced by other persuasive data that the highest court of the state would decide otherwise."). However, the case law does not require that the Court be bound by an unpublished decision, but rather that the Court may not "disregard" the decision. *Id.* at 478 (citing *Ziegler v. IBP Hog Mkt.*, 249 F.3d 509, 517 (6th Cir. 2001)). Accordingly, the undersigned has carefully read and considered these cases, but finds that they are factually distinct from the instant case and therefore are not binding authority.

attorney's duty to the client, and the confidentiality of the attorney-client relationship."
*Goodley v. Wank & Wank, Inc.*, 62 Cal. App. 3d 389, 397 (Cal. Ct. App. 1976).

Plaintiff relies on the reasoning in *Parrett v. Nat'l Century Fin. Enters.*, No. 2:04-cv-489, 2006 U.S. Dist. LEXIS 16982, at *12-16 (S.D. Ohio Mar. 23, 2006),[20] arguing that *Sparagowski* is inapplicable because the assignment in the instant case occurred by operation of law, whereas *Sparagowski* involved an actual sale of a legal malpractice claim.[21] (Doc. 18 at 32-33). *Parrett* recognized that the "Bankruptcy Code authorizes the creation of post-confirmation entities whose purpose is to liquidate the property of the estate for the benefit of the creditors." *Id.* at 5 (stating that the rule against the transfer of malpractice claims should not be applied where assignment is authorized by law, where the policy concerns of the rule are not implicated, and where the rule would frustrate the Bankruptcy Code). *See also Cottrell*, 876 F.2d 542-543 (holding that claims become a part of the bankruptcy estate regardless of whether such claims are assignable under state law).

---

[20] MWE claims that the *Parrett* court reached the wrong conclusion. Other federal courts have disagreed with MWE. *See In re Jennings*, 378 B.R. 678, 683-684 (Bankr. M.D. Fla. 2006) (citing *Parrett* and holding that entities appointed under a Chapter 11 plan can assert causes of action that belong to the estate irrespective of the general rule prohibiting assignment); *Network Staffing Serv., Inc., v. Jenkins & Gilchrist*, No. 02-35608-SAF-11, 04-3388, 2004 WL 3007082, * 4 (Bankr. N.D. Tex. 2004) (holding that Texas state law against assigning malpractice claims was inapplicable to liquidating trust created pursuant to Chapter 11 plan).

[21] "The plaintiff *purchased* the claim against defendants-appellees from the trustee in bankruptcy on March 14, 1977." *Sparagowski*, 1980 Ohio App. LEXIS 12363 at 2-3 (emphasis added). The Court in *Sparagowski* did not discuss claims transferred to a post-confirmation entity created to prosecute the claims of the estate under 11 U.S.C. § 1123(b)(3)(B).

Defendant claims that the assignment of the legal malpractice claim from Antioch to the Litigation Trust did not occur by operation of law but by Antioch's affirmative conduct. Antioch specifically retained the malpractice claim (while keeping others), as it may do, under 11 U.S.C. § 1123(b), and then Antioch "assigned" the claim to the Litigation Trust. The Trust was created to litigate claims in place of the dissolved estate. As a result, and consistent with fundamental bankruptcy law, the Trustee stands in the shoes of Antioch, and therefore can bring any claim that Antioch could have brought.

## IV.  CONCLUSION

Accordingly, based on the foregoing, Defendant's motion to dismiss (Doc. 16) is **DENIED**.

**IT IS SO ORDERED.**

Date:  August 27, 2010

Timothy S. Black
United States District Judge

-45-