IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION (DAYTON)

| | | |
|---|---|---|
| ANTIOCH LITIGATION TRUST, | : | CASE NO. 09-CV-218 |
| W. TIMOTHY MILLER, TRUSTEE, | : | |
| | : | (Judge Timothy S. Black) |
| Plaintiff, | : | |
| | : | |
| v. | : | **DEFENDANT MCDERMOTT** |
| | : | **WILL & EMERY LLP'S** |
| McDERMOTT WILL & EMERY LLP, | : | **MOTION FOR SUMMARY** |
| | : | **JUDGMENT ON LIABILITY** |
| Defendant. | : | **ISSUES RELATING TO THE** |
| | : | **FAIRNESS OF THE 2003 ESOP** |
| | : | **TRANSACTION** |

Pursuant to Fed. R. Civ. P. 56, Defendant McDermott Will & Emery LLP

moves for summary judgment on liability issues relating to Plaintiff's fifth claim, which

is that MWE committed legal malpractice by failing to advise The Antioch Company

("Antioch") to sue its Directors in connection with a 2003 Employee Stock Ownership

Plan ("ESOP") Transaction before the statute of limitations expired.  This motion

demonstrates that Antioch did not have viable claims against those Directors, and that

therefore, MWE did not commit legal malpractice by failing to advise Antioch to pursue

those claims.  This motion also demonstrates that even if the $850 price per share that

Antioch paid in the transaction was not fair to Antioch (as claimed by Plaintiff's damages

expert), MWE is a law firm and it had no reason to know that the price was not fair to

Antioch.

The Court should grant summary judgment to MWE on Plaintiff's fifth

claim for the following three separate and independent reasons:

1. <u>Shareholder Consent</u>:  Plaintiff has conceded that <u>all</u> of Antioch's shareholders consented to the terms of the 2003 ESOP Transaction, after full disclosure of all material facts.  Plaintiff's claim is premised on the argument that the Directors had a duty to second-guess the decision reached by all of Antioch's shareholders.  That proposition is without basis, and in fact, the law is to the contrary.  It is well settled that a corporation does not have a claim against its Directors if all of its shareholders consented to the transaction after full disclosure.

2. <u>Approval of Disinterested Directors</u>:  Antioch's Directors were disinterested, since all shareholders had the opportunity to be treated equally in the 2003 ESOP Transaction.  Those Directors are therefore entitled to the benefit of the business judgment rule.  Even if those Directors were not entitled to the protection of that rule, Plaintiff cannot prove by clear and convincing evidence that the Directors acted with reckless disregard for the best interest of Antioch.

3. <u>MWE had no reason to know that the $850 price per share was unfair</u>:  Antioch engaged one of the leading accounting firms in the country, Deloitte & Touche ("Deloitte"), which concluded that Antioch's shares were worth $875 per share.  Deloitte was responsible for the financial analysis.  MWE was not responsible for doing this work or for ensuring that Deloitte did its job correctly.  Moreover, Plaintiff has conceded that it is not aware of any errors in Deloitte's analysis, even now, years later and with the benefit of complete hindsight.  Without any basis for concluding that Deloitte's valuation was erroneous or that Deloitte had departed from its standard of care, there was no reason for MWE to advise Antioch to initiate suit against its Directors claiming that the $850 price was not fair to Antioch.

This Court should thus grant summary judgment to MWE on Plaintiff's

fifth claim.

Respectfully submitted,


s/ Charles J. Faruki
Charles J. Faruki (0010417)
   Trial Attorney
Jeffrey S. Sharkey (0067892)
Donald E. Burton (0040553)
FARUKI IRELAND & COX P.L.L.
500 Courthouse Plaza, S.W.
10 North Ludlow Street
Dayton, OH  45402
Telephone:  (937) 227-3705
Telecopier:  (937) 227-3717
Email:  cfaruki@ficlaw.com

Attorneys for Defendant
McDermott Will & Emery LLP

**TABLE OF CONTENTS**

**Page**

I.   INTRODUCTION AND SUMMARY ........................................................................ 1

II.  ANTIOCH'S SHAREHOLDERS RATIFIED THE 2003 ESOP TRANSACTION ......... 5

    A.   IF SHAREHOLDERS UNANIMOUSLY RATIFY A TRANSACTION
        AFTER FULL DISCLOSURE OF ALL MATERIAL FACTS, THEN
        THE CORPORATION CANNOT LATER CHALLENGE THAT
        TRANSACTION ............................................................................................ 6

*If a transaction is unanimously approved by the shareholders after full disclosure of all material facts, then the corporation cannot make a claim related to the transaction. In the matter of Safety International, Inc., 775 F.2d 660, 661 (5th Cir. 1985) (holding that bankrupt corporation could not sue its shareholders because "[e]ven when the transaction is detrimental to the corporation, no cause of action will lie if all of the shareholders have ratified the transaction").*

    B.   SHAREHOLDER RATIFICATION DOES NOT REQUIRE A VOTE OF
        THE SHAREHOLDERS ................................................................................ 11

*Shareholder ratification does not require a vote of the shareholders. A transaction can be ratified by the shareholders if they: (1) accept and retain the benefits of the transactions, (2) acquiesce in it, or (3) fail to repudiate the transaction within a reasonable period of time. Campbell v. Hospitality Motor Inns, Inc., 24 Ohio St. 3d 54, 57 (1986).*

    C.   ALL OF ANTIOCH'S SHAREHOLDERS CONSENTED TO THE 2003
        TRANSACTION ............................................................................................ 13

*Plaintiff has conceded in this matter that "all of the shareholders consented to the transaction." Plaintiff Dep., p. 31.*

    D.   ALL MATERIAL FACTS WERE DISCLOSED ............................................. 14

        1.   All Material Facts Were Disclosed to the ESOP ..................................... 14

*Plaintiff has conceded that all material facts were disclosed to the ESOP. Plaintiff Dep., pp. 31, 216.*

        2.   All Material Facts Were Disclosed to the Selling Shareholders ............... 16

*Plaintiff's expert has conceded that all material facts were disclosed to the selling shareholders. Gehlman Dep., pp. 283-86.*

i

E.   SUMMARY ...................................................................................... 18

III.   DIRECTOR APPROVAL ........................................................................ 18

A.   THE 2003 ESOP TRANSACTION WAS APPROVED BY ANTIOCH'S
DISINTERESTED DIRECTORS AND IS PROTECTED BY THE
BUSINESS JUDGMENT RULE .......................................................... 18

*Directors are entitled to the benefit of the business judgment rule if all shareholders have an opportunity to be treated equally under a transaction. <u>Koos v. Central Ohio Cellular Inc.</u>, 94 Ohio App. 3d 579, 593-94. Here, all shareholders had an opportunity to be treated equally because the ESOP had the ability to veto the transaction. The transaction satisfies the business judgment rule because there was a "rational business purpose" for the transaction.*

B.   EVEN WERE THE BUSINESS JUDGMENT RULE NOT TO APPLY,
PLAINTIFF CANNOT RECOVER DAMAGES ................................. 22

1.   Plaintiff Cannot Prove by "Clear and Convincing Evidence" That
the Actions of the Board Were Made with Intent to Injure Antioch
or with Reckless Disregard ....................................................... 23

*A director can be liable for damages only if the director acts "with deliberate intent to cause injury to the corporation or . . . with reckless disregard for the best interests of the corporation. Ohio Rev. Code § 1701.59(E). The evidence shows that the Directors did not intend to injure the corporation or act with reckless disregard.*

