IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT
WESTERN DIVISION (AT DAYTON)

| | | |
|---|---|---|
| ANTIOCH LITIGATION TRUST, | : | CASE NO. 09-CV-218 |
| W. TIMOTHY MILLER, TRUSTEE, | : | |
| | : | (Judge Timothy S. Black) |
| Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | |
| MCDERMOTT WILL & EMERY LLP, | : | |
| | : | |
| Defendant. | : | |
| | : | |
| | : | |

---

**STATEMENT OF UNDISPUTED FACTS IN SUPPORT OF DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT ON LIABILITY ISSUES
RELATING TO THE FAIRNESS OF THE 2003 ESOP TRANSACTION**

---

Charles J. Faruki (0010417)
Trial Attorney
Jeffrey S. Sharkey (0067892)
Donald E. Burton (0040553)
FARUKI IRELAND & COX P.L.L.
500 Courthouse Plaza, S.W.
10 North Ludlow Street
Dayton, OH  45402
Telephone:  (937) 227-3705
Telecopier:  (937) 227-3717
Email:  cfaruki@ficlaw.com

Attorneys for Defendant
McDermott Will & Emery LLP

EXHIBIT 1

## TABLE OF CONTENTS

**Page**

I.     THE ANTIOCH COMPANY ............................................................................1

II.    ANTIOCH'S SHAREHOLDERS.....................................................................3

III.   THE 2003 ESOP TRANSACTION ................................................................4

IV.   SIX FINANCIAL ADVISORS CONCLUDED THAT ANTIOCH'S SHARES
       WERE WORTH MORE THAN $850.............................................................9

       A.     BVI ......................................................................................................9

       B.     DELOITTE...........................................................................................10

       C.     DUFF & PHELPS ...............................................................................11

       D.    HOULIHAN .........................................................................................12

       E.     PRAIRIE CAPITAL.............................................................................13

       F.     MARK GREENBERG .........................................................................13

V.     ANTIOCH'S BOARD APPROVED THE 2003 ESOP TRANSACTION .......14

**STATEMENT OF UNDISPUTED FACTS IN SUPPORT OF
DEFENDANT'S MOTION FOR SUMMARY JUDGMENT ON LIABILITY
ISSUES RELATING TO THE FAIRNESS OF THE 2003 ESOP TRANSACTION**

Pursuant to Federal Rule of Civil Procedure 56 and this Court's Standing Order

Governing Civil Motions for Summary Judgment, Defendant McDermott Will & Emery LLP

("MWE") submits the following undisputed facts in support of its Motion for Summary

Judgment on Liability Issues Relating to the Fairness of the 2003 ESOP Transaction.

I.        **THE ANTIOCH COMPANY**

1.        The Company was founded in 1926, and later incorporated in 1946, as

Antioch Bookplate. In 1996, its corporate and trade name was officially changed to The

Antioch Company. The Company was originally a printer of bookplates, but it eventually

produced bookstore items such as bookmarks, book covers and calendars. Following its

acquisition of Webway, Inc, and Heritage Springfield, Inc., in 1985 and 1990 respectively,

the Company's predominate product became photo albums. After the rapid growth of is

Creative Memories division, the Company became primarily a direct marketer of photo

albums and accessories sold through the party plan direct sales method by tens of thousands

of independent sales consultants. Dep. Ex. 31 - Offer to Purchase, Doc. No. 98-13, p. 4969.

Admitted by Plaintiff at Doc. No. 176, ¶ 7, p. 17308; Doc. No. 332, § IV(B)(2), p. 29852.[1]

2.        In 1979, the Company established an ESOP, a tax-qualified retirement

plan in accordance with sections 401(a) and 4975(7) of the Internal Revenue Code of 1986, and

---

[1] The "Doc. No." citations throughout these undisputed facts refer to those documents filed by Plaintiff in The
Antioch Company Litigation Trust, W. Timothy Miller, Trustee, v. Lee Morgan, et al., Case No. 3:10-CV-156.  All
page references are to the page identification number (PageID).  General Order No. Day 12-01, p. 12.

section 407(d)(6) of ERISA, designed to invest primarily in stock of the Company.  Admitted by Plaintiff at Doc. No. 332, § IV(B)(6), p. 29853.

