IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT
WESTERN DIVISION (AT DAYTON)

| | | |
|---|---|---|
| ANTIOCH LITIGATION TRUST, | : | CASE NO. 09-CV-218 |
| W. TIMOTHY MILLER, TRUSTEE, | : | |
| | : | (Judge Timothy S. Black) |
| Plaintiff, | : | |
| | : | |
| v. | : | **DEFENDANT'S MOTION TO** |
| | : | **STRIKE EXPERT REPORT OF** |
| MCDERMOTT WILL & EMERY LLP, | : | **DAVE G. BORDEN AND TO** |
| | : | **EXCLUDE HIS TESTIMONY** |
| Defendant. | : | |

Pursuant to Fed. R. Evid. 702 and Daubert v. Merrell Dow Pharms., 509 U.S. 579, 597, 113 S. Ct. 2786, 2799 (1993), Defendant McDermott Will & Emery LLP ("MWE") moves to strike the written report of Dave G. Borden, who was retained by Plaintiff to provide expert opinion testimony in this case regarding damages associated with the 2003 ESOP tender offer transaction (the "2003 ESOP Transaction"), and to exclude all evidence relating to Borden's opinions.

The Court should exclude Borden's opinions for two separate and independent reasons: (1) the figures used in Borden's damages analysis are entirely subjective; and (2) the information relied upon by Borden in his report was not known or knowable at the time of the 2003 ESOP Transaction.

Respectfully submitted,


/s/ Charles J. Faruki
Charles J. Faruki (0010417)
    Trial Attorney
Jeffrey S. Sharkey (0067892)
Donald E. Burton (0040553)
FARUKI IRELAND & COX P.L.L.
500 Courthouse Plaza, S.W.
10 North Ludlow Street
Dayton, OH 45402
Telephone: (937) 227-3705
Telecopier: (937) 227-3717
Email: cfaruki@ficlaw.com

Attorneys for Defendant
McDermott Will & Emery LLP

# TABLE OF CONTENTS

**Page**

I.    INTRODUCTION AND SUMMARY ............................................................. 1

II.    BACKGROUND FACTS ............................................................................ 4

    A.    Historical Performance of The Antioch Company ................................. 4

    B.    Six Financial Advisors Concluded that Antioch's Shares were Worth More than $850 ....................................................................................... 5

        1.    BVI .................................................................................. 5

        2.    Deloitte & Touche ........................................................... 6

        3.    Houlihan Lokey Howard Zukin ....................................... 6

        4.    Duff & Phelps ................................................................. 7

        5.    Prairie Capital ................................................................. 8

        6.    Mark A. Greenberg ......................................................... 8

III.    GOVERNING STANDARD ..................................................................... 8

IV.    THE COURT SHOULD EXCLUDE BORDEN'S OPINIONS FOR TWO SEPARATE AND INDEPENDENT REASONS ......................................... 10

    A.    The Figures Used in Borden's Damages Analysis Are Entirely Subjective and Unreasonable ............................................................................. 10

    B.    The Information Relied Upon by Borden in His Report was not Known or Knowable at the Time of the 2003 ESOP Transaction ......................... 13

        1.    The Survey Upon which Borden Relies was Published in 2004 ............. 14

        2.    Borden Cannot Provide a Copy of the 2004 Survey ................................ 15

        3.    Borden's Opinions are Inconsistent with the Materials on which He Relies ............................................................................. 17

V.    CONCLUSION ....................................................................................... 18

## MEMORANDUM IN SUPPORT OF DEFENDANT'S MOTION TO STRIKE EXPERT REPORT OF DAVE G. BORDEN AND TO EXCLUDE HIS TESTIMONY

## I.        INTRODUCTION AND SUMMARY

Plaintiff's damages expert, David Borden, has submitted an expert report claiming, "[T]he Fair Market Value of the stock of the [Antioch] Company at the time of The [2003] Transaction was $720 per share," and based on the difference between this $720 price and the $850 sale price, concludes, "The Transaction exceeded the Fair Market Value by $36,050,690." March 14, 2014, Expert Report of Dave G. Borden ("Borden Report") [Doc. Nos. 123-12 – 123-13], pp. 4749-50 (pp. 49-50).[1]  To arrive at his $720 price, Borden modifies the calculations of two financial advisory firms that worked on the 2003 ESOP Transaction, Houlihan Lokey Howard and Zukin Financial Advisors, LLC ("Houlihan") (the financial advisor to the non-ESOP shareholders) and Duff & Phelps, LLC ("Duff & Phelps") (the financial advisor to the ESOP).  Specifically, Houlihan concluded that Antioch's shares were worth $825 to $920 (midpoint of $872.50), and Duff & Phelps concluded that Antioch's shares were worth $774 to $932 (midpoint of $853).  Mr. Borden, however, modified certain calculations performed by Houlihan and Duff & Phelps and averaged the resulting values to arrive at a per share value of $720.

