UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| ANTIOCH LITIGATION TRUST, | : | Case No. 3:09-cv-218 |
| W. TIMOTHY MILLER, TRUSTEE, | : | |
| | : | |
| Plaintiff, | : | Judge Timothy S. Black |
| | : | |
| vs. | : | |
| | : | |
| MCDERMOTT WILL & EMERY LLP, | : | |
| | : | |
| Defendant. | : | |

## ORDER GRANTING DEFENDANT'S MOTION
## FOR PARTIAL SUMMARY JUDGMENT (Doc. 87)

This civil action is before the Court on Defendant McDermott Will & Emery LLP

("MWE")'s motion for summary judgment on the Condor Guaranty (Doc. 87), and the

parties' responsive memoranda (Docs. 105, 115).

## I.    BACKGROUND

The seventh claim relates to the Antioch Company's alleged failure to meet the

requirement under federal law that it provide "adequate security" for certain promissory

notes issued to ESOP participants.  Antioch engaged companies named Condor Insurance

(for three years) and Condor Guaranty (for one year) (collectively referred to as

"Condor") to secure those notes, but when a demand was made on Condor Guaranty, it

refused to pay on the grounds that the notice was insufficient.  MWE maintains that it is

entitled to summary judgment on Plaintiff's claim that MWE breached its duty by failing

to recommend that Condor's insolvency be disclosed to ESOP Noteholders or

participants in 2008.[1]

## II.    UNDISPUTED FACTS[2]

### A.    ESOP Participants Were Issued Promissory Notes For Which the Company Was Required by Law to Provide "Adequate" Security

1. Following the 2003 ESOP Transaction, employees who retired or terminated their employment with Antioch received twenty percent of the value of their shares and a promissory note payable over the following four years in twenty-percent installments ("ESOP notes").  (Case No. 3:10cv156, Doc. 82 at 208).

2. In the summer of 2004, the Company began issuing the ESOP notes to departing ESOP participants.  (Case No. 3:10cv156, Doc. 82 at 435-36).

3. The Company continued issuing ESOP Notes to departing ESOP participants in 2005, 2006, and 2007, ultimately issuing a total of four rounds of ESOP Notes from 2004 through 2007.  (Case No. 3:10cv156, Doc. 82 at 248-49; Doc. 105 at 106-10).

4. In accordance with ERISA and the Internal Revenue Code, Antioch was required to provide "adequate" security for the ESOP notes to ensure that the ESOP notes would be paid, in the event Antioch defaulted on its obligation to make payments on the ESOP notes.  (Case No. 3:10cv156, Doc. 105 at 112; Ex. 112 to Lipson-Wilson Dep.).

### B.    Condor Insurance Was Engaged by The Antioch Company As A Guaranty On the ESOP Notes

#### i.    *Antioch entered into a Guaranty Agreement with Condor Insurance*

---

[1] This Court previously ruled that Plaintiff's seventh claim for malpractice could go forward, but only as to a limited scope.  Specifically, this Court ruled that Plaintiff's claim of negligence as to Condor Guaranty failed as a matter of law "but for the discrete claim that MWE breached its duty by failing to recommend that the insolvency of [guarantor] Condor be disclosed to ESOP Noteholders or participants in 2008."  (Doc. 77 at 10).

[2] *See* Doc. 87-1 and 106.

5. Barry Hoskins, Antioch's CFO, engaged an insurance broker to seek out an insurance company to provide financial guarantees in the form of surety bonds for the ESOP Notes. (Case No. 3:10cv156, Doc. 82 at 255-58, Exs. 40-41).

6. Specifically, Barry Hoskins engaged an insurance broker, Acordia, to locate insurance companies willing to provide adequate security in the form of a surety bond on the ESOP Notes. (Case No. 3:10cv156, Doc. 82 at 331). Acordia was able to locate only one insurance company, Condor Insurance Limited, Inc., ("Condor Insurance") who was willing to provide adequate security for the ESOP notes. (*Id.* at 332, Ex. 49).