2.   The 2003 ESOP Transaction Is Not Void or Voidable............................ 24

*A transaction is not void or voidable if it is approved by the "vote of a majority of disinterested Directors, even though the disinterested Directors constitute less than a quorum." Ohio Rev. Code § 1701.60(A)(1)(a). It is undisputed that there was at least one disinterested director who voted to approve the transaction, and the transaction therefore is not void or voidable.*

IV.   THERE WERE NO FACTS KNOWN TO MWE SUGGESTING THAT THE
2003 ESOP TRANSACTION WAS NOT FAIR TO ANTIOCH ................................... 26

*MWE would not have a duty to advise Antioch to file suit against its Directors unless MWE was aware of facts suggesting that the price for the 2003 transaction was not fair to Antioch. Gehlman Dep., p. 47. Antioch's financial advisor, Deloitte, concluded that Antioch's shares were worth $875 per share, and Antioch purchased those shares for $850 per share. MWE is a law firm, not a financial firm, and had no reason to know that the $850 price was unfair to Antioch.*

V.     CONCLUSION ................................................................................................30

**MEMORANDUM IN SUPPORT OF DEFENDANT MCDERMOTT WILL &
EMERY LLP'S MOTION FOR SUMMARY JUDGMENT ON LIABILITY
ISSUES RELATING TO THE FAIRNESS OF THE 2003 ESOP TRANSACTION**

I.                 **INTRODUCTION AND SUMMARY**

           In 2003, Antioch had two blocks of shareholders -- the ESOP and its

non-ESOP shareholders (which included Directors, officers and others).  SUF, ¶¶ 7-9.

Antioch engaged Deloitte and MWE to advise it on a transaction through which Antioch

would purchase all of the shares of the non-ESOP shareholders ("2003 ESOP

Transaction").  SUF, ¶¶ 10-12, 16.  After the transaction, the ESOP would be the sole

shareholder and would own 100% of Antioch's shares.[1]  SUF, ¶ 12.

           There were significant tax advantages to the transaction.  Specifically, if

an S-corporation (which Antioch was) is 100% owned by an ESOP, then the corporation

and its shareholders owe no income taxes.  SUF, ¶¶ 13-15.  Deloitte calculated that

Antioch was expected to have an additional $130 million in cash after ten years if it

executed the 2003 ESOP Transaction (after those tax savings and all expenses were

considered).  SUF, ¶ 41.

           Deloitte further concluded that Antioch's shares were worth $875 per

share.  SUF, ¶ 42.  In the transaction, Antioch paid only $850 per share to acquire the

shares owned by the non-ESOP shareholders.  SUF, ¶ 28.b.  (Plaintiff's damages expert

---

[1] The desired result could have been achieved by having the ESOP shareholder buy all of the stock of the
non-ESOP shareholders without any involvement of Antioch.  However, for tax reasons, Deloitte proposed
a transaction structure in which the non-ESOP shareholders could be bought out by having the corporation
-- instead of the ESOP -- buy those shares.  The end result was the same:  the ESOP would own all of
Antioch's stock.

nevertheless claims that the shares were worth only $720, and that Antioch suffered $36 million in damages by paying $130 per share too much for its shares.)

After MWE was engaged, it advised Antioch to appoint an independent trustee to act on behalf of the ESOP. SUF, ¶ 17. GreatBanc was engaged to act as the ESOP Trustee, and GreatBanc engaged an independent financial advisor (Duff & Phelps) and an independent law firm (Jenkens and Gilchrist) to represent it. SUF, ¶¶ 18, 21-22. Duff & Phelps concluded (among other points) that Antioch's shares were worth $774 to $932 (midpoint $853). SUF, ¶ 46.

MWE also advised Antioch to engage a financial advisor to determine whether the transaction was fair to the non-ESOP shareholders (i.e., that the price was not too low). SUF, ¶ 23. Houlihan Lokey was engaged to fill that role, and it concluded that Antioch's shares were worth $825 to $920 (midpoint $872.50). SUF, ¶¶ 24, 49.

The 2003 ESOP Transaction was the subject of a series of Board meetings, and the Board approved the transaction at its October 30, 2003 meeting. SUF, ¶¶ 62, 64. The tender offer was issued to all of Antioch's shareholders on November 14, 2003. SUF, ¶ 25. The transaction closed on December 16, 2003. SUF, ¶ 33.

Significantly, all of Antioch's shareholders consented to the 2003 ESOP Transaction. Specifically, all of the non-ESOP shareholders tendered their shares to Antioch in response to the tender offer. SUF, ¶ 31. Further, the 2003 ESOP Transaction was conditioned upon the ESOP not tendering its shares. SUF, ¶ 29. In other words, GreatBanc (as ESOP Trustee) had the ability to terminate the transaction by offering to

sell the ESOP's shares to Antioch in response to the tender offer. SUF, ¶ 29. The ESOP consented to the 2003 ESOP Transaction by declining to tender its shares. SUF, ¶ 30.

Plaintiff's fifth claim asserts that MWE committed malpractice by failing to advise Antioch to sue its Directors for breach of fiduciary duty related to the 2003 ESOP Transaction before the statute of limitations on those claims expired in 2007. This Court should dismiss that fifth claim for three separate and independent reasons:

First, a corporation cannot challenge a transaction as unfair to it if all of its shareholders consented to the transaction after full disclosure of all material facts. In re Safety Int'l, Inc., 775 F.2d 660, 662 (5th Cir. 1985) (holding that claims of bankrupt corporation against its two shareholders should be dismissed because "even when the transaction is detrimental to the corporation, no cause of action will lie if all of the shareholders have ratified the transaction" and the shareholders knew all of the material facts). Plaintiff has conceded that all of Antioch's shareholders consented to the transaction after disclosure of all material facts.

Second, any claim against the Directors would fail if the Directors were entitled to the protection of the business judgment rule. Under Ohio law, if all shareholders have an opportunity to be treated equally in a transaction, then the Directors are not considered to be interested in that transaction, and are entitled to the protection of the business judgment rule. Koos v. Cent. Ohio Cellular, Inc., 641 N.E.2d 265, 275 (Ohio Ct. App. Cuyahoga Cty. 1994). Antioch offered to buy its shares from all of its shareholders, and the transaction could be completed only if the ESOP declined the offer (i.e., absent consent by the ESOP to the transaction, the transaction could not have

3

closed). Since the ESOP had the option to be treated equally to all other shareholders, the Directors are protected by the business judgment rule. Alternatively, even if the Directors were not entitled the protection of the business judgment rule, they could not be sued pursuant to Ohio Revised Code § 1701.59(E) (which provides that a director is not liable in damages unless "it is proved by clear and convincing evidence" that the director acted "with deliberate intent to cause injury to the corporation or . . . with reckless disregard for the best interests of the corporation") and § 1701.60(A)(1)(a) (which provides that a transaction is not void or voidable if it is approved by a majority of the corporation's disinterested Directors after disclosure of all material facts).

Third, at the Rule 30(b)(6) deposition of Plaintiff, Plaintiff's designee, Tim Miller, a partner at Taft, Stettinius & Hollister, conceded that Plaintiff was not aware of "any specific facts" suggesting that there were "any errors of any sort" by Deloitte. May 23, 2011 Rule 30(b)(6) Deposition of Plaintiff ("Plaintiff Dep."), Doc. No. 103, p. 8041 (p. 122) (emphasis added).[2] If Plaintiff and its attorney witness cannot identify any errors by Deloitte, then MWE should not be expected to identify any such errors either. Since Deloitte concluded that Antioch's shares were worth $875 per share, and Antioch paid only $850 for them, there was no reason for MWE to advise Antioch to pursue claims asserting that the price was not fair.