3.     From 1999 to 2003, net sales for Antioch increased from $200.90 million to $374.75 million, increasing at a compounded annual growth rate of 16.9% between 1999 and 2003.  Dep. Ex. 48, p. KMK-013017 (Prairie Capital Valuation Report as of December 31, 2003).

4.     Further, gross profits increased from $116.03 million in 1999 to $236.55 million in 2003.  Id.

5.     Antioch's sales and profits leading up to the Transaction in 2003 were a record for the Company.  May 22, 2014 Deposition of David G. Borden, CPA/ABV ("Borden Dep."), p. 179.

6.     Antioch's sales, gross profits and net earnings all increased from 1999 through 2003:



**Source:  Ex. 48, p. KMK-013045**

## II.        ANTIOCH'S SHAREHOLDERS

      7.        Antioch had two groups of shareholders.  The first group was its

non-ESOP shareholders, which included some (but not all) of its Directors and officers, as well

as other persons.  Dep. Ex. 294 (list of non-ESOP shareholders).

      8.        The ESOP was also a shareholder, and it owned approximately 43% of

Antioch's shares.  Plaintiff's Consolidated Statement of Disputed Issues of Material Fact

("Plaintiff's Consolidated Statement"), Doc. No. 113-1, ¶ 4, p. 8635.

      9.        The ESOP acted through an ESOP Trustee, who was appointed to

represent the best interest of the ESOP.  May 6, 2014 Deposition of Gregory A. Gehlmann

("Gehlmann Dep."), p. 79; July 10-11, 2012 Deposition of Marilyn Marchetti ("Marchetti Dep."),

Doc. No. 85, p. 3182 (pp. 15-17); Dep. Ex. 525, Doc. No. 98-41.

**III.**          **THE 2003 ESOP TRANSACTION**

10.    In January 2003, Antioch held an "ESOP summit," the purpose of which was to discuss compliance with a new IRS ruling regarding the allocation of cash within an ESOP.  Dep. Ex. 336; May 23, 2011 Rule 30(b)(6) Deposition of Plaintiff ("Plaintiff Dep."), Doc. No. 103, p. 8019 (p. 35); Gehlmann Dep., p. 180; Plaintiff's Consolidated Statement, Doc. No. 113-1, ¶ 4, p. 8635.

11.    The ESOP summit was attended by Deloitte & Touche ("Deloitte"), as well as various Antioch employees.  Dep. Ex. 336, p. DT2400.

12.    At the ESOP summit, Deloitte suggested that Antioch consider engaging in an ESOP transaction, through which Antioch would purchase the shares of its non-ESOP shareholders and the ESOP would become the 100% shareholder of Antioch (the "2003 ESOP Transaction").  Id. at DT2403; April 18-19, 2012 Deposition of Dan Holthaus ("Holthaus Dep."), Doc. No. 81, p. 2726 (p. 29).

13.    In addition to achieving compliance with the new IRS ruling, the 2003 ESOP Transaction would have tax benefits for Antioch.  Specifically, Antioch was an S-corporation, and thus owed no incomes taxes; its income taxes flowed through to its shareholders.  Holthaus Dep., Doc. No. 81, p. 2724 (p. 19).  Antioch paid dividends to its shareholders to allow them to pay those tax liabilities.  Id. at 2724 (p. 20).