The Court should strike Borden's report and exclude all evidence relating to his opinions for two separate and independent reasons.

First, the figures used in Borden's damages analysis are entirely subjective and unreasonable.  For example, Borden revised Houlihan's and Duff & Phelps's calculations by applying a company specific risk factor ("CSRF") of 5 percent to Houlihan's calculations and

---

[1] Citations to the Court's electronic PageID number are in the form "p. __."

3 percent to Duff & Phelps's calculations. The result of applying such a risk factor is to reduce the values calculated by Houlihan and Duff & Phelps. May 22, 2014 Deposition of David G. Borden ("Borden Dep.") [Doc Nos. 121-122], p. 4286 (p. 77). However, Borden admitted that he has not sponsored any calculations to arrive at the CSRF that he used, but rather, these were numbers that he selected "based upon [his] judgment and [his] evaluation of the risk." Id. at 4289 (pp. 87-88).

To satisfy the reliability standard of Fed. R. Evid. 702, an expert witness must explain "how and why" he reached his opinions. In re Scrap Metal Antitrust Litig., 527 F.3d 517, 529, 531 (6th Cir. 2008). Nowhere in his report does Borden present any calculation or supporting basis for the CSRF that he used; they are simply numbers that he selected out of thin air. He wants the Court to take his "word for it." However, the Sixth Circuit has held that courts should not take the witness's "word for it." Thomas v. City of Chattanooga, 398 F.3d 426, 431-32 (6th Cir. 2005), cert. denied, 546 U.S. 814, 126 S. Ct. 338 (2005). Accord: Nelson v. Tenn. Gas Pipeline Co., 243 F.3d 244, 254 (6th Cir. 2001) ("A district court is not required to admit expert testimony 'that is connected to existing data only by the ipse dixit of the expert.'" (quoting, Gen. Elec. v. Joiner, 522 U.S. 136, 146, 118 S. Ct. 512, 519 (1997)).

Second, Borden's first error (selecting a CSRF out of thin air) is compounded by the fact that he relied heavily on information that was not available until after the 2003 ESOP Transaction closed to select his CSRF. Borden conceded that the value of Antioch's shares for the 2003 ESOP Transaction should be determined based on "information that was 'known or knowable' at the time of The Transaction." Borden Report, p. 4701 (p. 2). Based upon information that he claims was known or knowable in 2003, Borden concluded that a modified CSRF should be applied to Houlihan's and Duff & Phelps's calculations. Id. at 4746-48 (pp. 46-

48).  However, the information upon which Borden relied in calculating the value of the Company's shares was not known or knowable until more than six months after the 2003 ESOP Transaction closed.

Specifically, in determining what information was "known or knowable" at the time of the 2003 ESOP Transaction, Borden relied heavily on the results of a survey of scrapbooking customers that (according to Borden) showed that customer preferences reflected a declining interest in scrapbooking and a shift in customer preferences away from in-house consultants (the method that Antioch used to sell its products).  Id. at 4707 (p. 8).  The problem with Borden's reliance on that survey, however, is that the survey was conducted in 2003, but was not published until 2004.  Mr. Borden cites to no facts – and there are none in the record – demonstrating that anyone associated with the 2003 ESOP Transaction knew or could have known in 2003 facts that were not published until 2004.[2]

To make matters worse, Borden lost his copy of the 2004 Survey and has not been able to locate another copy.  Borden Dep., p. 4304 (pp. 146-47).  The only information that Plaintiff has produced in discovery related to that 2004 Survey is a 2004 Article that reports on the 2004 Survey[3] and a 2007 Survey that contains some of the information published in the 2004 Survey.[4]  The 2004 Article, however, states that it "can only really scratch the surface" of the 2004 Survey, and Borden admitted that the 2004 Survey was "significantly more comprehensive than the magazine article."  2004 Article, p. 48; Borden Dep., p. 4311 (p. 175).  Borden acknowledged that he "would much prefer to have the '04 report than this article."  Borden Dep.,

---

[2] In this motion, MWE refers to the survey here as the "2004 Survey" because it was published in 2004.

[3] Dep. Ex. 852, "The 2003 National Survey of Scrapbooking in America." Craftrends Magazine. June 2004 ("2004 Article").