7. Hoskins ultimately engaged Condor Insurance to issue surety bonds to secure the ESOP Notes in 2004. (Case No. 3:10cv156, Doc. 82 at 248-49, 256). Although Condor Insurance was not rated by A.M. Best, it was the only surety willing to provide coverage for the ESOP Notes. (*Id.* at 336-39, Ex. 49).[3]

8. Dinsmore & Shohl was acting as Antioch's legal counsel in the summer of 2004. (Case No. 3:10cv156, Doc. 82 at 251). Hoskins asked Dinsmore & Shohl to review the financial guaranty agreement and proposed surety bond from Condor Insurance to make sure the surety bond would fit within Antioch's credit agreement with Bank One. (*Id.* at 253-54, Ex. 40).[4]

---

[3] Plaintiff admits that Hoskins engaged Condor Insurance to issue surety bonds to secure the ESOP Notes in 2004 and that it was his responsibility at that time as Chief Financial Officer of the Company. Plaintiff denies that there were no indications that Condor Insurance was experiencing financial difficulties or that it stood up to scrutiny as a legitimate surety bond provider. Plaintiff argues that the Company was required to acknowledge that Condor Insurance was not A.M. Best Rated. (Dep. Ex. 49). Condor Insurance's principal, Harvey Milam, and his wife, had a long history of judgments and tax liens entered against them in federal court and in the state of Mississippi, including a judgment for securities fraud from 1994 in the United State District Court of Utah. (Dep. Ex. 730). Condor Insurance did not require collateral from the Company, something Plaintiff claims that Hoskins and others celebrated, when it should have raised red flags about the trustworthiness of the off-shore surety. (Case No. 3:10cv156, Doc. 82 at 332-333).

[4] Plaintiff admits that Dinsmore was representing Antioch in the summer of 2004 with respect to amendments to the credit agreement with Bank One, and that Hoskins asked Dinsmore to look at the proposed guaranty agreement with Condor to see if it would violate the credit agreement. Plaintiff denies that Dinsmore was acting as Antioch's legal counsel in any broader sense or that Hoskins asked Dinsmore to review any other aspect of the Condor guaranty, including whether it constituted adequate security under ERISA. (Dep. Ex. 40; Case No. 3:10cv156, Doc. 82 at 254).

9. Condor Insurance issued a surety bond to secure up to $32,509,331.00 of Antioch's liability on the 2004 ESOP notes on August 20, 2004. (Case No. 3:10cv156, Doc. 82, Ex. 50).

10. Hoskins purchased a surety bond from Condor Insurance to secure the ESOP notes issued in 2005. (Case No. 3:10cv156, Doc. 82 at 249).

11. Condor Insurance issued a surety bond to secure the second round of ESOP Notes on September 30, 2005. (Case No. 3:10cv156, Doc. 82, Ex. 51).

12. After Hoskins resigned as Chief Financial Officer at the end of 2005, Karen Felix, the Company's new Chief Financial Officer, and Steve Bevelhymer, the Company's Treasurer, took over the responsibility of engaging an insurance company to issue surety bonds to secure the ESOP Notes in 2006 and 2007, and renewing the surety bonds issued to secure the ESOP Notes previously issued in 2004 and 2005. (Case No. 3:10cv156, Doc. 109 at 84-87; Doc. 105 at 106-10).

13. Felix tasked Steve Bevelhymer, Antioch's Treasurer, with obtaining surety bonds for the ESOP notes in 2006 and 2007, and renewing the surety bonds for the ESOP notes previously issued in 2004 and 2005. (Case No. 3:10cv156, Doc. 109 at 84-87; Doc. 105 at 107).

14. Bevelhymer purchased surety bonds from Condor Insurance to secure the ESOP notes issued by Antioch in 2006 and renewed the surety bonds for the ESOP notes issued in 2004 and 2005 with Condor Insurance. (Case No. 3:10cv156, Doc. 105 at 106-08, Ex. 713).

### ii. *Antioch later engaged Condor Guaranty, Inc. to secure the Notes*

15. Condor Guaranty, Inc., a different but related company, was incorporated on November 8, 2006. (Case No. 3:10cv156, Doc. 105 at 114, Ex. 108).

16. Bevelhymer signed the documents engaging Condor Guaranty, Inc. to provide surety bonds on the ESOP notes issued by Antioch in 2007 and to renew the surety bonds for the 2004, 2005, and 2006 ESOP notes with Condor Guaranty. (Case No. 3:10cv156, Doc. 105 at 109-10, Ex. 714).

17. Condor Guaranty assumed liability for the 2004, 2005, and 2006 ESOP notes. (Case No. 3:10cv156, Doc. 105 at 109-10).

4

18. Condor Guaranty issued a surety bond to secure the fourth round of ESOP notes on October 1, 2007.  (Case No. 3:10cv156, Doc. 105, Ex. 714).

19. Premium payments were due to Condor Guaranty annually in August with an additional payment in October.  (Case No. 3:10cv156, Doc. 109 at 90-91, Ex. 190).

20. As of November 2007, the next premium payment to Condor Guaranty was not due until August 2008.  (Case No. 3:10cv156, Doc. 109 at 111, Ex. 195).