---

[2] All page references are to the page identification number (PageID). General Order No. Day 12-01, p. 12.

4

## II.       ANTIOCH'S SHAREHOLDERS RATIFIED THE 2003 ESOP TRANSACTION

Whether Plaintiff has any viable claim related to the fairness of the 2003 ESOP transaction must be determined in the context of the undisputed fact that the 2003 ESOP transaction was an agreement among all of Antioch's shareholders: the ESOP, on the one hand, and the non-ESOP shareholders, on the other. In that context, whether the transaction was fair to Antioch is simply irrelevant. Put another way, when a willing buyer and seller, each acting at arm's length and with access to all relevant information, strike a deal to purchase an asset, the asset is without a stake in the transaction and does not suffer a compensable loss if, in hindsight, one side or the other later comes to regret the transaction.

A hypothetical illustrates the point. Suppose a corporation ("C") has only two shareholders -- B and S. Shareholder S, a would-be seller, owns an asset worth only $1. Notwithstanding its nominal value, S wants to sell that asset to C for a highly-inflated price, $1,000,000. Suppose further that B consents to the sale, after full disclosure of all material facts. The sale is consummated: C pays $1,000,000 to S for a worthless asset, a transaction that, by any measure, is not a good one for either C, the purchaser, or for B, whose half interest in the corporation is now worth less than it was worth immediately before the lopsided transaction to which it agreed Yet, neither C nor B is able to sue Shareholder S under a claim that the transaction was not fair. And, just as clearly, a lawyer representing C has no basis to advise that a lawsuit be brought against S, much less a duty to do so. Indeed, if the lawyer had such a duty, for whom would he be acting? Not for the shareholders, both of whom favored the transaction. And not C, who acts through its board, the representatives of the same consenting shareholders.

5

As demonstrated below, it is settled law that a corporation cannot sue over a transaction if either (a) all shareholders consented to the transaction after full disclosure of all material facts; or (b) a majority of the disinterested shareholders consented to the transaction after disclosure of all material facts. As also demonstrated below, it is an undisputed fact -- and Plaintiff has conceded as much -- that all of Antioch's shareholders consented to the 2003 ESOP transaction after disclosure of all material facts.

### A.    IF SHAREHOLDERS UNANIMOUSLY RATIFY A TRANSACTION AFTER FULL DISCLOSURE OF ALL MATERIAL FACTS, THEN THE CORPORATION CANNOT LATER CHALLENGE THAT TRANSACTION

If a transaction is <u>unanimously</u> approved by the shareholders after full disclosure of all material facts, then a corporation cannot make a claim related to the transaction. <u>Koos v. Cent. Ohio Cellular, Inc.</u>, 641 N.E.2d 265, 272-74 (Ohio Ct. App. Cuyahoga Cty. 1994) (affirming a grant of summary judgment in shareholder derivative action, since shareholders unanimously approved challenged transaction); <u>L.R. Schmaus Co. v. Comm'r of Internal Revenue</u>, 406 F.2d 1044, 1045 (7th Cir. 1969) ("[T]he stockholders of a corporation may, by unanimous action of all its stockholders, dispose of its property as it pleases, so long as it does nothing against public policy.") (internal quotation marks and citation omitted); 12B <u>Fletcher Cyclopedia of the Law of Private Corporations</u> § 982, at 106-07 (2001) ("a person owning all of the legal and equitable interest in a corporation may give away the corporate assets"); 3 <u>Fletcher Cyclopedia of the Law of Private Corporations</u> § 979, at 626, 630 (1997-2002) ("If [a transaction between a corporation and its shareholders] is consented to or ratified, with full knowledge of the facts, it is finally and absolutely binding, and neither the corporation nor individual shareholders nor strangers can afterward sue to set it aside, or otherwise

6

attack its validity. . . .  Under most circumstances according to the Delaware view, majority shareholder approval is all that is necessary; however, unanimous shareholder ratification must be obtained where it is alleged that there has been a waste or gift of corporate assets.") (footnote omitted); Norman D. Lattin, Lattin on Corporations § 77, at 266-67 (2d ed. 1971) ("directors have no authority to make [gifts] without the unanimous consent of the shareholders"); Cohen v. Ayers, 449 F. Supp. 298, 311 n.9 (N.D. Ill. 1978) ("ratification by less than all the shareholders cannot cure wasting corporate assets"), aff'd, 596 F2d 733 (7th Cir. 1979);  Cruz v. Carpenter, 893 F.2d 84, 86 n.5 (5th Cir. 1990) ("Once fiduciary breaches by directors and officers are effectively 'ratified' by all shareholders, the objectionable conduct or transactions cannot later serve as a basis for derivative suits by new owners"); Solomon v. Armstrong, 747 A.2d 1098, 1114 (Del. Ch. 1999) ("Void acts include . . . gift, waste . . . .  [O]nly a unanimous shareholder vote can ratify these . . . acts.") (emphasis omitted), aff'd, 746 A.2d 277 (Del. 2000); Miller & Lux, Inc. v. Anderson, 318 F.2d 831, 838 (9th Cir. 1963) ("That a corporation is hurt, or destroyed, by the intended conduct of the owners of its shares, gives rise to no legal claims, either in the shareholders, or in the corporation as a legal entity."), cert. denied, 375 U.S. 986, 84 S. Ct. 517 (1964); Martindale v. Gleasman, No. 07-CV-6517, 2008 U.S. Dist. LEXIS 49846, at *15 (W.D.N.Y. June 27, 2008) ("Accordingly, the law is clear that a shareholder is estopped from challenging, either individually or through a derivative action, any corporate policy which he approved or which the shareholder had knowledge but to which no objection was put forth."); Intl. Ins. Co. v. Johns, 874 F.2d 1447, 1460 & n.25 (11th Cir. 1989) ("Only a unanimous shareholder approval can ratify corporate waste."); In re REA Express, Inc. Private Treble Damage Antitrust Litig., 412 F. Supp.

1239, 1257 (E.D. Pa. 1976) ("[D]irectors of a corporation do not breach their fiduciary duty to the corporation by taking action which . . . was taken at the behest of all the shareholders of the corporation.").

Similarly, a corporation cannot challenge a transaction between the corporation and an interested party as <u>unfair</u> to the corporation if a majority of disinterested shareholders approved the transaction after full disclosure of all material facts. Claman v. Robertson, 128 N.E.2d 429, syllabus ¶ 1 (Ohio 1955) (in shareholder derivative action,[3] holding that "[a] disinterested majority of the shareholders of a corporation have the power to ratify directors' frauds provided there is no actual fraud in either inducing or affecting such ratification."); Benincasa v. Flight Sys. Auto. Group L.L.C., 242 F. Supp. 2d 529, 537-38 (N.D. Ohio 2002) (under Ohio law, dismissing breach of fiduciary duty claim because plaintiff shareholder consented to the transaction with full knowledge about the transaction); Apicella v. PAF Corp., 479 N.E.2d 315, 319-20 (Ohio Ct. App. Cuyahoga Cty. 1984) (in shareholder derivative action, plaintiff was precluded from recovering for alleged harm to corporation during period of time that plaintiff "acquiesced" to challenged transaction); Gearhart Indus., Inc. v. Smith Int'l, Inc., 741 F.2d 707, 720 (5th Cir. 1984) ("A challenged transaction found to be unfair to the corporate enterprise may nonetheless be upheld if ratified by . . . the majority of the stockholders.").