14.    If Antioch was 100% owned by the ESOP, then the need to pay those dividends would be eliminated.  Id. at 2727 (pp. 32-33).  The reason that the need to pay dividends would be eliminated is that an ESOP is not required to pay income taxes.  Id. at 2724 (p. 21).  Thus, after the transaction, Antioch would be an S-corporation (and owe no taxes itself)

4

whose sole shareholder would be the ESOP (who also owed no taxes). Id. at 2724, 2727 (pp. 19-21, 32-33).

15.     The 2003 ESOP Transaction would thus eliminate Antioch's need to make payments for income taxes. Id. at 2727 (pp. 32-33).

16.     MWE was engaged as corporate counsel for the Company on May 27, 2003, to advise the Board with respect to the proposed transaction. Dep. Ex. 334; Plaintiff's Consolidated Statement, Doc. No. 113-1, p. 8637, ¶ 11.

17.     MWE advised Antioch to appoint an independent ESOP Trustee to represent the ESOP in connection with the transaction. September 20-21, 2012 Deposition of Marsha D. Matthews ("Matthews Dep."), Doc. No. 86, p. 3388 (p. 253).

18.     Antioch followed that advice, and on August 4, 2003, it engaged GreatBanc Trust Co. ("GreatBanc") to fill that role. Dep. Ex. 525 (Doc. No. 98-41). GreatBanc was a respected trustee, which has been involved in a number of similar transactions. Gehlmann Dep., p. 80.

19.     As ESOP Trustee, GreatBanc was required to act in the best interest of the ESOP, and to exercise its "independent discretionary judgment" in connection with the 2003 ESOP Transaction. Dep. Ex. 525, Doc. No. 98-41, p. 5318; Marchetti Dep., Doc. No. 85, p. 3182 (p. 17).

20.     There were extensive negotiations among the ESOP (i.e., GreatBanc), the selling shareholders and the Company leading to the terms of the 2003 ESOP Transaction. Plaintiff Dep., Doc. No. 103, p. 8017 (p. 26); Marchetti Dep., Doc. No. 85, p. 3188 (pp. 40-41).

5

21.     GreatBanc engaged a financial advisor -- Duff & Phelps -- to assist it in its role as the ESOP Trustee.  Dep. Ex. 528, Doc. No. 98-43, p. 5330, ¶ 2.  Duff & Phelps was a respected financial advisor.  Plaintiff Dep., Doc. No. 103, p. 8017 (p. 29); Gehlmann Dep., p. 81.

22.     GreatBanc also engaged independent legal counsel -- Jenkens & Gilchrist -- to assist it in its role as the ESOP Trustee.  Dep. Ex. 526, Doc. No. 98-42.  Jenkens & Gilchrist was a respected law firm.  Gehlmann Dep., p. 81.

23.     MWE also advised Antioch to engage a financial advisor to opine on whether the transaction was fair to the non-ESOP shareholders (i.e., that the price per share was not too low).  Dep. Ex. 379, Doc. No. 98-33, p. 5218; Matthews Dep., Doc. No. 86, p. 3327 (pp. 31-32).

24.     Antioch engaged Houlihan Lokey Howard & Zukin Financial Advisors, Inc. ("Houlihan") to opine on whether the transaction was fair to the non-ESOP shareholders. Dep. Ex. 45.

25.     On November 14, 2003, Antioch issued an Offer to Purchase it shares (the "Tender Offer") to all of Antioch's shareholders.  Dep. Ex. 31, Doc. No. 98-12-98-14; Plaintiff's Consolidated Statement, Doc. No. 113-1, p. 8640, ¶ 20.  That Tender Offer was about one inch thick, and contained detailed information about the transaction.  Dep. Ex. 31, Doc. Nos. 98-12 through 98-14.

26.     In addition to the Tender Offer, Antioch established a "war room," which had extensive information about Antioch that was made available to the advisors working on the transaction.  Dep. Ex. 530 (listing materials in war room), Doc. No. 77, p. 2287.  The ESOP

Trustee and its financial advisor (GreatBanc and Duff & Phelps) had access to the war room, and stated that they were provided all the information that they wanted regarding the transaction. Marchetti Dep., Doc. No. 85, pp. 3193-94 (pp. 61-62, 64-65); August 22-23, 2012 Deposition of Lee Scott Bloom ("Bloom Dep."), Doc. No. 77, p. 2287 (pp. 71-73).