[4] Dep. Ex. 846. CK Media, "2007 National Survey of Scrapbooking in America." 2007. ("2007 Survey").

p. 4310 (p. 171). Similarly, the 2007 Survey reports on some of the information contained in the 2004 Survey, but much of the data that Borden cites to from the 2004 Survey is not contained in either the 2004 Article or the 2007 Survey.

Since Mr. Borden has lost the 2004 Survey on which his opinions are based, there is no way for MWE to determine (a) whether Borden has accurately described what is in the actual 2004 Survey; or (b) more importantly, whether the full 2004 Survey included information that would support conclusions that are inconsistent with Borden's opinions.

In addition to the facts that the information in the 2004 Survey could not have been known in 2003 and that Borden lost the 2004 Survey, the little information that was available is inconsistent with Borden's opinions about the health of the scrapbooking market. For example, Borden states, "Scrapbooking became widely popular in the late 1990's but by 2003 was beginning to lose some of its popularity." Borden Report, p. 4707 (p. 8). However, that claim is inconsistent with the 2004 Article, which states that the scrapbooking industry had grown by "more than 50 percent over the last three years [2001-2003]." 2004 Article, p. 44.

## II.     BACKGROUND FACTS

### A.     Historical Performance of The Antioch Company

From 1999 to 2003, net sales for Antioch increased from $200.9 million to $374.7 million, increasing at a compounded annual growth rate of 16.9%. Dep. Ex. 48, Doc No. 123-5, p. 4497. Further, gross profits increased from $116 million (57.8% of sales) in 1999 to $236.5 million (63.1% of sales) in 2003. Id. According to Borden, "History means something . . . and this company was very successful, very good growth, very good profitability." Borden Dep.,

p. 4322 (p. 218). As acknowledged by Borden, Antioch's sales and profits leading up to the 2003 ESOP Transaction were a record for the Company. Id. at 4312 (p. 179).

Antioch's five-year sales, gross profits, and net earnings are summarized in the chart below.



**Antioch sales, profits, and earnings (In 000s): 1999-2003**

Source: Dep. Ex. 48, p. 4525.

## B. Six Financial Advisors Concluded that Antioch's Shares Were Worth More than $850

As discussed below, analyses by six different financial analysts demonstrate that Antioch's shares were worth more than $850.

### 1. BVI

In the years prior to the 2003 ESOP Transaction, BVI was the financial advisor engaged to value Antioch's shares to determine the amounts to be paid to employees who retired. Dep. Ex. 3, Doc. No. 123-1, p. 4371. BVI determined that Antioch's shares were worth $680 per

share as of December 31, 2002 (i.e., about one year before the transaction). Id. at 4369. The average percentage increase in Antioch's value per share from 1993 - 2002 was 68.15%. Id. at 4406. If that 68.15% annual growth rate was applied to BVI's December 31, 2002 price of $680, then the share price in the 2003 ESOP Transaction would have been approximately $1,143 per share. Mr. Borden described BVI's analysis, but did not criticize it. Borden Dep., p. 4278 (pp. 42-43).

### 2.    Deloitte & Touche

In early 2003, Antioch engaged Deloitte & Touche ("Deloitte") to perform a feasibility analysis of the proposed ESOP transaction and restructuring. Dep. Ex. 24B [Doc. No. 98-11], p. 4882 (Case No. 3:10-cv-00156). In connection with its analysis, Deloitte calculated that Antioch was expected to have an additional $130 million in cash after ten years if it executed the 2003 ESOP Transaction (after the various tax savings and expenses were considered), and concluded that the Company's shares were worth $875 per share. Dep. Ex. 437, Doc. No. 123-10, p. 4649; Dep. Ex. 26B, p. HL000514; Dep. Ex. 133, p. DT1728; Dep. Ex. 134, p. DT2428. In his report, Borden described Deloitte's valuation, but did not criticize it. Borden Dep., p. 4278 (pp. 42-43).

### 3.    Houlihan Lokey Howard Zukin

Antioch retained Houlihan to render an opinion as to whether the 2003 ESOP Transaction was fair to the selling shareholders. Dep. Ex. 45, Doc. No. 123-4, p. 4466. In its fairness opinion, Houlihan performed both a DCF analysis and market (or comparables) analysis, both discussed more fully below, to determine the value of Antioch's shares, and concluded that the Company's shares were worth between $825 and $920 per share (midpoint of $872.50). Dep.