### C.    The Financial Status and Non-Performance of the Condor Entities

21. In November 2007, Kimberlee Lipson-Wilson expressed concerns regarding the financial health of Condor Guaranty.  (Case No. 3:10cv156, Doc. 105, Ex. 108).

22. Antioch was aware of Condor's alleged financial difficulties by July 2007.  (Case No. 3:10cv156, Doc. 131 at 171-72, Ex. 731).

23. In a November 8, 2007 email to Kimberlee Lipson of Antioch, Marsha Matthews, an attorney with MWE, advised that the Board should be informed if Condor Guaranty were experiencing financial difficulties.  (Case No. 3:10cv156, Doc. 101 at 116, Ex. 108).

24. By February 1, 2008, the Board was made aware that Condor Insurance had filed bankruptcy and the ESOP notes were being secured by a different but related entity.  (Case No. 3:10cv156, Doc. 105 at 113, 120, Ex. 1990[sic]).

25. The Company requested that MWE investigate the situation to gather as much information as it could regarding the Condor entities.  (Case No. 3:10cv156, Doc. 109 at 96).[5]

26. This request was made approximately in February 2008.  (Case No. 3:10cv156, Doc. 109 at 96).

---

[5] Plaintiff admits that the Company finally requested that MWE conduct research into the status of the Condor entities in early February 2008.  (Dep. Ex. 728).  A simple internet search quickly revealed the insurer's serious financial issues and raised questions about Condor Guaranty's solvency.  (Dep. Ex. 112; Dep. Ex. 730).

27. MWE advised Antioch to find a different surety. On February 29, 2008, MWE provided a five-page memorandum to Antioch that included the following advice: "Based upon our interpretation of the authorities and assuming that certain allegations made against the surety company are accurate, we believe that a violation of the adequate security requirement is imminent and all efforts should be made to find replacement security." (Doc. 71-11).[6]

28. In August 2008, the Company sent a letter to ESOP noteholders informing them that the ESOP Notes were still secured by the surety bonds issued by Condor Guaranty and that the Company would be submitting a claim to Condor Guaranty for payment of the ESOP Notes. (Doc. 89 at 301).[7]

29. Antioch informed the ESOP noteholders that their August payment would not be made and the company would be submitting a claim to Condor Guaranty for payment of the ESOP notes. (Case No. 3:10cv156, Doc. 89 at 300-01, Ex. 311).

30. In August 2008, Antioch submitted a claim to Condor Guaranty for payment on the ESOP Notes in accordance with the terms of the surety bonds. (Case No. 3:10cv156, Doc. 89 at 302-03).

31. The Company submitted multiple claims to Condor Guaranty for payment of the ESOP Notes, and provided the information requested by Condor Guaranty to assess the claims, but Condor Guaranty did not make a payment to the ESOP Noteholders in accordance with its obligations to do so under the terms of the surety bonds. (Case No. 3:10cv156, Doc. 89 at 302-05).

---

[6] Plaintiff admits this statement, but denies the implication that the scope of MWE's duty to advise the Company on the Condor situation ended here.

[7] Plaintiff admits that in August 2008, Asha Morgan Moran sent out a letter to ESOP Noteholders stating that the ESOP Notes were still secured by the surety bonds issued by Condor Guaranty and that the Company would be submitting a claim to Condor Guaranty for payment of the ESOP Notes despite knowing that it was incredibly unlikely that Condor Guaranty was solvent and/or would make a payment on its claim. (Dep. Ex. 311). The letter did not inform the ESOP Noteholders of any of the information that the Company learned as to the insolvency of Condor Insurance, the claim by Condor Insurance against Condor Guaranty for fraudulent transfer of assets, or the multiple judgments for fraud and nonpayment against Condor's principal, Harvey Milam. (Dep. Ex. 311; Dep. Ex. 730).

32. However, Condor Guaranty, in contrast to Condor Insurance, was not in bankruptcy. There is no indication in the record that Condor Guaranty's failure to pay Antioch's claims "has anything to do with a financial inability to do so. (Case No. 3:10cv156, Doc. 294-2). Rather, Condor Guaranty asserts various alleged breaches by Antioch of its obligations under the Financial Guaranty Agreements, including inadequate or defective notice, failure to provide financial information, and other alleged defenses." (Case No. 3:10-cv-156, Doc. 301 at 15).[8]

33. The IRS never took any action against Antioch for engaging the Condor entities. (Case No. 3:10cv156, Doc. 88 at 272; Doc. 109 at 14-15).[9]