---

[3] A shareholder derivative action is a claim brought by shareholders on behalf of the corporation. Ohio R. Civ. P. 23.1; Fed. R. Civ. P. 23.1. Here, Plaintiff asserts claims belonging to Antioch that have been assigned to Plaintiff. A shareholder derivative suit is thus analogous to the claims asserted by Plaintiff, since both involve claims belonging to a corporation that are being asserted by third parties.

The rule that shareholder approval of a transaction precludes any claim by the corporation challenging that transaction has been applied to preclude a bankrupt corporation from filing claims against its former shareholders/directors. For example, in In re Safety Int'l, Inc., 775 F.2d 660, 661 (5th Cir. 1985), Don Dyer and Phillip Graves owned 100% of the stock in Safety International, Inc., and each was a director. In 1982, they entered a transaction by which (a) Graves became the 100% owner of Safety's stock; and (b) Dyer acquired an option to purchase the building in which Safety operated. Id.

The corporation later went bankrupt, and the bankrupt corporation filed a claim against Dyer seeking to have a constructive trust placed upon Dyer's option. Id. The bankruptcy court ordered Dyer to turn over the option to the corporation, and the district court affirmed. Id. at 661-62.

The court of appeals reversed, explaining:

"[E]ven when the transaction is detrimental to the corporation, no cause of action will lie if all of the shareholders have ratified the transaction.

The facts of this case do not warrant the imposition of a constructive trust. Even if Dyer and Graves breached their fiduciary duty to Safety by taking the purchase option in their own names, no party to this action can complain of the breach. There are no nonconsenting shareholders; Dyer and Graves held all of the shares of Safety. Moreover, although no formal shareholder action was taken, both were fully aware of their private ownership of the purchase option. Thus, their January 1982 agreement constituted informal ratification of the potential breach, foreclosing action by the corporation."

Id. at 662 (emphasis added) (internal citations omitted).

Other courts have reached the same result. Liston v. Gottsegen (In re Mi-Lor Corp.), 348 F.3d 294, 296, 305 (1st Cir. 2003) (plaintiffs -- who were creditors in bankruptcy that "st[ood] in the shoes of the corporation" -- sued majority shareholders/directors of the corporation, alleging that the majority shareholders had unjustly enriched themselves through a transaction that had been approved by all of the shareholders; the court held that "[b]ecause the shareholders are the owners, if all of the owners . . . agree to allow a release of claims of self-dealing after receiving full information about it, then they have had the opportunity to protect their own interests and there are no dissenting shareholders who may need further protection. It would ordinarily be unwise to involve courts in reviewing the informed and unanimous decisions of the owners, absent special circumstances") (emphasis in original); In re Tufts Elecs., Inc., 746 F.2d 915, 917 (1st Cir. 1984) (The sole shareholder of a corporation acquired certain property on which the corporation operated, and after the corporation went bankrupt, the trustee of the bankrupt corporation filed a claim against the shareholder seeking the imposition of a constructive trust on the property; the district court granted the constructive trust, but the First Circuit reversed stating "[w]e must keep in mind that [the shareholder] was the sole shareholder . . . . We find that under any theory of liability for breach of fiduciary duty, [the shareholder's] behavior was entirely proper for the sole shareholder of a close corporation."); Pittman v. Am. Metal Forming Corp., 649 A.2d 356, 362-64 (Ct. App. Md. 1994) (A bankrupt corporation filed a claim against its sole shareholder alleging that a pre-bankruptcy transaction involving the shareholder violated duties the shareholder owed to the corporation; the U.S. Court of Appeals for the Fourth Circuit certified a question to the Court of Appeals of Maryland regarding whether the

10

shareholder had breached fiduciary duties; the Maryland court held that the corporation did not have a claim against its shareholder "[b]ecause Pittman was the sole shareholder of Pittcon Industries, [the transactions at issue] were necessarily disclosed to and ratified by all shareholders of Pittcon Industries" and "because Pittman as the sole shareholder necessarily obtained unanimous ratification prior to entering into [other transactions at issue] and no creditors were harmed, he is not liable for breach of a fiduciary duty owed to Pittcon Industries."); Banco de Desarrollo Agropecuario S.A. v. Gibbs, 709 F. Supp. 1302, 1305 (S.D.N.Y. 1989) ("A bankrupt corporation does not have a cause of action against its officers and fiduciaries for unauthorized acts such as conversion, self-dealing or waste when the shareholders of the corporation have unanimously consented to those acts."); Field v. Lew, 184 F. Supp. 23, 27 E.D.N.Y. 1960) ("A corporate officer who uses corporate funds for his own purposes may be liable for conversion to the corporation and in bankruptcy to the trustee. . . .  However, the general rule of liability does not apply when the officer's acts have been ratified by all the shareholders of the corporation.  In that case, the unauthorized acts of the individual become the authorized acts of the corporation, the corporation loses its right of action against the officer, and the corporation, having no right, the trustee in bankruptcy also has no right."), aff'd, 296 F.2d 109 (2d Cir. 1961).

### B.  SHAREHOLDER RATIFICATION DOES NOT REQUIRE A VOTE OF THE SHAREHOLDERS

Ohio Revised Code § 1701.60(A) provides that a transaction is not void or voidable if approved (after disclosure of all material facts) by the "vote" of disinterested directors (subsection (A)(1)(a)) or the "vote" of disinterested shareholders (subsection (A)(1)(b)).  However, the Supreme Court of Ohio has held that § 1701.60(A) is not the

only way that a transaction can be ratified, and that a transaction can be ratified if the corporation accepts the benefits of the transaction, acquiesce in it, or fails to repudiate the agreement.  Campbell v. Hospitality Motor Inns, Inc., 493 N.E.2d 239, 241-42 (Ohio 1986) (per curiam).

   Specifically, in that case, a party argued that the "only way this unauthorized agreement could have been subsequently ratified was by express formal action of the board."  The Court rejected that argument:  "We do not agree.  We find a better view to be [that], [t]he requirement that binding action must be taken at a formal meeting of directors is no longer as rigid as was once the case" and stating that ratification by the board would occur "where the directors have actual knowledge of the facts and (1) accept and retain the benefits of the contract, (2) acquiesce in it, or (3) fail to repudiate the contract within a reasonable period of time."  Accord:  2A Fletcher Cyclopedia of the Law of Corporations § 764, at 481-82 (2009) ("The shareholders may ratify unauthorized or irregular acts of the directors or of other corporate officers or agents in two ways:  (1) by vote at a shareholders meeting, or (2) by implication by accepting the benefits, affirmative acts that can be accounted for only on the theory of adoption of the unauthorized or regular acts, or by acquiescence.  It is not necessary that a meeting of the shareholders be held in order to ratify an illegal act of the board of directors.") (footnotes omitted); In re Safety Int'l, Inc., 775 F.2d at 662 ("Moreover, although no formal shareholder action was taken, both were fully aware of their private ownership of the purchase option.  Thus, their January 1982 agreement constituted informal ratification of the potential breach, foreclosing action by the corporation."); In re:  Mi-Lor Corp., 384 F.3d at 298, 305 (all shareholders signed a release, which the