      27.     Plaintiff was not aware of any material facts that were not disclosed to GreatBanc and Duff & Phelps. Plaintiff Dep., Doc. No. 103, p. 8050 (pp. 159-60); Gehlmann Dep., p. 82.

      28.     The consideration that Antioch agreed to pay in the 2003 ESOP Transaction falls into the following categories:

      a.     <u>Consideration Provided to the ESOP</u>: Antioch agreed to provide certain payments to the employee-members of the ESOP, which included certain dividend payments and a put price protection which guaranteed certain minimum payments to retirees. Dep. Ex. 20, pp. GBT01233-34. Plaintiff does not claim that those payments were unfair to Antioch.

> "Q.    Does the Litigation Trust assert that the distributions made by The Antioch Company to the ESOP associated with this transaction were unfair to The Antioch Company?
>
> A.    I'm not aware that we made that allegation in any of our complaints."

Plaintiff Dep., Doc. No. 103, p. 8044 (p. 136).

      b.     <u>Consideration Provided to the Selling Shareholders</u>: The consideration that Antioch provided to the selling shareholders falls into two categories. Specifically, selling shareholders had a choice between receiving either:

     i.    <u>Package of cash, notes and warrants</u>: One option available to the selling shareholders was to select a package of $280 cash, a $280 note and a $290 warrant (the warrants were an option to purchase Antioch's shares in 2013 for $850). Dep. Ex. 15, Doc. No. 98-8, p. 4803; Dep. Ex. 31, Doc. No. 98-12, p. 4915. Of Antioch's 279,163 non-ESOP shareholders, 156,000 selected this option (roughly 55%). Dep. Ex. 294.

     ii.    <u>Cash</u>: The other option available to the selling shareholders was to select $850 in cash. Dep. Ex. 31, Doc. No. 98-12, p. 4915. Of Antioch's 279,163 non-ESOP shareholders, 122,313 selected this option (roughly 45%). Dep. Ex. 294.

29.    The 2003 ESOP Transaction was conditioned upon the ESOP not tendering its shares. Plaintiff Dep., Doc. No. 103, p. 8017 (pp. 27-28); Gehlmann Dep., p. 283. If the ESOP would have tendered its shares, then there would have been no transaction. Marchetti Dep., Doc. No. 85, pp. 3185-86 (pp. 29-30).

30.    The ESOP (through its Trustee, GreatBanc) thus "consented" to the transaction by not tendering its shares. Plaintiff Dep., p. 31, Doc. No. 103, p. 8018; Marchetti Dep., Doc. No. 85, pp. 3185-86 (pp. 29-30).

31.    All of the non-ESOP shareholders consented to the 2003 ESOP Transaction by tendering their shares. Dep. Ex. 294; Plaintiff Dep., p. 31, Doc. No. 103, p. 8018.

32.    Plaintiff testified that all of Antioch's shareholders consented to the 2003 ESOP Transaction:

    "Q.    . . . Is it your understanding that the ESOP, through GreatBanc, essentially consented to the tender offer by declining to tender its shares?

    A.    Yes. That's how I understood it unfolded, yes.

    Q.    So just so we are clear, <u>all of the shareholders consented to the transaction</u>. The non-ESOP

> shareholders consented by tendering their shares,
> the ESOP consented by not tendering its shares?
>
> A. Yes . . . ."

Plaintiff Dep., Doc. No. 103, p. 8018 (p. 31) (emphasis added).