Ex. 14 [Doc. No. 98-7], p. 4759 (Case No. 3:10-cv-00156); Dep. Ex. 152 [Doc. No. 98-21], p. 5141 (Case No. 3:10-cv-00156).

Kreg Jackson was the person in the lead at Houlihan for its work on the 2003 ESOP Transaction. Mr. Jackson explained that Houlihan would not "under any circumstances draft an opinion that include[s] a value range for a company that was higher or lower than what [he] thought the company was actually worth," and that Houlihan's clients could be injured if it were to offer inaccurate value ranges. February 29, 2012 Deposition of Kreg J. Jackson [Doc. No. 83], p. 2975 (pp. 22-23) (Case No. 3:10-cv-00156). He further testified that Houlihan's opinion as to share value would not have been any different if it had been engaged to determine whether the $850 price was fair to Antioch. Id. at 3042 (pp. 291-92).

### 4. Duff & Phelps

GreatBanc Trust Co., the independent ESOP trustee, engaged Duff & Phelps to provide independent advisory services in connection with the 2003 ESOP Transaction. Dep. Ex. 528 [Doc. No. 98-43], p. 5330 (Case No. 3:10-cv-00156). Since the ESOP was to become the 100% shareholder of Antioch after the 2003 ESOP Transaction, it was in the best interest of the ESOP that the price Antioch paid to the selling shareholders be as low as possible. May 23, 2011 Rule 30(b)(6) Deposition of W. Timothy Miller ("Plaintiff Dep.") [Doc No. 103], p. 8016 (p. 25) (Case No. 3:10-cv-00156). Duff & Phelps utilized both the DCF and market valuation approaches to determine that Antioch's shares were worth between $774 and $932 per share (midpoint of $853). Dep. Ex. 15 [Doc. No. 98-8], p. 4819 (Case No. 3:10-cv-00156).

### 5. Prairie Capital

After the 2003 ESOP Transaction closed, the ESOP engaged Prairie Capital Advisors, Inc. ("Prairie Capital") to perform a valuation of Antioch's common stock as of December 31, 2003. Dep. Ex. 48, Doc. No. 123-5, p. 4474. The purpose of this valuation was to determine the fair market value of the Company's common stock held indirectly by employee participants through the ESOP. Prairie Capital determined a per share value of $894 as of December 31, 2003 (i.e., two weeks after the transaction closed). Id. at 4513. In determining this value, Prairie Capital performed both a DCF and comparables analysis. Id. at 4502. Borden did not criticize Prairie Capital's valuation methods or the $894 share value. Borden Dep., p. 4278 (pp. 42-43).

### 6. Mark A. Greenberg

Mark Greenberg is a financial expert engaged by Plaintiff. Dep. Ex. 797 [Doc. No. 214-12], p. 19777 (Case No. 3:10-cv-00156). He sponsored an opinion that Antioch's shares were worth $689 on a post-transaction basis. Id. at 19786. However, at his deposition, Mr. Greenberg admitted that he made a mathematical error in his calculation, and that after that error was corrected, Antioch's shares were actually worth $1,000 to $1,200 per share on a post-transaction basis. August 26-27, 2013 Deposition of Mark A. Greenberg [Doc. Nos. 214-215], pp. 20127-29 (pp. 474-76) (Case No. 3:10-cv-00156). Mr. Greenberg conceded that the 2003 ESOP Transaction was a "good deal" for Antioch on a post-transaction basis once the error in his calculation was corrected. Id. at 20128-29 (pp. 475-76).

## III.     GOVERNING STANDARD

"[T]he Court must exclude expert testimony that does not squarely comport with the Federal Rules of Evidence, including the Rule 702 requirements of qualifications, reliability,

and relevance." <u>Info-Hold, Inc. v. Muzak LLC</u>, No. 1:11-cv-283, 2013 U.S. Dist. LEXIS 117953, at *2-3 (S.D. Ohio Aug. 20, 2013) (Black, J.). This gatekeeping function "applies to all expert testimony." <u>Kumho Tire Co., Ltd. v. Carmichael</u>, 526 U.S. 137, 147, 119 S. Ct. 1167, 1174 (1999). The proffering party must demonstrate by "a preponderance of evidence that the expert's testimony is reliable, relevant, and that the expert is qualified to give his opinion on each subject matter for which it is offered." <u>Info-Hold</u>, 2013 U.S. Dist. LEXIS 117953 at *4.