### D. The ESOP Trustee's Powers and Its Awareness of the Condor Situation

34. In contrast to the ESOP itself, the ESOP participants did not have the ability to elect the Board. The power to shares role [sic] of the ESOP was held by the ESOP trustee. Specifically, the Antioch ESOP Plan stated:

> Shares of Company Stock in the Trust shall be voted by the Trustee only in such manner as directed by the Committee. With respect to any corporate matter which involves the voting of such shares at a shareholder meeting and which constitutes a merger, consolidation, recapitalization, reclassification, liquidation, dissolution, sale of substantially all assets of a trade or business or a similar transaction specified in regulations under Section 409(e)(3) of the Code, however, each Participant (or Beneficiary) shall be entitled to give confidential instructions as to the voting of shares of Company Stock then allocated to his ESOP Account.

(Doc. 87-2 at ¶ 2, TAC-CC-0315491-TACCC-0315550).[10]

---

[8] Plaintiff admits that Condor proffered reasons other than its financial ability to pay in denying the Company's claims.

[9] Plaintiff admits that the IRS never took action against Antioch for failing to provide adequate security for the ESOP Notes.

[10] Plaintiff admits that the Jan. 1, 2007 Employee Stock Ownership Plan includes that provision.

Evolve Bank & Trust, Co. was retained by Antioch on January 16, 2008, to serve as an independent, discretionary ESOP Trustee. (Case No. 3:10cv156, Doc. 110 at 16, Ex. 738).

35. It was Evolve's duty to represent the interests of the ESOP. (Case No. 3:10cv156, Doc. 110 at 14-15). Evolve had the power to vote the approximate 85% of Antioch's shares that the ESOP held, and this control of the majority of the Company's stock gave it unchecked power to remove and appoint board members. (*Id.* at 25; Ex. 309 to Moran Dep. (June 5, 2008 Bd. Minutes) at TAC-CC-0400310-400311)).[11]

36. Evolve retained financial and legal advisors apart from Antioch. (Case No. 3:10cv156, Doc. 110 at 19, 225, Ex. 739).[12]

37. Evolve made its own decisions based upon its view of the best interests of ESOP participants and beneficiaries. (Case No. 3:10cv156, Doc. 110 at 15, 17; Doc. 204, ¶ 31).[13]

38. Kenneth Lenoir, the principal of Evolve, explained that it was Evolve's responsibility to act "for the exclusive benefit of the participant." (Case No. 3:10cv156, Doc. 110 at 14-15). Mr. Lenoir further explained that as a discretionary Trustee, Evolve would make decisions on an "independent basis." (*Id.* at 16-17).[14]

39. Evolve knew early on in its engagement that Condor was financially unsound. "But this is not the first bond surety that I have seen that has been offshore and has been a farce. So, we Googled Condor Guaranty and we found out that Condor Guaranty was basically a sham." (Case No. 3:10cv156, Doc. 110 at 98). Mr. Lenoir agreed that Evolve was aware of the issues related to Condor "fairly early on in [its] engagement." (*Id.* at 100-01).

---

[11] Plaintiff admits this statement, but denies the implication that the Board needed the vote of any shareholders to initiate a sale through bankruptcy. (Dep. Ex. 710).

[12] Plaintiff admits that Evolve retained financial and legal advisors apart from the Company; however they were not "their own" in that the same advisors had represented Reliance as ESOP Trustee.

[13] Plaintiff admits that he so testified.

[14] Plaintiff admits that he so testified.

### E. MWE's Involvement With Antioch Ended on June 5, 2008

40. On June 5, 2008, Evolve terminated Antioch's Board of Directors to prevent a sale of the company to J.H. Whitney and ultimately a 363 bankruptcy sale. (Case No. 3:10cv156, Doc. 110 at 57-59; Doc. 88 at 268-69).[15]

41. MWE's representation of Antioch "was summarily terminated on June 5, 2008." (Case No. 3:09-cv-218, Doc. 61-1 at 1420).

42. On or about June 5, 2008, Antioch's reconstituted Board of Directors engaged Timothy Pohl of the Skadden, Arps, Slate, Meagher & Flom, LLP law firm to replace McDermott Will & Emery as Antioch's counsel. (Case No. 3:10cv156, Doc. 110 at 175-15-176, Ex. 746; Doc. 204 at ¶ 50).