corporation later challenged; court held that corporation could not challenge release if all shareholders signed release after all material facts were disclosed); Apicella, 479 N.E.2d at 319-20 (plaintiff shareholder filed derivative action on behalf of corporation; court held that corporation was precluded from recovering damages for conduct to which the plaintiff had "acquiesced"); Benincasa, 242 F. Supp. 2d at 537-38 (plaintiff shareholder barred from pursuing action against fellow shareholders; court held that action was barred because "the plaintiff signed the stock purchase agreement and the related documents, which clearly stated the terms of the transaction"); Thornton v. Laneheart, 723 So. 2d 1118, 1120, 1125 (Ct. App. La. 1998) (plaintiff shareholder brought derivative claims on behalf of corporation against majority shareholders who were officers and directors of corporation; court held that the conduct at issue "could be ratified by the shareholders. Such ratification could be implied by acquiescence"); Robert A. Wachsler, Inc. v. Florafax Int'l, Inc., 778 F.2d 547, 551 (10th Cir. 1985) ("corporate ratification can occur when a corporation simply accepts the benefits of an otherwise unauthorized agreement"); Martindale, 2008 U.S. Dist. LEXIS 49846, at *15 ("Accordingly, the law is clear that a shareholder is estopped from challenging, either individually or through a derivative action, any corporate policy which he approved or which the shareholder had knowledge but to which no objection was put forth.").

### C.   ALL OF ANTIOCH'S SHAREHOLDERS CONSENTED TO THE 2003 TRANSACTION

Here, it is undisputed that all of Antioch's shareholders consented to the 2003 ESOP Transaction. Specifically, all of the non-ESOP shareholders consented to the 2003 transaction by tendering their shares. SUF, ¶ 31. Similarly, the 2003 ESOP Transaction was contingent upon the ESOP not tendering its shares; the ESOP (through

13

its Trustee, GreatBanc) had the ability to stop the 2003 ESOP Transaction by tendering the ESOP's shares. SUF, ¶ 29. The ESOP thus consented to the 2003 ESOP Transaction when it declined to tender its shares. SUF, ¶ 30.

Indeed, Plaintiff <u>conceded</u> at its Rule 30(b)(6) deposition that all of Antioch's shareholders consented to the 2003 ESOP Transaction:

> "Q.     . . . Is it your understanding that the ESOP, through GreatBanc, essentially consented to the tender offer by declining to tender its shares?
>
> A.     Yes. That's how I understood it unfolded, yes.
>
> Q.     So just so we are clear, <u>all of the shareholders consented to the transaction</u>. The non-ESOP shareholders consented by tendering their shares, the ESOP consented by not tendering its shares?
>
> A.     <u>Yes</u> . . . ."

Plaintiff Dep., Doc. No. 103, p. 8018 (p. 31) (emphasis added).

### D.     ALL MATERIAL FACTS WERE DISCLOSED

As demonstrated below, all facts that were material to the ESOP (which was to be the 100% shareholder after the transaction) were disclosed to it. Further, all facts that were material to the non-ESOP shareholders (who sold their shares to Antioch) were disclosed to them.

#### 1.     All Material Facts Were Disclosed to the ESOP

Antioch provided a proxy statement to all shareholders; that proxy statement was about one inch thick and described the transaction in detail. SUF, ¶ 25. In addition to the proxy statement, Antioch established a "war room," which had extensive information about Antioch. SUF, ¶ 26. The ESOP Trustee and its financial advisor

(GreatBanc and Duff & Phelps) had access to the war room, and stated that they were provided all the information that they wanted regarding the transaction. SUF, ¶ 26.

Plaintiff conceded that it was not aware of material facts that were not disclosed to the ESOP:

> "Q. Are you aware of any material facts that were not disclosed to the -- I'll call them the ESOP team, meaning GreatBanc, Duff & Phelps, Jenkens and Gilchrist?
>
> A. Based on my review of the documents, not as yet . . . .
>
>           * * *
>
> Q. You are not asserting that one group of shareholders misled the other group of shareholders to your knowledge --
>
> A. I don't --
>
> Q. -- associated with the transaction as a whole?
>
> A. No, I mean, I don't think that we are aware of anything like that, . . ."

Plaintiff Dep., Doc. No. 103, pp. 8018, 8064 (pp. 31, 216).

Similarly, a financial expert engaged by the Plaintiff stated:

> "[The 2003 ESOP Transaction] could not have occurred without the agreement of the ESOP trustee to stand down. It was <u>not as if the significant risks</u> the Company could be taking on <u>were hidden</u> or not easy to extrapolate from the Company's recent history."

July 12, 2013 Expert Report of Mark A. Greenberg ("Greenberg Report"), Dep. Ex. 797, Doc. No. 214-12, p. 19800 (emphasis added).

Also, Plaintiff's expert on liability issues conceded that he was not aware of any material facts that were not disclosed to the ESOP:

> "Q.    . . . Does your report say any facts suggesting that one group of shareholders in this transaction misled another group of shareholders as to any facts?
>
> A.    No, I don't think my report talks about any conscious action on anyone to mislead or defraud.
>
> \* \* \*
>
> Q.    . . . Your report does not claim there were material facts withheld from GreatBanc [the ESOP Trustee], Duff & Phelps, and Jenkens & Gilchrist, correct?
>
> A.    That's correct."

May 6, 2014 Deposition of Gregory A. Gehlmann Dep., pp. 79, 82.[4]

All material facts were thus disclosed to the ESOP.

### 2.    All Material Facts Were Disclosed to the Selling Shareholders

Houlihan was the financial advisor engaged to determine whether the transaction was fair to the non-ESOP shareholders. SUF, ¶ 24. Plaintiff admitted that it was not aware of any material facts that were not disclosed to Houlihan. SUF, ¶ 52.

In addition, a fact would be material to the non-ESOP shareholders only if the fact suggested that the $850 price should be higher. Plaintiff does not claim that the price per share should have been higher than $850; Plaintiff claims that the price should have been lower. March 14, 2014 Report of Dave G. Borden, CPA/ABV ("Borden

---

[4] Mr. Gehlmann's deposition is being filed with the Court simultaneously with the filing of this motion.

Report"), pp. 49-50. It necessarily follows that all material facts were disclosed to the non-ESOP shareholders.

Plaintiff's liability expert conceded that he was not aware of any material facts that were not disclosed to the non-ESOP shareholders:

> "Q. . . . [Y]ou're aware that The Antioch Company had a number of outside shareholders who were neither employees nor management:
>
> A. Correct.
>
> Q. And those persons were being asked to tender their shares?
>
> A. Correct.
>
> Q. And . . . a company . . . faces a potential claim that the transaction was unfair to those people because the price was too low, right?
>
> A. Correct.
>
>       * * *
>
> Q. And the purpose of the tender [offer proxy statement, Dep. Ex. 31, Doc. No. 98-12] as to those people is to protect them then from a price per share that is below fair market value?
>
> A. That's correct.
>
> Q. <u>You don't claim that happened here, do you</u>?
>
> A. <u>No</u>.
>
>       * * *
>
> Q. Let me give you some real specifics. Suppose the company in my hypothetical is offering two thousand dollars per share in the tender. There's information that's not disclosed to those people that would have suggested the shares were actually worth a thousand dollars. Okay? The people tender

> their shares, they collect their two thousand dollars.
> You would agree with me in that situation the
> selling shareholders aren't harmed by the failure to
> disclose information to them?
>
> A.    Correct."

Gehlmann Dep., pp. 283-85, 286 (emphasis added).

The testimony of Plaintiff's expert thus establishes that all facts that were

material to the non-ESOP shareholders were disclosed to them.