33. The 2003 ESOP Transaction closed on December 16, 2003. Dep. Ex. 20.

## IV. SIX FINANCIAL ADVISORS CONCLUDED THAT ANTIOCH'S SHARES WERE WORTH MORE THAN $850

### A. BVI

34. In the years prior to the 2003 transaction, BVI was the financial advisor engaged to value Antioch's shares to determine the amounts to be paid to employees who retired. Dep. Ex. 3, p. MWE0019976.

35. BVI determined that Antioch's shares were worth $680 per share as of December 31, 2002 (i.e., about one year before the transaction). Id. at MWE0019974.

36. The growth percentage in the price-per-share from $680 per share (as of December 31, 2002) to $850 per share (as of December 16, 2003, when the 2003 ESOP Transaction closed) was one of the smallest increases that Antioch experienced in the ten years prior to the 2003 ESOP Transaction:

| Year | Price Per Share | Percent Increase |
|------|-----------------|------------------|
| 1993 | $   9.84 | |
| 1994 | $  12.92 | 31.30% |
| 1995 | $  34.48 | 166.87% |
| 1996 | $  82.36 | 138.86% |
| 1997 | $ 189.96 | 130.65% |
| 1998 | $ 244.76 | 28.85% |

9

| Year | Price Per Share | Percent Increase |
|------|-----------------|------------------|
| 1999 | $ 307.00 | 25.4%% |
| 2000 | $ 379.00 | 23.5%% |
| 2001 | $ 496.00 | 30.87% |
| 2002 | $ 680.00 | 37.10% |
| 2003 | $ 850.00 | 25.00% |

Source: Dep. Ex. 3, p. MWE 20011 (as to 1993-2002 price per share figures);
Dep. Ex. 31, Doc. No. 98-12, p. 4915 (as to $850 price-per-share offered in the 2003 ESOP Transaction).

37.    The average percentage increase in Antioch's value per share from 1993 - 2002 was 68.15%. If that 68.15% annual growth rate was applied to BVI's December 31, 2002 price of $680, then the share price in the 2003 ESOP Transaction would have been approximately $1,143 per share.

38.    Plaintiff was not aware of any errors in BVI's analysis. Plaintiff Dep., Doc. No. 103, pp. 8013-14 (pp. 13-14).

**B.    DELOITTE**

39.    Antioch engaged Deloitte on February 17, 2003 to analyze the potential 2003 ESOP Transaction. Dep. Ex. 24B, Doc No. 98-11.

40.    Dan Holthaus, a partner at Deloitte, testified:

"Q.    . . . . And who was Deloitte's client?

A.    The Antioch Company.

Q.    It wasn't any of its individual employees, directors, shareholders?

A.    No. It was the Antioch Company.

10

> Q.    And did you understand that, having been engaged
> by the Antioch Company, it was one of your
> responsibilities to act in the best interest of the
> company and not necessarily the individuals who
> are involved?
>
> A.    Yes.  We generally act in the best interest of our
> client.  Not generally.  We do."

Holthaus Dep., Doc. No. 81, p. 2728 (pp. 34-35).

41.    Due to the tax benefits of the 2003 ESOP Transaction, Deloitte concluded

that Antioch would have an additional $130 million in ten years if it executed the 2003 ESOP

Transaction.  Dep. Ex. 437, p. D&P_A006628; Holthaus Dep.,Doc. No. 81, p. 2739 (p. 81).

42.    Deloitte also concluded that Antioch's shares were worth $875.00 per

share.  Dep. Ex. 26B, p. HL000514; Dep. Ex. 134, p. DT2428; Dep. Ex. 133, p. DT1728;

Holthaus Dep., Doc. No. 81, pp. 2732-33 (pp. 50-54).

43.    Plaintiff testified that it was not aware of "any specific facts" suggesting

that there were "any errors of any sort" made by Deloitte.  Plaintiff Dep., Doc. No. 103, p. 8041

(p. 122).