When assessing the reliability of an expert's opinion, the Court must "determine whether it rests upon a reliable foundation, as opposed to, say, unsupported speculation." <u>In re Scrap Metal</u>, 527 F.3d at 529-30. To satisfy this standard, the expert must explain "<u>how and why</u>" he has reached his opinion. <u>Id.</u> at 531 (emphasis added). <u>Accord</u>: <u>Kumho Tire</u>, 526 U.S. at 152. The burden of explaining "how and why" an expert reaches his opinion applies with equal force to scientific and non-scientific testimony. <u>Thomas v. City of Chattanooga</u>, 398 F.3d 426, 431, 432 (6th Cir. 2005). In <u>Thomas</u>, the Sixth Circuit Court of Appeals followed the Advisory Committee Note to Rule 702, which states in pertinent part:

> "[I]f the witness is relying solely or primarily on experience, then the witness must explain <u>how that experience leads to the conclusion reached</u> . . . and <u>how that experience is reliably applied to the facts</u>. The trial court's gatekeeping function requires more than simply 'taking the expert's word for it.'"

<u>Id.</u> at 432 (emphasis added) (quoting Fed. R. Evid. 702 advisory committee's note (2000 amend.)).

More recently, in <u>Automated Solutions Corp. v. Paragon Data Sys.</u>, the Sixth Circuit stated, "[e]xpert reports must include 'how' and 'why' the expert reached a particular result, not merely the expert's conclusory opinions." No. 13-3025/3058, 2014 U.S. App. LEXIS

11918, at *38 (6th Cir. 2014) (quoting, <u>R.C. Olmstead, Inc. v. CU Interface, LLC</u>, 606 F.3d 262,

271 (6th Cir. 2010)). <u>Accord</u>: <u>Alexander v. CareSource</u>, 576 F.3d 551, 560 (6th Cir. 2009)

("Conclusory statements unadorned with supporting facts are insufficient to establish a factual

dispute that will defeat summary judgment."); <u>Nelson v. Tenn. Gas Pipeline Co.</u>, 243 F.3d 244,

254 (6th Cir. 2001) ("A district court is not required to admit expert testimony 'that is connected

to existing data only by the *ipse dixit* of the expert.'" (quoting <u>Gen. Elec. Co. v. Joiner</u>, 522 U.S.

136, 146, 118 S. Ct. 512, 519 (1997)).

## IV. THE COURT SHOULD EXCLUDE BORDEN'S OPINIONS FOR TWO SEPARATE AND INDEPENDENT REASONS

### A. The Figures Used in Borden's Damages Analysis Are Entirely Subjective and Unreasonable

The two valuation methods used by Houlihan and Duff & Phelps in this case were

the DCF analysis and the market (or comparables) approach. Dep. Ex. 152, p. 5141; Dep.

Ex. 15, p. 4815. In a DCF analysis, a company's value is derived by estimating future available

cash flows of the subject company and discounting those cash flows to present value at an

appropriate discount rate. Borden Report, p. 4739 (p. 39).

Under the market valuation approach (sometimes called the comparable company

approach), the value of a company is determined generally by analyzing similar public

companies and applying market multiples derived from the comparable companies to the subject

company. Stan Bernstein, Susan H. Seabury & Jack F. Williams, <u>Squaring Bankruptcy</u>

<u>Valuation Practice with Daubert Demands</u>, 16 Am. Bankr. Inst. L. Rev. 161, 194 (2008). For

example, in its fairness opinion, Duff & Phelps analyzed two comparable company groups:

(1) direct sales companies, and (2) craft/hobby companies. Dep. Ex. 15, p. 4815. The idea is

that companies with similar characteristics should have similar valuation multiples. 16 Am.

Bankr. Inst. L. Rev. at 193-94. Under the market valuation method, the expert seeks to determine the subject company's market value by analyzing the prices of comparable publicly-traded companies and, more specifically, the valuation multiples inherent in these prices vis-a-vis those companies' historical financial performance. Id. As a simplified example, if the analysis shows that comparable companies have a total value (market price, as determined on a stock exchange, times number of shares) on average of ten times their net profits, then one could estimate that the subject company was worth ten times its net profits.

In this case, both Houlihan and Duff & Phelps used the DCF and market valuation methods to value Antioch's shares at the time of the 2003 ESOP Transaction. Dep. Ex. 152, p. 5141; Dep. Ex. 15, p. 4815. In valuing Antioch's shares, Houlihan applied a three percent CSRF to its DCF analysis and calculated a range of multiples for its market approach. Dep. Ex. 152, p. 5140. In determining its CSRF, Houlihan took into account various potential risks facing Antioch at that time, including increased retail competition, Antioch's smaller size, and Antioch's limited international presence. Id. at 5139. Houlihan averaged the high and low values from its DCF and market calculations to arrive at a per share value range of $825 to $920 (midpoint of $872.50). Id. at 5141.