### F. The Trustee Cannot Pursue Claims on Behalf of the ESOP Participants or Noteholders

43. The Trust can assert only those claims assigned to it by the bankruptcy estate of The Antioch Company. The Trust may pursue claims that are "Trust Assets." (Case No. 3:10cv156, Doc. 103 at 310-11, Ex. 22).[16]

44. The Trust Assets comprise the "Litigation Claims." (Case No. 3:10cv156, Doc. 103, Ex. 22 at 1).[17]

45. The "Litigation Claims" were transferred only from the Antioch Company and its affiliates, which were petitioners in the Antioch bankruptcy, and not any other entities or individuals. As part of Antioch's plan of reorganization, in accordance with 11 U.S.C.§ 1123(b)(3), Antioch's bankruptcy estate succeeded to and retained certain identified "Litigation Claims." (January 27, 2009 Findings of Fact, Conclusions of Law, and Order Under 11 U.S.C. §§ 1126 and 1129(a) and (b) and Fed. R. Bankr. P. 3020 (I) Approving the Prepetition Solicitation Procedures, (II)

---

[15] Plaintiff admits this statement, but denies that Evolve acted alone.

[16] Plaintiff admits that it may pursue the Litigation Claims assigned to it by the Debtor. Plaintiff claims that it could also pursue claims of the beneficiaries of the Trust if those trust beneficiaries chose to assign such claims. (Trust Agreement, Article 4.1(b) (Dep. Ex. 22)).

[17] Plaintiff admits that Trust Assets include Litigation Claims, but The Trust Agreement also identifies Litigation Trust Funding, Privilege Rights, and Expense Advance as "Trust Assets." (Dep. Ex 22).

Approving the Adequacy of the Disclosure Statement and (III) Confirming the Second Amended Joint Prepackaged Plan of Reorganization of the Antioch Company and Its Affiliate Debtors (Related Docket No. 25), In re The Antioch Company, Case Nos. 08-35741 through 08-35747, United States Bankruptcy Court for the Southern District of Ohio ("Bankruptcy Order"), ¶ M, p. 11; ¶ 30, p. 37; Bankruptcy Order, Exhibit A, Second Amended Joint Prepackaged Plan of Reorganization of The Antioch Company and its Affiliate Debtors ("Plan of Reorganization"), ¶ 5.13(a), pp. 29-30; ¶ 10.5, p. 37). The Bankruptcy Order provided that "the Debtors, their Estates, or the Reorganized Debtors shall cause the Litigation Claims to be contributed, transferred, and assigned to the Litigation Trust." Bankruptcy Order, ¶ M, p. 11. *Accord*: Bankruptcy Order, ¶ 30, p. 37; Plan of Reorganization, ¶ 5.13(a), pp. 29-30; ¶ 10.5 at 37-38.

46. The "Litigation Claims" are defined as "all claims, rights of action, suits or proceedings by any Debtor or Estate, whether in law or in equity, whether known or unknown, that any Debtor or Estate may hold against any person, including all Avoidance Actions that are not Authorized Creditor Payment Avoidance Actions, but excluding (i) all claims, rights of action, suits or proceedings that are affirmatively released by the Debtors pursuant to this Plan and (ii) all Business Litigation Claims." (Plan of Reorganization, ¶ 1.75 at 14).

### III.  STANDARD OF REVIEW

A motion for summary judgment should be granted if the evidence submitted to the Court demonstrates that there is no genuine issue as to any material fact, and that the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). The moving party has the burden of showing the absence of genuine disputes over facts which, under the substantive law governing the issue, might affect the outcome of the action. *Celotex*, 477 U.S. at 323. All facts and inferences must be construed in a light most favorable to the party opposing the motion. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986).

A party opposing a motion for summary judgment "may not rest upon the mere allegations or denials of his pleading, but . . . must set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 248 (1986).

## IV.  ANALYSIS

MWE argues that the Court recently granted summary judgment to Steven Bevelhymer in the Bankruptcy Case on the ground that he left Antioch in May 2008, and Antioch did not submit a claim to Condor Guaranty until August 2008.  (Case No. 3:10cv156, Doc. 301 at 14-16).  The Court explained that Condor was not in bankruptcy; there is no evidence that any refusal to pay the claim was a result of Condor's financial inability to pay; and the reason cited by Condor for failing to pay related to defective notice and other defenses.  (*Id*. at 15).  The same reasoning applies to MWE, since its representation of the Company was terminated in June 2008.  The analysis is the same and the Court has no reason to make a different finding.

## V.  CONCLUSION

Accordingly, for these reasons, Defendant's motion for partial summary judgment on the Condor Guaranty (Doc. 87) is **GRANTED**.

**IT IS SO ORDERED**.

Date:  8/25/16                                          *s/ Timothy S. Black*
                                                     Timothy S. Black
                                                     United States District Judge