### E.    SUMMARY

In short, the 2003 ESOP Transaction was an agreement between Antioch's

shareholders that was reached after all material facts were disclosed.  Plaintiff's theory in

this case is that the Directors had a duty to second-guess an agreement reached by all of

Antioch's shareholders.  The Court should reject that theory, and should grant summary

judgment to MWE for two reasons:  (1) all shareholders consented to the transaction; and

(2) the one disinterested shareholder -- the ESOP -- consented to the transaction.

### III.    DIRECTOR APPROVAL

### A.    THE 2003 ESOP TRANSACTION WAS APPROVED BY ANTIOCH'S DISINTERESTED DIRECTORS AND IS PROTECTED BY THE BUSINESS JUDGMENT RULE

Ohio has adopted the business judgment rule, which protects disinterested

directors.  Stepak v. Schey, 553 N.E.2d 1072, 1076 (Ohio 1990) (Holmes, J.,

concurring).  This "rule recognizes that many important corporate decisions are made

under conditions of uncertainty, and it prevents courts from imposing liability on the

basis of ex post judicial hindsight and lowers the volume of costly litigation challenging

directorial actions." Radol v. Thomas, 772 F.2d 244, 257 (6th Cir. 1985) cert. denied,

477 U.S. 903, 106 S. Ct. 3272 (1986).  Accord:  Granada Invs., Inc. v. DWG Corp., 823

F. Supp. 448, 455 (N.D. Ohio 1993) (quoting Joy v. North, 692 F.2d 880, 866 (2d Cir.

1982), cert. denied, 460 U.S. 1051, 103 S. Ct. 1498 (1983)).  The business judgment rule

is "highly deferential."  Healthcare Mgmt. & Inv. Holdings, LLC v. Feldman, Nos.

1:03CV0323 and 1:04CV0883, 2006 U.S. Dist. LEXIS 66038, at *32 (N.D. Ohio Sept.

15, 2006).  "[A] court will not substitute its judgment for that of the [director or officer] if

the . . . decision can be attributed to any rational business purpose."  Id. at *32-33

(emphasis added) (omission of text in original) (internal quotation marks and citation

omitted).  Accord:  Gries Sports Enters. v. Cleveland Browns Football Co., 496 N.E.2d

959, 965 (Ohio 1986) ("any rational business purpose") (internal quotation marks and

citation omitted) (applying Delaware law); In re Goodyear Tire & Rubber Co. Derivative

Litig, Case Nos. 5:03CV2180, 5:03CV2204; 5:03CV2374; 5:03CV2468; and

5:03CV2469, 2007 U.S. Dist. LEXIS 1233, at *31-32 (N.D. Ohio Jan. 5, 2007).

   A director is interested in a transaction only if the director will receive a

benefit that is not available to all shareholders.  McCall v. Scott, 239 F.3d 808, 817 (6th

Cir. 2001) ("A director is considered interested when, for example, he will receive a

personal financial benefit from a transaction that is not equally shared by the stockholders

. . . .") (emphasis added); Baldwin v. Bader, No. 07-46-P-H, 2008 U.S. Dist. LEXIS

56236, at *122 (D. Me. July 23, 2008) ("The defendants are correct that a

director/shareholder who stands to benefit from a stock-offer plan or other corporate

scheme does not engage in self-dealing when all shareholders are afforded the right to

participate on equal terms in the transaction.") (emphasis added); In re Synthes, Inc.

Shareholder Litig., 50 Ohio A.3d 1022, 1035 (Del. Ch. 2012) (observing that "a

fiduciary's financial interest in a transaction as a stockholder . . . <u>does not establish a disabling conflict of interest</u> when the transaction treats <u>all stockholders equally</u>") (emphasis added).

In <u>Koos v. Cent. Ohio Cellular, Inc.</u>, 641 N.E.2d 265, 269-70 (Ohio Ct. App. Cuyahoga Cty. 1994), the corporation offered to sell shares to all of its shareholders. The plaintiffs (minority shareholders) were given the opportunity to buy shares (and thus avoid dilution), but they declined to do so. <u>Id</u>.

The plaintiffs filed a shareholder derivative suit (on behalf of the corporation -- see Ohio R. Civ. P. 23.1) against the other shareholders. <u>Id</u>. at 268. Plaintiffs argued that the defendants acted in bad faith when they caused the corporation to issue stock to themselves at less than fair value. <u>Id</u>. at 275. The court affirmed the grant of summary judgment to the defendants:

> "Plaintiffs were given the same right as all other
> shareholders to purchase their pro rata share of Cellwave's
> proposed stock offering and avoid dilution. Plaintiffs
> consulted their attorney, and decided, for their own
> personal reasons, that they did not want to invest any more
> funds in Cellwave. . . . <u>Since all shareholders had the right
> to participate equally in the stock offering, no fiduciary
> breach occurred. The business judgment rule protects the
> issuance of stock from attack as a breach of the duty of
> care.</u>"

<u>Id</u>. (emphasis added) (citation omitted).

Thus, in <u>Koos</u>, the minority shareholders had the option to be treated "equally." <u>Id</u>. The fact that some shareholders <u>elected</u> to be treated differently (<u>i.e.</u>, decided not to buy more shares) was immaterial. <u>Id</u>. Because the shareholders had the

option to be treated equally, the directors retained the protection of the business judgment rule. Id.

Here, the ESOP also had the option to be treated "equally." If the ESOP wished to be treated like all other shareholders, then all it had to do was tender its shares. If it would have done so, then there would have been no transaction, and all the shareholders would have been treated equally. SUF, ¶ 29. The following chart demonstrates the similarities between Koos and this case:

| **Description** | **Koos** | **Antioch v. MWE** |
|---|---|---|
| Proposed corporate action: | Corporation selling shares to shareholders | Corporation buying shares from shareholders |
| Option available to minority shareholders: | Buy shares from corporation | Offer to sell shares to corporation |
| Effect if shareholder exercises option: | All shareholders treated equally. All shareholders pay the same amount for new shares | All shareholders treated equally. Corporation pays $0 to all shareholders |

Therefore, here as in Koos, all shareholders had the option to be treated "equally." Koos, 641 N.E.2d at 275. The fact that the ESOP here elected to be treated differently does not change the fact that it had the right to be treated the same. Therefore, under Koos, "the business judgment rule protects the [purchase] of stock from attack." Id.

The 2003 ESOP Transaction easily clears the "any rational business purpose" standard that applies under the business judgment rule. The transaction was

expected to generate $130 million in additional cash for Antioch (due to tax savings, and after all costs had been accounted for). SUF, ¶ 41.

### B. EVEN WERE THE BUSINESS JUDGMENT RULE NOT TO APPLY, PLAINTIFF CANNOT RECOVER DAMAGES

Even if the business judgment rule did not apply, MWE would still be entitled to summary judgment. Specifically, Plaintiff has advanced two damages theories. First, Plaintiff seeks damages equal to the difference between the $850 per share price and the $720 price that Plaintiff's expert claims the shares were worth. Borden Report, pp. 49-50. As demonstrated below, the Court should grant summary judgment to MWE because Plaintiff cannot prove "by clear and convincing evidence" that the Board acted "with reckless disregard for the best interests of the corporation." Ohio Rev. Code § 1701.59(E).

Second, Plaintiff seeks damages under a "void the transaction" theory in an amount equal to the amounts that Antioch paid to the Morgans (less certain tax consequences of voiding the transaction). Dep. Ex. 842.[5] As demonstrated below, the Court should grant summary judgment to MWE because disinterested Directors approved the 2003 ESOP Transaction after full disclosure of all material facts.