## C.    DUFF & PHELPS

44.    As discussed above, GreatBanc engaged a financial advisor -- Duff &

Phelps -- to advise GreatBanc in its role as the ESOP Trustee.  Dep. Ex. 528, Doc. No. 98-43,

p. 5330, ¶ 2.

45.    Since the ESOP was to become the 100% shareholder of Antioch after the

2003 ESOP Transaction, it was in the best interest of the ESOP that the price Antioch paid to the

selling shareholders be as low as possible.  Plaintiff Dep., Doc. No. 103, p. 8016 (p. 25);

11

Marchetti Dep., Doc. No. 85, p. 3183 (pp. 18-19); Bloom Dep., Doc. No. 77, p. 2285 (p. 62); Gehlmann Dep., p. 118.

46.     Duff & Phelps concluded that Antioch's shares were worth $774 to $932 (midpoint of $853).  Dep. Ex. 15, Doc. No. 98-8, p. 4819.

47.     One week before the transaction closed, Duff & Phelps provided an updated analysis to GreatBanc that stated that the consideration (i.e., the $850 per share and the package) to be provided to the selling shareholders was fair to the ESOP from a financial point of view.  Dep. Ex. 539, Doc. No. 98-45, p. 5342.

### D.     HOULIHAN

48.     Antioch engaged Houlihan to opine on whether the transaction was fair to the non-ESOP shareholders.  Dep. Ex. 45.

49.     Houlihan concluded that Antioch's shares were worth between $825 and $920 (midpoint of that range is $872.50).  Dep. Ex. 14, Doc. No. 98-7, p. 4759.

50.     Kreg Jackson (the person in the lead at Houlihan) explained that Houlihan would not "under any circumstances draft an opinion that included a value range for a company that was higher or lower than what [it] thought the company was actually worth," and that Houlihan's clients could be injured if it were to offer inaccurate value ranges.  February 29, 2012 Deposition of Kreg Jackson ("Jackson Dep."), Doc. No. 83, p. 2975 (pp. 22-23).

51.     Mr. Jackson further testified:

"Q.     Would your opinion [as to the $825-$920 value range] have
        been any different if you had been engaged to determine

whether the amount of the consideration being paid by the corporation was fair to it?

\* \* \*

A.      No."

Id. at 3042 (pp. 291-92).

52.      Plaintiff was not aware of any material facts that were not disclosed to Houlihan.  Plaintiff Dep., Doc. No. 103, p. 8050 (pp. 159-60).

### E.      **PRAIRIE CAPITAL**

53.      Prairie Capital was engaged to replace BVI, and was responsible for valuing Antioch's shares to determine the amount to be paid to retiring employees.  Dep. Ex. 48.

54.      Prairie Capital determined that as of December 31, 2003 (i.e., only two weeks after the 2003 ESOP Transaction closed), Antioch's shares were worth $894 per share. Dep. Ex. 48, p. KMK-013033.

### F.      **MARK GREENBERG**

55.      Mark Greenberg is a financial expert engaged by Plaintiff.  Dep. Ex. 797, Doc. No. 214-12, p. 19777.  He sponsored an opinion that Antioch's shares were worth $689 on a post-transaction basis.  Id. at 19786.

56.      However, at his deposition, Mr. Greenberg admitted that he made a mathematical error in his calculation, and that after that error was corrected, Antioch's shares were actually worth $1,000 to $1,200 per share on a post-transaction basis.  August 26-27, 2013 Deposition of Mark A. Greenberg ("Greenberg Dep."), Doc. No. 215, pp. 20127-29.

57.    Mr. Greenberg testified that the 2003 ESOP Transaction was a "good deal" for Antioch on a post-transaction basis once the error in his calculation was corrected. Id. at 20128-29.

## V.    ANTIOCH'S BOARD APPROVED THE 2003 ESOP TRANSACTION

58.    There were nine voting Board members at the time of the 2003 ESOP Transaction: Lee Morgan, Asha Morgan Moran, Alan Luce, Ben Carlson, Denis Sanan, Malte von Matthiessen, Jeannine McLaughlin, Sandra Borstad, and Debra Brooks Cain. Dep. Ex. 12, Doc. No. 98-6, p. 4691 (listing Board members; Joe Foster was a non-voting member).