Duff & Phelps did not apply a CSRF to its DCF analysis, but rather, adjusted Antioch's sales projections downward to account for risks, including increased competition from other direct sales organizations that could enter the scrapbook arena, retail craft stores experimenting with scrapbook services and products, and the possibility of reaching a saturation point with respect to the number of independent consultants it can attract and retain. Dep. Ex. 15, p. 4812. In calculating the value of Antioch's shares, Duff & Phelps arrived at a per share value range of $774 to $932 (midpoint of $853). Id. at 4819.

In his report, Borden described the calculations performed by Houlihan and Duff & Phelps with which he disagreed, modified certain assumptions that they made regarding the potential risks specific to Antioch, and came up with a price per share of $720. Borden Report, pp. 4745-4750 (pp. 45-50). Specifically, Borden opined that Houlihan's risk adjustments were not large enough, and that Duff & Phelps erred in not making any such risk adjustments. He thus discounted Houlihan's market multiples even further and increased Houlihan's risk adjustment to five percent. Id. at 4746-47 (pp. 46-47). Borden then used a three percent risk adjustment for Duff & Phelps. Id. at 4748 (p. 48).

Borden admitted that he has not sponsored any calculations to arrive at the CSRF that he used:

> "Q. You've already told me that you have not sponsored any calculation of this five percent company-specific risk factor, right? I can't look at a piece of paper and say here's how we added up these items to five percent?
>
> A. No. Nor can you look at any specific calculation from Houlihan Lokey and calculate the three percent or anybody's specific company risk.
>
> Q. It's a number that you've selected based upon your judgment and your evaluation of the risk?
>
> A. That's correct.
>
>          * * *
>
> Q. And it's a product of your judgment, not a calculation that you've performed?
>
> A. That's correct."

Borden Dep., p. 4289 (pp. 87-88).

The fact is, Borden performed no calculations to arrive at his CSRF figures or adjustments to Houlihan's market multiples; he simply pulled those numbers out of the air, and wants the Court and the jury to rely on his report, just because he says it is so. Antioch Co. Litig. Trust v. Morgan, No. 3:10-cv-156, 2014 U.S. Dist. LEXIS 47740, at *10-11 (S.D. Ohio Apr. 7, 2014) (Black, J.) ("Opinion testimony is not reliable if it is based solely on the witness's say so."). Borden was required to explain "how and why" he arrived at the figures he used in his damages analysis. In re Scrap Metal, 527 F.3d at 531; Kumho Tire, 526 U.S. at 152. Because he has completely failed to include any calculation supporting those figures, the Court should not simply take his "word for it." Thomas, 398 F.3d at 432.

### B. The Information Relied Upon by Borden in His Report Was Not Known or Knowable at the Time of the 2003 ESOP Transaction

Not only are Borden's adjustments to Houlihan's and Duff & Phelps's calculations unreasonable because they are numbers that he picked out of thin air, but also, the reasons that he gave for making those adjustments in the first place are entirely unsupported. Specifically, Borden modified the calculations by Houlihan and Duff & Phelps because (in Borden's opinion) they relied upon "overly aggressive" projections from Antioch's management, which failed to account for an expected decline in the scrapbooking market in general and a shift in customer preferences away from making purchases from Antioch consultants. Borden Report, pp. 4720-22 (pp. 21-23); Borden Dep., p. 4332 (p. 259).

As discussed further below, Borden's analysis on that point contains three significant flaws:

1. Mr. Borden concedes that the figures used in the valuation analysis should be based upon information that was "known or knowable" at the time of the transaction. Borden Report, p. 4701 (p. 2). Despite that concession, Borden

criticizes Houlihan's and Duff & Phelps's 2003 work for not taking into account a survey that was not published until 2004. Borden Dep., p. 4304 (pp. 148-49).

2. To make matters worse, Borden has lost the 2004 Survey that he claims Houlihan and Duff & Phelps should have considered. Id. (p. 147).

3. Borden's claims that the scrapbooking market was in decline in 2003 is inconsistent with the materials that he relied upon (and has not lost), (i.e., 2004 Article, p. 49).

For each of these separate and independent reasons, the Court should conclude that Borden's opinions are not admissible.