---

[5] As demonstrated in the Motion of Defendant McDermott Will & Emery LLP to Exclude Untimely Additional Opinion of Plaintiff's Expert Dave G. Borden Under Fed. R. Civ. P. 26(a)(2) (Doc. No. 91) and in the Reply Memorandum of Defendant McDermott Will & Emery LLP to Plaintiff's Memorandum In Opposition To Defendant's Motion to Exclude Untimely Additional Opinion of Plaintiff's Expert Dave G. Borden Under Fed. R. Civ. P. 26(a)(2) (Doc. No. 114), Plaintiff should be barred from pursuing damages under this theory because it provided its damages calculation on the morning of Borden's deposition, well after the deadline for Plaintiff to provide expert reports.

1.  **Plaintiff Cannot Prove by "Clear and Convincing Evidence" That the Actions of the Board Were Made with Intent to Injure Antioch or with Reckless Disregard**

Under Ohio law, a director can be liable for damages only in limited

circumstances:

> "A director shall be liable in damages for any action that
> the director takes or fails to take as a director only if it is
> proved by clear and convincing evidence in a court of
> competent jurisdiction that the director's action or failure to
> act involved an act or omission undertaken with deliberate
> intent to cause injury to the corporation or undertaken with
> reckless disregard for the best interests of the corporation.
> Nothing contained in this division affects the liability of
> directors under section 1701.95 of the Revised Code or
> limits relief available under section 1701.60 of the Revised
> Code."

Ohio Rev. Code § 1701.59(E) (emphasis added).

Here, Plaintiff has never claimed that the Board acted with "intent to cause

injury" to Antioch. Nor can Plaintiff establish by "clear and convincing evidence" that

the Board acted with "reckless disregard." Specifically, Antioch engaged Deloitte;

Deloitte concluded that Antioch's shares were worth $875 per share, and that Antioch

would have an additional $130 million in ten years if it executed the transaction. SUF,

¶¶ 41-42.

Further, before the transaction closed, the Board asked management to

prepare a "downside" scenario to determine the impact that the 2003 ESOP Transaction

would have on Antioch if Antioch's sales were to decline. SUF, ¶ 68. Plaintiff's expert

conceded that it was "good governance" for the Board to ask for a downside scenario.

SUF, ¶ 69. At the next Board meeting (also before the transaction closed), the

"downside" scenario was presented, and it showed that if Antioch's sales declined and then flattened, then Antioch would still have $62 million more in cash than it would have had if it did not execute the 2003 ESOP Transaction. SUF, ¶¶ 70-71.

Pursuant to Ohio Rev. Code § 1701.59(C)(2), the Directors were entitled to rely upon the "financial data" provided to them. The Directors were, therefore, entitled to rely upon the information provided to them, which demonstrated that the 2003 ESOP Transaction was expected to be in the best interest of Antioch ($130 million benefit expected) and would still be in Antioch's best interest if sales declined and flattened out ($62 million benefit under the downside scenario).

Plaintiff thus cannot establish by "clear and convincing evidence" that the Directors acted with "reckless disregard" for the best interests of Antioch. The Court should thus grant summary judgment to MWE on Plaintiff's claim that MWE should have advised Antioch to pursue a damages remedy against its Directors.

## 2. The 2003 ESOP Transaction Is Not Void or Voidable

A transaction is not "void or voidable" if it is approved by a majority of the corporation's disinterested directors:

> "No contract, action, or transaction shall be void or voidable . . . if in any such case any of the following apply:
>
> (a) The material facts as to his or their relationship or interest and as to the contract, action, or transaction are disclosed or are known to the directors or the committee and the directors or committee, in good faith reasonably justified by such facts, authorizes the contract, action, or transaction by the affirmative vote of a majority of the disinterested directors, even though the disinterested directors constitute less than a quorum of the directors or the committee;"

Ohio Rev. Code § 1701.60(A)(1)(a) (emphasis added).

It is undisputed that one member of the Board -- Alan Luce -- did not own any shares and was thus a disinterested Board member:

> "Q.   . . . as you've just described them, <u>some of the directors were interested</u>, correct?
>
> A.   Yes, all but three.  Two were -- <u>well, all but one</u> maybe from what I understand.
>
> Q.   Well, and --
>
> A.   Mr. Luce, I believe, was the only one --
>
> Q.   Right.
>
> A.   -- if I'm correct.
>
> Q.   Mr. Luce owned no shares of any shape.
>
> A.   Correct."

Plaintiff Dep., Doc. No. 103, p. 8068 (pp. 230-31) (emphasis added).

It is also undisputed that Mr. Luce was loyal to Antioch:

> "Q.   Are you aware of any specific facts that suggest that Mr. Luce was not loyal to The Antioch Company?
>
> A.   Not as I sit here today, no."

<u>Id</u>. at 8043 (p. 132).

In addition to Luce, there were two other Board members (Borstad and Brooks-Cain) who were employees of Antioch, but who owned no shares outside of the ESOP.  SUF, ¶ 60..  They thus constitute disinterested Directors as well.

Plaintiff has not identified any material facts that were not disclosed to the Board.  Gehlmann Dep., p. 270 ("Q.  You don't claim in your report that there were any

material misstatements or omissions in terms of information provided to the board in those presentations of historic facts, right?  A.  Based on 2003, and so no.").

The Court should thus conclude that the transaction was approved by a majority of Antioch's disinterested Directors, and was not "void or voidable."

## IV.    THERE WERE NO FACTS KNOWN TO MWE SUGGESTING THAT THE 2003 ESOP TRANSACTION WAS NOT FAIR TO ANTIOCH

Plaintiff's liability expert conceded that if MWE was not aware of facts establishing a basis to file suit, then MWE had no obligation to advise Antioch to sue its Directors.  Gehlmann Dep., p. 47.  As demonstrated below, the Court should grant summary judgment to MWE because there was no way for MWE to know in 2007 (when the statute of limitations expired on Antioch's claims against its Directors) that the 2003 ESOP Transaction was unfair to Antioch as of the time of the transaction in 2003.  It clearly is not enough to show only that subsequent, post-2003 events which were not known by anyone in 2003, demonstrate that the transaction was a bad one.  As also demonstrated below, the best way for the Court to determine the facts that MWE should have known in 2007 is to examine the facts that Plaintiff knew at the time of its Rule 30(b)(6) deposition in 2011.  Certainly, MWE could not have known more in 2007 when the limitations period expired, than Plaintiff knew four years later.

Specifically, as to facts known to MWE in 2007 on which it could base an evaluation of the fairness of the transaction as of 2003, MWE would have known facts provided to it in documents and orally. There is no evidence in this case of any material oral communications that were not also available in writing.  Indeed, the deposition

26

exhibits in this case include many detailed notes and minutes of meetings. SUF, ¶ 62. Plaintiff's liability expert admitted that he could not identify "any material oral communications." Gehlmann Dep., pp. 94-95 ("I don't know."). Thus, the material facts known to MWE in 2007 were all available in the documents.

As to facts known to Plaintiff in 2011, MWE conducted a Rule 30(b)(6) deposition of Plaintiff in 2011. Before that deposition occurred, MWE had produced all of its documents to Plaintiff. Further, before that deposition, Plaintiff had access to thousands of documents that it obtained in discovery covering over one million pages, many of which MWE had never seen (e.g., internal Antioch documents, GreatBanc documents, Duff & Phelps documents, Houlihan documents, Deloitte documents, etc.). Thus, at the time of the 2011 Rule 30(b)(6) deposition of Plaintiff, Plaintiff had access to substantially more information than MWE had access to in 2007 (when the statute of limitations expired).