59.    Antioch reserved two voting seats on its Board of Directors for non-management employees. April 24-25, 2012 Deposition of Nancy Blair ("Blair Dep."), Doc. No. 76, pp. 2208-09 (pp. 453-54); June 6, 2012 Deposition of Benjamin Carlson ("Carlson Dep."), Doc. No. 79, p. 2528 (pp. 135-36). Admitted by Plaintiff at Doc. No. 270, ¶ 5, p. 26261. Borstad and Brooks-Cain were the non-management employee members of the Board. Dep. Ex. 12, Doc. No. 98-6.

60.    Three of Antioch's Board members -- Luce, Borstad, and Brooks-Cain -- did not own shares of Antioch's stock outside of the ESOP, and thus would not be selling shareholders in the 2003 ESOP Transaction. Dep. Ex. 31, Doc. No. 98-13, p. 4995.

61.    Plaintiff's liability expert (Gehlmann) agreed that it was "common that directors will own shares in a corporation," that some corporations "require directors to own shares," and companies do so "to align the interests of the corporation and the directors." Gehlmann Dep., p. 175.

62.     The 2003 ESOP Transaction was the subject of a series of presentations at Board meetings in the second half of 2003. Dep. Ex. 4 (presentation at July 17, 2003 Board meeting), Doc. No. 98-3; Dep. Ex. 379, Doc. No. 98-33, p. 5218 (minutes of July 17, 2003 Board meeting); Dep. Ex. 380 (presentation at August 21, 2003 Board meeting); Dep. Ex. 33, Doc. No. 98-15, p. 5099 (minutes of August 21, 2003 Board meeting); Dep. Ex. 436 (presentation at October 16, 2003 Board meeting); Dep. Ex. 495, Doc. No. 98-39, p. 5313 (minutes of October 16, 2003 Board meeting); Dep. Ex. 437 (presentation at October 30, 2003 Board meeting); Dep. Ex. 152 , Doc. No. 98-21 (presentation at October 30, 2003 Board meeting); Dep. Ex. 12, p. GBT00103(minutes of October 30, 2003 Board meeting); Dep. Ex. 13 (presentation at December 4, 2003 Board meeting); Dep. Ex. 7, Doc. No. 98-5 (minutes of December 4, 2003 Board meeting).

63.     Plaintiff's liability expert (Gehlmann) testified that he was not aware of any "material misstatements or omissions" of historic facts made to the Board. Gehlmann Dep., p. 270.

64.     The Board unanimously voted to approve the 2003 ESOP Transaction using a valuation of $850 per share on October 30, 2003. Dep. Ex. 12, Doc. No. 98-6, p. 4692 (Brooks-Cain was absent).

65.     Analysis that Deloitte prepared for the October 30, 2003 meeting showed that Antioch was projected to have an additional $130 million in cash in ten years if it executed the 2003 ESOP Transaction. Dep. Ex. 437, p. D&P_A006628; Blair Dep., Doc No. 76, pp. 2098, 2104-05 (pp. 32, 57-58); Holthaus Dep., Doc. No. 81, p. 2739 (p. 81). That $130

million was a "net" number, meaning it was the projected tax benefits less all expenses. Blair Dep., Doc. No. 76, pp. 2097-98 (pp. 29-30).

66.     At the time of the October 30, 2003 meeting, Antioch's annual sales historically had been growing at a rate of 17.4%; the projections underlying the transaction were for a future growth rate of 10.4%. Dep. Ex. 437, p. D&P_A006619.

67.     The projections underlying that analysis were contained in pages D&P_A006615-20 of Dep. Ex. 437. Each page of those projections contained the following notice: "The Company believes these assumptions are reasonable but the effects of the transaction may differ materially from those described if such assumptions are not accurate." Id.