1.     <u>The Survey Upon which Borden Relies was Published in 2004</u>

In his report, Borden relies heavily upon a survey published by CK Media titled <u>Scrapbooking in America</u> (the 2004 Survey), which reported on consumer habits in the scrapbooking industry. Borden Report, pp. 4707-16 (pp. 8-17). Although the survey was conducted in 2003, the survey was not published until June 2004, a fact which Borden acknowledges in his deposition. Borden Dep., p. 4304 (p. 148).

Relying heavily upon the 2004 Survey, Borden spends much of his report attempting to show that based upon the conditions of the scrapbooking market in 2003, the parties to the 2003 ESOP Transaction should have known that a sales downturn was coming. However, Borden admitted that he is not aware "of any evidence suggesting that anybody at The Antioch Company had access to either the report or to the magazine article in 2003." Borden Dep. p. 4304 (pp. 148-49). Borden claimed that Antioch could have known the information in the 2004 Survey since Antioch was in the scrapbooking industry. Id. (p. 149). However, he admitted that the purpose of the 2004 Survey was to provide information to "people who had businesses that were in the scrapbooking industry." Id. at 4308 (p. 164). The very point of the

survey was to provide information to industry participants that they did not know; otherwise, there would have been no need for the survey. Borden cited no facts in the record showing that anyone at Antioch knew or should have known the information contained in the 2004 Survey. Thus, it was improper for Borden to rely upon it.

## 2. Borden Cannot Provide a Copy of the 2004 Survey

To make matters worse, Borden cannot even produce a copy of the 2004 Survey:

"Q. Your report cites to a 2004 Scrapbooking in America report
  that I understand has been misplaced, right?

A. Correct.

\* \* \*

Q. Do you know what happened to it?

A. I wish I knew. No, I do not."

Id. at p. 4304, pp. 146-47. Thus, there is no way for MWE to determine whether the 2004 Survey contains information that is inconsistent with the information cited in Borden's expert report, or to cross examine Borden on it.

In lieu of producing the 2004 Survey, Borden produced a magazine article from Craftrends Magazine – also published in June 2004 – that discusses some of the results of the 2004 Survey. Id. (p. 148). However, the 2004 Article states that it "can only really scratch the surface" of the 2004 Survey, and Borden admitted that the 2004 Survey was "significantly more comprehensive than the magazine article." 2004 Article, p. 48; Borden Dep., p. 4311 (p. 175). Borden even acknowledged that he "would much prefer to have the '04 report than this article." Borden Dep., p. 4310 (p. 171).

Mr. Borden also provided a 2007 Survey by the same company (CK Media), which included some data from the 2004 Survey. Dep. Ex. 846. However, much of the information that Borden cited to in his report from the 2004 Survey is not contained in the 2004 Article or the 2007 Survey that he provided.

Examples of information that is <u>not</u> included in the 2004 Article or the 2007 Survey include:

1. Borden's Report contains an extensive discussion of "dedicated" scrapbookers. Borden Report, pp. 4707-15 (pp. 8-16). Specifically, he opines that "dedicated" scrapbookers spent the most money on scrapbooks, and that their preferences had changed so that they preferred to purchase scrapbooks from retail outlets, not the in-house consultants that Antioch used to sell its products. <u>Id</u>. at 4712-15 (pp. 13-16). However, there is no mention of "dedicated" scrapbookers in the 2004 Article. Dep. Ex. 852. Also, 2004 data for "dedicated" scrapbookers is not contained in the 2007 Survey. Dep. Ex. 846. Thus, there is no way for MWE to determine whether Borden accurately cited the data, or more importantly, whether the full 2004 Survey contains additional data that is inconsistent with his opinions.

2. The 2004 Article "does not indicate how many people were surveyed as a part of the 2004 survey." Borden Dep., p. 4310 (pp. 171-72). Nor does the 2007 Survey. Dep. Ex. 846.

3. "The [2004] magazine article doesn't indicate how the people who were surveyed were selected." Borden Dep., p. 4310 (p. 172). Nor does the 2007 Survey. Dep. Ex. 846.

4. "The [2004] magazine article does not indicate a method that was used to conduct the survey, whether it was telephone, Internet, or something else." Borden Dep., p. 4310 (p. 173). Nor does the 2007 Survey. Dep. Ex. 846.

5. "The [2004] magazine article doesn't indicate whether the respective surveys, meaning the one conducted in 2001 [also discussed in Borden's Report] and 2003, were conducted in the same manner." Borden Dep., pp. 4310-11 (pp. 173-74). Nor does the 2007 Survey. Dep. Ex. 846.