The person that Plaintiff designated as its Rule 30(b)(6) designee was a lawyer -- Plaintiff's designee was Timothy Miller, who is a partner at the firm Taft, Stettinius & Hollister. This Court has held that attorneys representing a party (i.e., Plaintiff's litigation counsel in this case) have an obligation to prepare that party for a Rule 30(b)(6) deposition. United States ex. rel. Fry v. Health Alliance of Greater Cincinnati, No. 1:03-cv-167, 2009 U.S. Dist. LEXIS 122533, at *6, *10 (S.D. Ohio Nov. 20, 2009) (Black, M.J.), ("The duty to produce the prepared witness on designated topics extends to matters not only within the personal knowledge of the witness, but also on all matters reasonably known by the responding party. Counsel has the responsibility to prepare its designee to the extent matters are reasonably available, whether from

documents, past employees, or other sources. The other sources may include information transmitted from the party's attorneys. . . . <u>[T]he fact that government attorneys are the only individuals with the requisite knowledge to answer Defendants['] questions does not prevent them from preparing a designee to answer the questions</u>.") (emphasis added) (citations omitted), <u>aff'd</u>, No. 1:03-CV-00167, 2010 U.S. Dist. LEXIS 1558 (S.D. Ohio Jan. 6, 2010). Indeed, this Court may recall that there was a discovery dispute between the parties as to whether litigation counsel for Plaintiff had a duty to prepare a Rule 30(b)(6) designee for a deposition. Plaintiff argued that it had no such obligation because Plaintiff is a litigation trust without personal knowledge of the facts. At the discovery conference with the Court, and in light of this Court's prior ruling on that precise issue, counsel for Plaintiff agreed to prepare Mr. Miller for a Rule 30(b)(6) deposition.

Turning to substance, Deloitte concluded that Antioch's shares were worth $875 per share in 2003 based on information then available and that Antioch would have an additional $130 million in cash if it executed the 2003 ESOP Transaction. SUF, ¶¶ 41-42. Plaintiff conceded at its Rule 30(b)(6) deposition that it was not "aware of any specific facts" suggesting that there were "any errors of any sort" made by Deloitte. Plaintiff Dep., Doc. No. 103, p. 8041 (p. 122). <u>Accord</u>: Gehlmann Dep., p. 73 (Plaintiff's liability expert admitted that he also was not aware of any errors made by Deloitte).

In addition, there were the following facts that confirmed the fairness of the $850 price:

    1.    <u>BVI</u>: BVI was engaged to determine the share price that would be paid to retiring employees. SUF, ¶ 34. If the historic growth rate in the value of Antioch's shares was applied to BVI's December 31, 2002 value of $680, then the share price for the 2003 ESOP Transaction would have been <u>$1,143</u>. SUF, ¶ 37.

2. <u>Duff and Phelps</u>: Duff and Phelps was the financial advisor to the ESOP. SUF, ¶ 44. Since the ESOP was to become the 100% owner of Antioch after the 2003 ESOP Transaction, it was in the financial interest of the ESOP that the price per share paid to the non-ESOP shareholders be set as low as possible. SUF, ¶ 44. Duff and Phelps concluded that the Antioch shares were worth between $774 and $932, with a midpoint of <u>$853</u>, and that the $850 price was fair to the ESOP. SUF, ¶¶ 46-47.

3. <u>Houlihan</u>: Houlihan was engaged to determine whether the $850 price was fair to the selling shareholders (<u>i.e.</u>, that the $850 price was not too low). SUF, ¶ 48. Houlihan concluded that the shares were worth between $825 and $920 (midpoint of <u>$872.50</u>), and the price was thus fair to the selling shareholders. SUF, ¶ 49. Houlihan testified that it would not calculate a value range that was higher or lower than what it thought the shares were worth since its clients could be injured if it did so, and that its value range would have been the same if it had represented Antioch. SUF, ¶¶ 50-51.

4. <u>Prairie Capital</u>: Prairie Capital replaced BVI and was responsible for determining the value per share that would be paid to retiring Antioch employees. SUF, ¶ 53. Prairie Capital determined that Antioch's shares were worth <u>$894</u> as of December 31, 2003 (<u>i.e.</u>, two weeks after the 2003 ESOP Transaction closed). SUF, ¶ 54.

5. <u>Plaintiff's Own Expert</u>: Plaintiff's own expert conceded that Antioch's shares were worth between <u>$1,000 and $1,200</u> post-transaction, and that the 2003 ESOP Transaction was a "<u>good deal</u>" for Antioch. SUF, ¶¶ 56-57. (emphasis added).

MWE would not have an obligation to advise Antioch to sue its Directors unless MWE <u>knew</u> facts suggesting that the price was not fair to Antioch. In light of the fact that Plaintiff could not identify "any specific facts" showing that there were "any errors of any sort" made by Deloitte, and in light of all the other valuations that were consistent with Deloitte's valuation, Plaintiff cannot establish that there were facts known to MWE in 2007 that would have given MWE a basis to advise Antioch to sue its Directors. The Court should thus conclude that MWE did not commit malpractice by failing to advise Antioch to sue its Directors.

Even assuming for the sake of argument that MWE should have known that there was an error in the financial analysis, that would not be enough to advise Antioch to sue its Board. Plaintiff would need to prove both: (a) that the Board knew or should have known of the error in 2003; and (b) that MWE was aware of facts that the Board had such knowledge. There are no facts showing either to be true in this case.

## V.        <u>CONCLUSION</u>

Admissions made by Plaintiff and Plaintiff's own experts demonstrate that this Court should grant summary judgment to MWE. Specifically, admissions by those persons establish that: (1) Antioch's shareholders consented to the 2003 ESOP Transaction after disclosure of all material facts; (2) Antioch's disinterested Board members approved the 2003 ESOP Transaction after disclosure of all material facts; and (3) there were no facts of which MWE should have been aware in 2007 that would have established a basis for MWE to advise Antioch to sue its Directors. The Court should thus grant summary judgment to MWE on Plaintiff's fifth claim.

Respectfully submitted,


s/ Charles J. Faruki
Charles J. Faruki (0010417)
   Trial Attorney
Jeffrey S. Sharkey (0067892)
Donald E. Burton (0040553)
FARUKI IRELAND & COX P.L.L.
500 Courthouse Plaza, S.W.
10 North Ludlow Street
Dayton, OH  45402
Telephone:  (937) 227-3705
Telecopier:  (937) 227-3717
Email:  cfaruki@ficlaw.com

Attorneys for Defendant
McDermott Will & Emery LLP

**CERTIFICATE OF SERVICE**

I certify that on the 7th day of August, 2014, I electronically filed the

foregoing Defendant McDermott Will & Emery LLP's Motion for Summary Judgment on

Liability Issues Relating to the Fairness of the 2003 ESOP Transaction with the Clerk of

Courts using the CM/ECF system, which will send notification of such filing to CM/ECF

participants:

> Marcia Voorhis Andrew
> Thomas R. Schuck
> Aaron M. Herzig
> Christina L. Fischer
> TAFT STETTINIUS & HOLLISTER LLP
> 425 Walnut Street, Suite 1800
> Cincinnati, OH  45202-3957
>
> Attorneys for Plaintiff

> s/ Jeffrey S. Sharkey
> Jeffrey S. Sharkey

474030.3