68.     At the October 30, 2003 Board meeting, the Board asked management to prepare a "downside" scenario to determine the effect that the 2003 ESOP Transaction would have on Antioch in the event that Antioch's sales declined in the future. Blair Dep., Doc. No. 76, pp. 2114-15 (pp. 97-99); April 9-10, 2012 Deposition of Asha Morgan Moran ("Moran Dep."), Doc. No. 89, p. 3769 (pp. 397-98); April 26-27, 2012 Deposition of Wayne Alan Luce ("Luce Dep."), Doc. No. 84, pp. 3081-82 (pp. 85-86); Carlson Dep., Doc. No. 79, p. 2545 (pp. 203-04); June 18-19 2012 Deposition of Denis R. Sanan ("Sanan Dep."), Doc. No. 92, pp. 4041, 4077 (pp. 112, 254); June 19-20 2012 Deposition of Jeanine M. McLaughlin ("McLaughlin Dep."), Doc. No. 87, p. 3474 (pp. 160-61).

69.     Plaintiff's liability expert agreed that it was "good governance" by Antioch's Board to request a downside scenario. Gehlmann Dep., p. 238.

70.     That "downside" scenario that the Board requested at the October 30, 2003
Board meeting was presented to Antioch's Board at the December 4, 2003 Board meeting.  Dep.
Ex. 13.  The "downside" scenario was prepared with the assistance of Deloitte (Blair Dep., Doc.
No. 76, p. 2147 (p. 228)) and assumed that Antioch's "[s]ales decline and then flatten out."  Dep.
Ex. 13, p. MMO0001771.

71.     Under those assumptions, due to the tax benefits of the transaction,
Antioch was projected to have an additional $62 million in cash after ten years if it executed the
2003 ESOP Transaction.  Dep. Ex. 13, p. MMO0001773; Blair Dep., Doc. No. 76, p. 2115
(p. 101).

72.     At the December 4, 2003 Board meeting, the Board ratified the 2003
ESOP Transaction.  Dep. Ex. 7, Doc. No. 98-5, p. 4687 (ratifying offer to purchase).

73.     All members of the Board were present for that meeting (id. at 4660), and
all of them voted for it.  April 12-13, 2012 Deposition of Lee Morey Morgan, Doc. No. 90,
p. 3794 (p. 83).

Respectfully submitted,


s/ Charles J. Faruki
Charles J. Faruki (0010417)
   Trial Attorney
Jeffrey S. Sharkey (0067892)
Donald E. Burton (0040553)
FARUKI IRELAND & COX P.L.L.
500 Courthouse Plaza, S.W.
10 North Ludlow Street
Dayton, OH 45402
Telephone: (937) 227-3705
Telecopier: (937) 227-3717
Email: cfaruki@ficlaw.com

Attorneys for Defendant
McDermott Will & Emery LLP

## <u>CERTIFICATE OF SERVICE</u>

I certify that on the 7th day of August, 2014, I electronically filed the foregoing

Statement of Undisputed Facts in Support of Defendant's Motion for Summary Judgment on

Liability Issues Relating to the Fairness of the 2003 ESOP Transaction with the Clerk of Courts

using the CM/ECF system, which will send notification of such filing to CM/ECF participants,

and I hereby certify that I have mailed by United States Postal Service the document to the non-

CM/ECF participants:

        Marcia Voorhis Andrew
        Thomas R. Schuck
        Aaron M. Herzig
        Christina L. Fischer
        TAFT STETTINIUS & HOLLISTER LLP
        425 Walnut Street, Suite 1800
        Cincinnati, OH  45202-3957

        Attorneys for Plaintiff
        Antioch Litigation Trust

                                      <u>s/ Jeffrey S. Sharkey</u>
                                        Jeffrey S. Sharkey

864918.1