6. "The [2004] magazine article . . . doesn't indicate whether the results were statistically significant." Borden Dep., p. 4311 (p. 174). Nor does the 2007 Survey. Dep. Ex. 846.

In short, there is no way to determine who was surveyed, whether the methods used to conduct the survey were reasonable, whether Borden accurately described what is in the 2004 Survey, or whether the full 2004 Survey included information that would support a conclusion that was inconsistent with Borden's opinions. Borden wants the Court to take his "word for it" that the scrapbooking industry was declining at the time of the 2003 ESOP Transaction and that Antioch knew or should have known about the decline.

### 3. Borden's Opinions are Inconsistent with the Materials on which He Relies

Mr. Borden's claim that the 2004 Survey shows that the scrapbooking industry was in decline in 2003 is inconsistent with the 2004 Article upon which he relies. As an example, Borden's report includes a heading titled, "Overall Decline in Scrapbooking," under which he states, "by 2003 [scrapbooking] was beginning to lose some of its popularity." Borden Report, p. 4738 (p. 38). However, that claim is inconsistent with the 2004 Article, which states that the scrapbooking industry had grown by 50% over the last three years (2000-2003). 2004 Article, p. 44.

There was additional information included in the 2004 Article about the health of the scrapbooking industry that Borden chose to ignore. For example:

1. A total of 55 percent of scrapbookers considered themselves "addicts" in 2003. This increased by 67 percent since 2001. 2004 Article, p. 49.

2. On average, scrapbookers subscribed to one scrapbook-related magazine in 2001. In 2003, scrapbookers subscribed to an average of 2.2 such titles. Id.

3. Scrapbookers were spending more time on scrapbooking. In 2003, 51 percent of scrapbookers spent at least 10 hours scrapbooking in a typical month, compared to 37 percent in 2001. Id.

4.  In 2003, 76 percent of scrapbookers had a space or room in their home reserved for scrapbooking, as compared to 55 percent in 2001.  Id.

5.  In 2003, participants in the scrapbooking market articulated the view that digital photography would help the market, since digital photography made it easier to take, manage and print pictures.  For example, Stacy Julian, Editor-in-Chief of Simple Scrapbooks magazine stated, "Digital photography and storage makes taking, viewing, finding, restoring and printing photos easier than ever.  I think we will see people introduced to traditional 'paper and paste' scrapbook projects through the digital doorway."  Id. at p. 56.

Mr. Borden's opinions are inconsistent with the 2004 Article on which he relies. Indeed, as an industry insider stated in the 2004 Article, "You can quote me.  When it comes to industry growth, you ain't seen nothing yet."  Id. at p. 50.  Contrary to Borden's assertions, the 2004 Article on which he relies demonstrates that the scrapbooking industry was healthy in 2003.  Thus, even if the participants in the 2003 ESOP Transaction had access to the 2004 Article (they did not), then that article would not have supported Borden's conclusion that the industry was in decline.

V.          **CONCLUSION**

The Court should strike the written report of David Borden and exclude all evidence relating to his opinions for two separate and independent reasons:  (1) the figures used in Borden's damages analysis are entirely subjective, as he pulled his numbers out of thin air; and (2) the information on which Borden relied was not known or knowable at the time of the transaction, as the materials that he relied upon – which he lost and cannot produce – were not published until after the 2003 ESOP Transaction closed.

Respectfully submitted,


/s/ Charles J. Faruki
Charles J. Faruki (0010417)
   Trial Attorney
Jeffrey S. Sharkey (0067892)
Donald E. Burton (0040553)
FARUKI IRELAND & COX P.L.L.
500 Courthouse Plaza, S.W.
10 North Ludlow Street
Dayton, OH 45402
Telephone: (937) 227-3705
Telecopier: (937) 227-3717
Email: cfaruki@ficlaw.com

Attorneys for Defendant
McDermott Will & Emery LLP

## CERTIFICATE OF SERVICE

I certify that on the 21st day of August, 2014, I electronically filed the foregoing Defendant's Motion to Strike Expert Report of Dave G. Borden and to Exclude His Testimony with the Clerk of Courts using the CM/ECF system, which will send notification of such filing to CM/ECF participants, and I hereby certify that I have mailed by United States Postal Service the document to the non-CM/ECF participants:

Thomas R. Schuck
Marcia Voorhis Andrew
TAFT STETTINIUS & HOLLISTER LLP
425 Walnut Street, Suite 1800
Cincinnati, OH  45202-3957

Attorneys for Plaintiff
Antioch Litigation Trust

/s/ Jeffrey S. Sharkey
Jeffrey S. Sharkey

851228.3